UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRUCE JACKSON                          CIVIL ACTION

   V.                                  NO. 1:05-cv-11429 RWZ

LINDSAY NORMAN, Individually and in his former capacity as President of Massachusetts Bay Community College; PAULA GASTENVELD, Individually and in her former capacity as Vice-President of Massachusetts Bay Community College; GHAZI DARKAZALLI, Individually and in his capacity as Dean at Massachusetts Bay Community College; THOMAS SABBAGH, Individually and in his former capacity as Associate Dean at Massachusetts Bay Community College; LAURIE TAYLOR, Individually and in her capacity as Vice-President of Massachusetts Bay Community College

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

FACTS; STATUS OF THE CASE

The facts and the status of the case are as given in the complaint, with the one exception that the arbitrator's award (Defendant's exhibit 2, hereinafter *AA*), September 12, 2005, had not yet been made. The award included the findings that (1) "The College did not have just cause to dismiss the Grievant, Dr. Bruce Jackson"; and (2) "The President's decision to dismiss Dr. Jackson was arbitrary and unreasonable based on clear and convincing evidence."

OVERVIEW

Examination of Defendant's arguments in the motion to dismiss shows that, by and large, these arguments reprise those of the trial judge's memorandum of September 24, 2002 in the earlier case (Defendant's *Memorandum*, Exhibit 3), with the exception of an added argument for sovereign immunity. It is somewhat puzzling, however, why this memorandum is included here. That order was vacated by the Court of Appeals, and ordered that it be replaced with dismissal

1

without prejudice, so that it could be re-activated if the result of the then on-going arbitration was felt to be incompletely remedial – the Court of Appeals clearly did not find the arguments sufficiently persuasive to simply affirm the judgment.

In the following I discuss first some threshold questions, then what is needed for due process issues, then the specific issue of the constitutional need for an impartial arbiter at all stages of the process, and some additional sources of due process violations. Finally, cases cited by Defendants in support of their motion to dismiss will be discussed. Defendant's arguments deal almost entirely with procedural due process, and only incidentally with substantive due process, the larger part of Plaintiff's complaint.

<u>THRESHOLD CONSIDERATIONS</u>

<u>STANDARD FOR MOTION TO DISMISS</u>.   A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Scheuer v. Rhodes*, 416 U.S. 232, 236; 94 S. Ct. 1683; 40 L. Ed. 2d 90 (1974).

<u>ELEMENTS OF A §1983 ACTION.</u>  The two essential elements of a § 1983 action are: "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527; 101 S. Ct. 1908; 68 L. Ed. 2d 420 (1981). State employees act under color of state law when the conduct occurs in the course of performing an actual or apparent duty of his office.

<u>INTERACTION  BETWEEN  CBA  CLAIMS  AND  STATUTORY  CLAIMS.</u>   Basically Defendant's arguments reduce to the proposition that Jackson's rights are completely defined by,

and circumscribed by, the CBA. But the claims in a Collective Bargaining Agreement and those resulting from statute are distinct (*O'Brien v. Town of Agawam*, 350 F.3d 279 (1ˢᵗ Cir. 2003)):

> [at 285] Rights conferred by Congress are conceptually distinct from those created by private agreement, … . "The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence." *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 50, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974) (involving rights under Title VII); see *Gilmer v. Interstate/Johnson Lane Corp*., 500 U.S. 20, 34-35, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991) (reiterating that statutory rights are independent of rights created under CBAs); *Morales-Vallellanes v. Potter*, 339 F.3d 9, 17 (1st Cir. 2003) (remedies under Title VII and CBAs are independent.

Thus, the arbitrator's award in favor of Dr. Jackson does not automatically end the matter, the rights infringed upon being different. Also, in a discrimination case, a Third Circuit court has noted (*Tice v. Central Area Transportation Authority et al*., 247 F.3d 506 (3ʳᵈ Cir. 2001):

> [at 519, n.11] *In Alexander v. Gardner-Denver Co*., 415 U.S. 36, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974), the Supreme Court explained that employees could pursue discrimination claims against their employers both through union grievance procedures and in federal court. In so holding, the Court observed that such a system would not grant "windfall" double-recoveries to plaintiffs, in part because if the union procedures fully remedy the violation, there will be "no further relief for the court to grant." *Id*. at n.14. … [and] *Alexander* [also] establishes that the disposition of a union grievance is relevant to the inquiry as to whether an employee has suffered any remediable injury as a result of the alleged civil rights violations.

RES JUDICATA EFFECTS OF ARBITRATION FINDINGS. Claims and issues which have been litigated in an arbitration in which witnesses have been sworn, and in which there has been opportunity for cross examination, as in the present case, can have res judicata effects in other litigation settings (*Blanchette v. School Committee of Westwood,* 427 Mass. 176; 692 N.E.2d 21 (1998), at 180, n.3.):

> The judicial doctrines concerning the preclusive effect of a prior adjudication are encompassed under the generic term of "res judicata" and consist of claim preclusion and issue preclusion. … . Claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action. … Issue preclusion prevents the relitigation of issues actually adjudicated, and essential to the judgment, in a prior action between the same parties or their privies.  [citations omitted]

Similarly, *Miles v. Aetna Casualty and Surety Company*, 412 Mass. 424; 589 N.E.2d 314 (1992), at 427:

> When arbitration affords opportunity for presentation of evidence and argument substantially similar in form and scope to judicial proceedings, the award should have the same effect on issues necessarily determined as a judgment has." …  An arbitration decision can have preclusive effect in a subsequent suit between the same parties or their privies.  [citations omitted]

DUE PROCESS CONSIDERATIONS

 THE PRESENCE OF MINIMAL PROCEDURAL DUE PROCESS RIGHTS DOES NOT OBVIATE THE NECESSITY OF PRESERVING OTHER CONSTITUTIONAL RIGHTS, SUCH AS THE REQUIREMENT OF AN IMPARTIAL ARBITER AT EVERY STAGE OF A PROCESS LEADING TO DISMISSAL.

Certain distinctions must be observed in considering due process claims: (1) whether the alleged violation is procedural or substantive; (2) if procedural, can a pre-termination violation always be cured by post-termination procedures, and if not, what characterizes a curable violation?  In the instant case we argue that Supreme Court cases have clearly and unequivocally stated that the mandate of an impartial arbiter at every stage of the process, as well as other violations of substantive constitutional rights, are substantive in nature.

DISTINGUISHING PROCEDURAL AND SUBSTANTIVE DUE PROCESS.

Distinctions between substantive and procedural due process are important (*United States v. Salerno et al.,* 481 U.S. 739; 107 S. Ct. 2095; 95 L. Ed. 2d 697 (1987), at 746):

> The Due Process Clause of the Fifth Amendment provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." This Court has held that the Due Process Clause protects individuals against two types of government action. So-called "substantive due process" prevents the government from engaging in conduct that "shocks the conscience," … or interferes with rights "implicit in the concept of ordered liberty." … When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair

4

manner. … This requirement has traditionally been referred to as "procedural" due process. [citations omitted]

Also, though speaking of First Amendment rights applicable to any constitutional right *Narumanchi v. Board of Trustees of the Connecticut State University, et al.,* 850 F.2d 70 (2nd Cir. 1988), at 73:

> First Amendment rights, in contrast to those rights protected by the procedural component of the Due Process Clause, are substantive in nature. As such, they may not be infringed regardless of the procedural "protection" accompanying the deprivation. "It is no defense to a claim of infringement of the liberties protected by the First Amendment that the procedure was fair, but it is a defense to a claim of deprivation of property, since such a deprivation is permitted by the due process clause provided there is no denial of due process." … Nor is it permissible, in light of *Patsy v. Board of Regents*, [457 U.S. 496 (1982)] to require initial recourse to available state proceedings, including union grievance proceedings, for the enforcement of First Amendment rights protectable in federal court pursuant to section 1983.

*Zinermon v. Burch*, 494 U.S. 113; 110 S. Ct. 975; 108 L. Ed. 2d 100 (1990), notes these distinctions. *Zinermon*, 490 U.S., at 125, cites three classes of §1983 cases, the first two being: (1) those involving the specific protections included in the Bill of Rights, such as, e.g., freedom of speech; (2) "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.' … As to these two types of claims, the constitutional violation actionable under § 1983 is complete when the wrongful action is taken. *Id*., at 338 (Stevens, J., concurring in judgments)." Under *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), §1983 may be invoked regardless of any state remedy available to compensate an individual for the deprivation of these rights. *Id*. The third type of protection available under the clause involves a guarantee of fair procedure, that is, procedural due process.

In the present case impartiality is constitutionally mandated at every stage of a proceeding, see below. Defendants cite *Feliciano-Angulo v. Rivera-Cruz*, 858 F.2d 40, 43 (1st Cir. 1988) for the proposition that a hearing can be held before the employer. We do not argue

this proposition, only that if the employer is not impartial, then there is a due process violation.

Defendants do not, however, consider nor discuss the clear and unambiguous statements, cited by the Arbitrator (see below), which evidence actual bias by Norman.

The same result, only more strongly, would derive from the Massachusetts Constitution, Article 29 of the Declaration of Rights. Under this rule, "it is the right of every citizen to be tried by judges 'as free, impartial and independent as the lot of humanity will admit,' and this mandate is rigidly enforced." *Beauregard v. Dailey*, 294 Mass. 315; 1 N.E.2d 481 (1936). The rule "is not limited to judges but extends broadly to all persons authorized to decide the rights of litigants." *Id*.

## NOT ALL INADEQUATE PRE-TERMINATION HEARINGS CAN BE CURED BY POST-TERMINATION HEARINGS.

In *Zinermon, supra*, at 127-128, the Court, after noting the series of cases stating that minimal due process requires only notice and opportunity for a hearing, then states "*[in] some circumstances*, however, the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." [emphasis added]. The implication is clear: a curative post-deprivation procedure is to be limited to only some few categories of inadequate pre-termination procedures. The Court then cites several examples – circumstances of the present case do not fit in any of these categories. Thus no justification for acceptance of an inadequate pre-termination hearing exists in this case.

## JACKSON DID NOT RECEIVE ADEQUATE PROCEDURAL DUE PROCESS

In any event, Jackson did not receive adequate due process because he did not receive notice that his actions could result in his dismissal (AA, at 40). *Cotnoir*, *Cotnoir v. University of Maine Systems and George Connick, et al.*, 35 F.3d 6 (1st Cir. 1994), is instructive in this respect,

with several pertinent similarities to the present case. Cotnoir was a tenured professor at the

University of Maine, Augusta, accused of misconduct. He was interviewed on these at different

stages by several of the University staff, all recommending dismissal, but was never specifically

told that the result of these investigations could result in his dismissal. Eventually Cotnoir

brought an action under 42 U.S.C. §1983 alleging denial of procedural due process. Defendants

then moved for summary judgment on the basis of qualified immunity, which the District Court

denied. The Appellate Court noted (at 10):

> Qualified immunity shields government officials performing discretionary
> functions from civil damages "insofar as their conduct does not violate clearly
> established statutory or constitutional rights of which a reasonable person
> would have known." [citations omitted]

 Further (*Id.*, at 10):

> The basic purport of the constitutional requirement is that, before a significant
> deprivation of liberty or property takes place at the state's hands, the affected individual
> must be forewarned and afforded an opportunity to be heard "at a meaningful time and in
> a meaningful manner."

The Court, (*Id.*, at 11), concluded that Cotnoir had not received meaningful notice that his

alleged misconduct could result in dismissal. Furthermore (*Id.*, at 12):

> Where an employee is fired in violation of his due process rights, the availability of post-
> termination grievance procedures will not ordinarily cure the violation. … Thus, even
> where a discharged employee receives a post-termination hearing to review adverse
> personnel action, the pretermination hearing still needs to be extensive enough to guard
> against mistaken decisions, and accordingly, the employee is entitled to notice, an
> explanation of the employer's evidence, and an opportunity to present his side of the
> story. … If an employee is fired without these pre-termination protections, normally the
> constitutional deprivation is then complete.  [citations omitted]

Finally, since it was not reasonable for the defendants to believe that their actions satisfied

minimum due process requirements, the denial of qualified immunity was justified.

   The importance of this case for the present case is the finding of the arbitrator (*AA*, at 40)

that "it cannot be said that the College had put Dr. Jackson on notice that his teaching methods

… was [*sic*] inappropriate and, if continued, could result in discipline, including dismissal." Arguably, as noted earlier, this finding could have *res judicata* status, at least when the award becomes final.

REQUIREMENT OF IMPARTIALITY

AN IMPARTIAL ARBITER IS REQUIRED AT EVERY STEP OF THE PROCESS.

A judgment must conform to constitutional imperatives. Here that consists of the requirement of an impartial hearing, even at the earliest stages of proceedings. A long line of Supreme Court cases demonstrates clearly and unambiguously that the requirement of an impartial arbiter in providing for a fair trial is a basic constitutional right. Defendant's thesis is, primarily, that minimal due process, that is, notice and an opportunity to be heard, is the only due process required. The Court has never said that minimal due process is sufficient – while it is necessary in the procedural phase, it is not sufficient for substantive due process. See *Salerno, supra*.

A judgment must conform to constitutional imperatives. Here that consists at least of the requirement of an impartial hearing, even at the earliest stages of proceedings.

IMPARTIALITY IS CONSTITUTIONALLY REQUIRED.

The most recent U.S. Supreme Court case in which impartiality is discussed as a constitutional requirement, though the case was decided on a First Amendment basis, is *Republican Party v. White*, 536 U.S.765; 122 S. Ct. 2528; 153 L. Ed. 2d 694 (2002). The Court stated (122 S.Ct. at 2535):

> One meaning of 'impartiality' in the judicial context -- and of course its root meaning -- is the lack of bias for or against either party to the proceeding. Impartiality in this sense assures equal application of the law. That is, it guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party. This is the traditional sense in which the term is used. ... It is also the sense in which it is

used in the cases cited by respondents and amici for the proposition that an impartial judge is essential to due process.

Further: impartiality "ensures that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Id.* at 2555 (Ginsburg, dissenting).

IMPARTIALITY MUST BE PRESENT AT ALL STAGES OF A PROCEEDING.

The United States Supreme Court has clearly and unequivocally stated, in several cases, that impartiality, constitutionally, must be maintained at every stage in a proceeding (*Ward v. Village of Monroeville,* 409 U.S. 57, 61; 93 S. Ct. 80; 34 L. Ed. 2d 267 (1972)):

> Respondent also argues that any unfairness at the trial level can be corrected on appeal and trial de novo in the County Court of Common Pleas. We disagree. ... Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance.

Similarly (*Marshall v. Jerrico*, 446 U.S. 238, 248; 100 S. Ct. 1610; 64 L. Ed. 2d 182 (1980)):

> Appellee correctly points out that in *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), we held that the availability of a trial de novo before an unbiased judge did not remove the constitutional infirmity in an original trial before one whose impartiality was impaired. A litigant, we said, "is entitled to a neutral and detached judge in the first instance."

And, for a case where an administrative agency was involved, *Northern Pipeline Construction Co. v. Marathon Pipe Line Co. et al.*, 458 U.S. 50; 102 S. Ct. 2858; 73 L. Ed. 2d 598 (1982):

> Our precedents make it clear that the constitutional requirements for the exercise of the judicial power must be met at all stages of adjudication, and not only on appeal, where the court is restricted to considerations of law, as well as the nature of the case as it has been shaped at the trial level.

In the present case, then, impartiality was required at the initial stages of the proceeding, that where a hearing on the charges was presided over by Norman, who was also the decisionmaker in the case. If Norman was not impartial, then the proceeding was invalid and void.

PREJUDGMENT.

Implicit in *Republican Party v. White*, 536 U.S.765; 122 S. Ct. 2528; 153 L. Ed. 2d 694 (2002) is the teaching that while a judge may have predispositions and opinions on general questions involving legal issues, it is nevertheless impermissible for him to not recuse himself in cases which contain elements of some personal involvement or prejudgment of the matter in hand.

Personal involvement may come in the form of the decisionmaker having been or being involved in law suits with the one he sits in judgment on.  See, e.g., *Johnson v. Mississippi*, 403 U.S. 212, 215; 91 S. Ct. 1778; 29 L. Ed. 2d 423 (1971), at 215. Personal animosity is another indicator of a lack of impartiality. In *Offutt v. United States*, 348 U.S. 11; 75 S. Ct. 11; 99 L. Ed. 11 (1954), the Court reversed and  remanded since the personal animosity precluded an impartial hearing.

In the present case Norman was a defendant in two suits brought by Jackson. The contentious relationship between Jackson and both Norman and Darkazalli was remarked on by the Arbitrator (*AA*, at 41).

Most importantly in this regard, however, are the statements by Norman prior to the hearing. The Arbitrator noted (*AA*, at 42) that "his correspondence with Chancellor Gill suggests that he had made up his mind about Dr. Jackson's guilt at least two month [*sic*] before he conducted the August 5-8 [*sic*] hearing and issued his August 8 decision." Additional evidence is available to support this conclusion, and will be presented if the motion to dismiss is denied..

The College (*Memorandum*, at 10) relies on *Withrow v. Larkin*, 421 U.S. 35 (1975) for the proposition that a decisionmaker involved in both investigative and adjudication functions may not be presumed unconstitutionally biased, or if he has taken a public position on the issues, citing *Hortonville School District No. 1 v. Hortonville Education Association*, 426 U.S. 482 (1976). Assuming the correctness of both propositions, they are not necessarily relevant in the present instance. There is a distinct and distinguishable difference between investigation, adjudication, or taking a public position on issues, and a specific, clear and unequivocal statement, prior to a hearing, that the individual, who is both hearing officer and decisionmaker, has already decided to dismiss the charged individual.

NORMAN, AS DECISIONMAKER, CAN BE SHOWN TO HAVE PREJUDGED THE RESULT, AND WAS NOT IMPARTIAL

In a letter of June 14, 2002 Norman informed Jackson that he was to be recommended for dismissal (*AA*, at 25). In a letter of June 28, 2002, Norman states: "I am

notifying you that I am recommending you for dismissal." (*AA*, at 26). There is no tentativeness here, the decision is quite definite. There is thus no way in which Norman can be considered the impartial decisionmaker to whom Jackson is constitutionally entitled. Also, as another indicator, Norman's letter dismissing Jackson was sent a fraction of a work day after the 5:40 p.m. conclusion of the hearing the day before, without even waiting for the transcript to be available, and without benefit of any personal notes (*AA*, at 42-43). It is an easy inference that such speed in the absence of a transcript was only possible because Norman had already pre-judged the matter.

The Arbitrator, in her opinion, (AA, at 40) stated that in view of his length of service at the College and his tenured status, that a lengthy series of progressive disciplinary steps should have been taken, but instead, he was "put on notice in March that there had been student complaints and by May 23, Vice President Gastenveld and Dean Darkazallli were recommending his dismissal based on the testimony of a relatively small cohort of students."   Further, after noting a contentious relationship between Jackson and both Darkazalli and Norman, the Arbitrator states (*AA*, at 41-42):

> "This backdrop of strained relationships with the administration suggests at least the possibility that the administration viewed the student complaints as an opportunity to rid the College of a troublesome professor. Whether that was the case or not, the record suggests that  President Norman, Vice President Gastenveld and Dean Darkazalli, acted unusually swiftly in moving the College's investigation along. More importantly, the focus of the investigation seemed to be one of building a case for dismissal, rather than of ascertaining whether there was a problem, and, if so, developing a plan to remedy it."

Furthermore, she found that President Norman did not bring an open mind to the hearing process (*AA*, at 42).

Ignoring these evidences of bias would emasculate the requirement of impartiality to the extent of making it meaningless.

RELATED CASES

Other First Circuit cases recognize the need for an impartial arbiter. *Brasslett v. Cota*, 761 F.2d 827 (1st Cir. 1985) explicitly states the need for an impartial arbitrator: "An impartial adjudicator is elemental to due process under the Fourteenth Amendment." *Id.*, at 837.  In *Acosta-Sepulveda v. Hernandez-Purcell*, 889 F.2d 9 (1st Cir. 1989), *Pathak v. Department of Veteran's Affairs*, 274 F.3d 28 (1st Cir. 2001) and  *Cronin v. Town of Amesbury*, 81 F.3d 257 (1st Cir. 1996), no disciplinary action was taken until after an impartial review body had held hearings.

*Brasslett*, *supra*, at 847, also illustrates the proposition that violation of a constitutional right, here Brasslett's right to free speech, overrides an acceptable procedural due process. Despite the fact that Brasslett was found to have had the notice and opportunity to present his case, that is, procedural due process was adequate, the court found for him on the basis that his First Amendment right to free speech had been violated.

SOVEREIGN AND QUALIFIED IMMUNITY

THE COLLEGE IS NOT AN ARM OF THE STATE, AND THE DEFENDANTS ARE THEREFORE NOT ENTITLED TO IMMUNITY OF ANY KIND.

Defendants (Memorandum, at 8-10) claim that actions against them in their official capacities are barred under the Eleventh Amendment. Defendants are, however, not entitled, as a matter of law, to immunity of any kind in a §1983 action. The area of immunity of state employees to suit has been slowly evolving over the past few years. Briefly, the argument goes that States can only be sued with their consent, and that State officials, as an integral part of the State, are also immune. Agencies created by the State's

legislature, however, may or may not be "arms of the state" for the purpose of immunity. The leading cases on this question in the First Circuit are *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Authority*,  991 F.2d 935 (1st Cir. 1993), and the update in *Fresenius Medical Care Cardiovascular Resources, inc., v. Puerto Rico and the Caribbean Cardiovascular Center Corp*., 322 F.3d 56 (1st Cir. 2003).  The question of whether an entity is an arm of the state and therefore entitled to share its immunity is a question of federal law. *Fresenius, supra*, at 61. Whether an agency of the state shares its sovereignty can have serious consequences, *Id*., at 63-64 **:**

> Thus, where an entity claims to share a state's sovereignty and the state has not clearly demarcated the entity as sharing its sovereignty, there is great reason for caution. It would be every bit as much an affront to the state's dignity and fiscal interests were a federal  court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty. The consequences of an arm- of-the-state finding are considerable. For example, where a state consents to suit in its own courts, such an arm-of-the-state finding may pose a threat to the state treasury, even if the state has not structured the entity so as to put its treasury at risk. In an era when many states face budget crises and impose cutbacks on recognized state agencies, yet another claimant on the treasury may not be welcomed.

"Not all entities created by states are meant to share state sovereignty." *Id.*  A detailed, full analysis can be extremely lengthy.  From *Fresenius*, at 68, we may ask first: "Has the state clearly structured the entity to share its sovereignty?" Examination of the enabling legislation (G.L. ch. 15A) shows that the Community Colleges are under the control of the Board of Higher Education, they are basically autonomous, each with their own Board of Trustees, they prepare their own budgets, etc., so that they do not share the state's sovereignty.  Secondly, *Fresenius, supra*, at 68 :

> If the factors assessed in analyzing the structure point in different

> directions, then the dispositive question concerns the risk that the damages
> will be paid from the public treasury. This is the rule of Metcalf & Eddy, valid
> today as well. This analysis focuses on whether the state has legally or
> practically obligated itself to pay the entity's indebtedness.
>
> The control asserted by the state is an important guide to the initial inquiry.
> But where the evidence is that the state did not structure the entity to put the
> state treasury at risk of paying the judgment, then the fact that the state
> appoints the majority of the governing board of the agency does not itself lead
> to the conclusion that the entity is an arm of the state.

The answer to the question of immunity in the present case is no. The College's budget goes through a process eventuating in legislative approval – the state has neither legally nor practically obligated itself to pay the College's indebtedness. These considerations lead to the conclusion that neither the College, its officials, nor its employees have any claim to a share in the state's sovereign immunity. In an earlier First Circuit decision, *University of Rhode Island,  v. A. W. Chesterton Company,*   2 F.3d 1200 (1st Cir. 1993), with many similarities to the present case, the University,  a part of the Rhode Island Board of Education,   was found not entitled to share in the state's sovereign immunity.

Other factors also lead to the same or similar conclusions. Even if the defendants were entitled as officials of the College to immunity, they would still be individually liable. The Board of Higher Education can sue and be sued (see e.g., *Board of Higher Education v. Mass. Teachers Association,* 62 Mass. App. Ct. 42 (2004); *Massachusetts Board of Higher Education/Massachusetts Bay Community College v. Massachusetts Teachers Association/Massachusetts Community College Council*, Suffolk Superior Court, Civil Action No. 05-0696-H). The Board, as a party to the Collective Bargaining Agreement, including a contractual obligation that dismissal will be for just cause according to due process, has waived any immunity (compare, on government as party to a contract, *Franconia Associates, et al., petitioners v. United States*, 536 U.S. 129; 122 S.

Ct. 1993; 153 L. Ed. 2d 132 (2002)); a public official cannot claim qualified immunity if he directly participated in violating a right of the plaintiff which is clearly established, see, among, many such cases, *Linda M. Pereira vs. Commissioner of Social Services & another,* 432 Mass. 251; 733 N.E.2d 112 (2000); defendants, having entered the judgment of the earlier case have established continuity, and, inasmuch as in the earlier case, they argued the case on the merits, and were given notice in plaintiff's memorandum of the issue of sovereign immunity, the law of the case is that they have waived their immunity.

Summarizing again: taking account of all the considerations above, Defendants can make no claim whatsoever to a share in the state's sovereign immunity.


## AVAILABILITY OF UNUSED ADMINISTRATIVE PROCESS

Under this caption Defendants argue that plaintiffs cannot argue violation of due process rights when they have not attempted to use available state procedures. This appears to be a new formulation arguing for exhaustion of state procedures. In support of this proposition they cite *Blevens v. Town of Bow, N.H.,* 53 F.3rd 327 (1st Cir. 1995). This citation is to a summary affirmance providing no details whatsoever. For guidance we may refer to the lower court opinion, *Blevens v. Town of Bow, N.H.*, 887 F. Supp. 38 (D.N.H. 1994), not cited by Defendants. This provides the information that the case concerns a property line and zoning dispute between the owner and the town. The court notes that the First Circuit "has repeatedly said that federal courts do not sit as a super zoning board or a zoning board of appeals," and that where "the state offers a panoply of administrative and judicial remedies, litigants may not ordinarily obtain federal court

review of local zoning and planning disputes by means of 42 U.S.C. §1983." As a property dispute which properly belongs in state court the case is irrelevant to the present situation, and provides no assistance in determining the merits of the present case.

The citation to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) merely states the requirement for minimal due process, but, as noted earlier, this is not the same as saying that minimal due process is all that is required. It is a necessary, but not a sufficient, condition.

<u>DISCUSSION OF CASES CITED BY DEFENDANTS</u>

Defendants cite Licari v. Ferruzzi, 22 F.3d 344, 347 (1st Cir. 1994) for the proposition that there is no violation of procedural due process where adequate post-deprivation remedies are available (Memorandum, at 7). Licari is a case in which a developer was frustrated with questions of building permits. In this specific realty case the procedures were found adequate, but procedural due process is not the primary issue when a constitutional right is violated.

Defendant (*Memorandum*, at 7) relies on *Acosta-Sepulveda v. Hernandez-Purcell*, 889 F.2d 9 (1st Cir. 1989) for the proposition that an impartial decisionmaker is not required at a pre-termination hearing. Acosta, in fact, provides an example of the opposite proposition. There the defendant had initially notified Acosta of his decision and the reasons for it. Pre-termination hearings were then held before a presumably impartial staff attorney. It was only several weeks later, after the staff attorney had issued a nineteen page report and recommendations that the defendant terminated Acosta. *Id.,* at 12. The statement that a hearing before an impartial decisionmaker is not required is in the nature of dictum, no citations are given supporting this proposition, which runs

17

counter to a long line of Supreme Court cases (see discussion above), and appears to be simply a reaction to a statement in the trial judge's opinion, *Acosta-Sepulveda v. Hernandez-Purcell,* 679 F. Supp. 151, 158 (D.Puerto Rico 1988), which couples the right to an impartial decisionmaker with procedural due process, attributing this to *Cleveland Board of Education v. Loudermill et al.,* 470 U.S. 532; 105 S. Ct. 1487; 84 L. Ed. 2d 494 (1985), where the substantive right to an impartial decisionmaker does not in fact appear. *Loudermill,* however, does define the minimal elements of procedural due process as notice and an opportunity for a hearing. Defining the minimal elements of a process should not escalate into defining these elements as the only required elements.

Defendants (*Memorandum,* at 7) cite *Newman v. Burgin,* 930 F.2d 955, 961 (1st Cir. 1991) for the proposition that the due process clause "does not require every procedural protection that may help; it simply requires that a private person have a basically fair opportunity to convince the decision-maker, by presenting proofs and arguments and replies to the arguments of others." The Court then cites examples of unnecessary protection such as the need for a grand jury. But *Newman* actually supports Plaintiff's position on the importance of the absence of bias. *Newman,* at 960, gives the following description of the process:

> Our brief description of that process shows that, at each stage of the proceedings, the University afforded Professor Newman an opportunity to present her side of the story, it permitted her to challenge decision makers for bias, it permitted her to call witnesses, it permitted her to see, and to criticize, the evidence against her, and it permitted her to see all tentative recommendations, and to argue against them, before they became final. In short, it provided Professor Newman with an impressive array of due process safeguards -- notice of proposed action, a trial-type hearing in which she was given an opportunity to present proofs and arguments and to challenge the proofs and arguments of others, *all before neutral decision makers*, who prepared written findings of fact and reasons for their decision. [emphasis added]

18

Note that at every stage, among other protections, she was permitted to challenge decision makers for bias, and that at every stage the decision makers were neutral.

RULE OF NECESSITY

THE RULE OF NECESSITY MAY REQUIRE NORMAN TO PRESIDE AT A HEARING, BUT DOES NOT REQUIRE HIM TO MAKE A DECISION OR TO BE TEMPORARILY REPLACED, OR SOME SUCH ALTERNATIVE.

The CBA calls for the President to preside over a pre-termination hearing and makes no provision for an alternative in the event of his incapacity, say for illness, or his disqualification, say for bias.  But in the event of a violation of a constitutional right the decisionmaker's decision should be voided. In *Aetna Life Insurance Co. v. Lavoie et al.,* 475 U.S. 813; 106 S. Ct. 1580; 89 L. Ed. 2d 823 (1986) the Court found that a  judge, who had cast the deciding vote in a 5-4 decision, and who had written the decision, was so biased as to require vacation of the decision. In the present case the equivalent would be for the Court to vacate the President's decision and order a decision for the grievant. Alternatives can also be suggested: the President could withdraw and appoint a new, unbiased, designee. The CBA, being silent on what to do in the event of the President's incapacity, should be expansive enough to allow for this. Or the President could explain his decision as a formality and invite an impartial arbitration hearing. There are no doubt other creative alternatives. In any event an inadequately written CBA should not be allowed to triumph over a constitutional imperative.

ROLE OF EMPLOYER AS DECISION MAKER

Defendants also argue (*Memorandum*, at 7) that a pre-termination hearing may be before the employer, since the hearing only has to alert the employer about the existence

of disputes about facts and arguments about cause and effect, citing *Feliciano-Angulo v. Rivera-Cruz*, 858 F.2d 44 [*sic* – 40 is correct](1ˢᵗ Cir. 1988). If the employer can be shown to be biased or have prejudged the situation, however, the situation would be entirely different, and *Feliciano* would not be applicable.

Defendants also argue (*Memorandum*, at 8), again citing *Feliciano*, at 43, that the person who instigated and investigated the matter can also preside over the termination proceeding. But the issue of bias was never dealt with, so that the case is basically irrelevant.

Finally, Defendants assert that the allegation of bias on the part of the decision maker must overcome a presumption that state administrators are fair and honest, that the court must be convinced of a risk of actual bias, citing *O'Brien v. DiGrazia*, 544 F.2d 543, 547 (1ˢᵗ Cir. 1976). This is a factual matter which, in and of itself, calls for denial of the motion to dismiss, though we have noted above a portion of the evidence demonstrating that Norman was not an impartial decisionmaker, and the presumption overcome..

<u>CONCLUSION</u>

For the reasons detailed above, Defendant's motion to dismiss should be denied.

Respectfully submitted,
Bruce Jackson
By his attorney,

/s/ Sam Silverman
Sam Silverman, BBO No. 462930
18 Ingleside Road
Lexington, MA  02420-2522
(781) 861-0368
smpr@rcn.com

Dated: 17 October 2005