UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRUCE JACKSON                                          CIVIL ACTION

  V.                                                    NO. 1:05-cv-11429 RWZ

LINDSAY NORMAN, Individually and in his former capacity as President of Massachusetts Bay Community College; PAULA GASTENVELD, Individually and in her former capacity as Vice-President of Massachusetts Bay Community College; GHAZI DARKAZALLI, Individually and in his capacity as Dean at Massachusetts Bay Community College; THOMAS SABBAGH, Individually and in his former capacity as Associate Dean at Massachusetts Bay Community College; LAURIE TAYLOR, Individually and in her capacity as Vice-President of Massachusetts Bay Community College

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO RECONSIDER

1. This memorandum concentrates on points specifically noted in the Memorandum of Decision (hereinafter "Decision"). A number of relevant considerations, however, detailed in previous Memoranda or Oppositions of Plaintiff, have not been taken into account in the decision, and are not discussed here. These earlier memoranda, though not explicitly discussed here, are incorporated by reference.

IMMUNITY OF DEFENDANTS IN OFFICIAL CAPACITY

1. This memorandum concentrates on points specifically noted in the Memorandum of Decision (hereinafter "Decision").

2. In Decision the Court, citing *Johnson v. Rodriguez*, 943 F.2d 104, 108 (1st Cir. 1991), states that neither a state agency nor a state official acting in his official capacity may be sued for damages in a § 1983 action, or, put otherwise, that they can claim immunity from suit. This well cited statement has now become an article of faith, and the underlying logic has been all but forgotten. *Johnson*, on this point, relates back to *Will v.*

1

*Michigan Department of State Police*, 491 U.S. 58; 109 S. Ct. 2304; 105 L. Ed. 2d 45 (1989). A careful reading of *Will*, however, shows the limits of this statement. The Court notes the earlier holding of *Monell* (*Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 (1978)) that, unlike States, municipalities, or, more generally, "local government units which are not considered part of the State for Eleventh Amendment purposes," can be considered as "persons" and thus not exempt from suit. *Will*, at 70. *Will* then clarifies that their holding "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." The question then of whether MBCC is an "arm of the state" for these purposes becomes a material fact to be demonstrated, and dismissal becomes inappropriate. In a prior memorandum Plaintiff has discussed recent decisions dealing with "arm of the state" jurisprudence, has pointed out that a basic aspect in deciding this is whether the state treasury is obligated to cover any judgment against the entity, and that in this case, the College, in a letter by the new President, has admitted that the costs of this litigation are borne by the College itself, and not by the state treasury. Defendants have thus far not discussed this point at all, thus perhaps waiving any objection to it. A negative form showing the absence of immunity if the entity is not an arm of the state is found in *O'Neill v. Baker*, 210 F.3d 41 (1st Cir. 2000) (at 47, n.5) where Plaintiff "made no claim that the DSS should not be considered an arm of the state for Eleventh Amendment purposes. Therefore, we assume that it is."; and in *Fred v. Roque*, 916 F.2d 37 (1st Cir. 1990) (at 39, n.4): "Appellee has not argued that the Department of Education is not an arm of the government of the Commonwealth of Puerto Rico, and hence we assume that it is." For these reasons, defendants can not

now be dismissed in their official capacities, and Plaintiff moves that that portion of the Decision be rescinded.

2. There is no inconsistency in a state employee abusing his authority under cover of state law being responsible under a 42 U.S.C. 1983 action. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' … To constitute state action, 'the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible,' and 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.' '[S]tate employment is generally sufficient to render the defendant a state actor.' It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42**;** 108 S. Ct. 2250; 101 L. Ed. 2d 40 (1988), at 49-50 (citations omitted). It is immaterial whether the state entity is or is not an arm-of-the-state, only that the actor acts "under color of" state law. See generally, Achtenberg, 1999 *Utah L. Rev*. 1.

## IMPARTIALITY +

1. The Decision (at 2) notes the presumption of impartiality by administrators in terms given by *Brasslett v. Cota*, 761 F.2d 827, 837 (1st Cir. 1985). This admonition seems to be honored only in the breach. Of thirty nine citations of *Brasslett* that I have found, sixteen are for the First Circuit, and of these only one, *Rogan v. City of Boston*, 267 F.3[rd]

24 (1st Cir. 2001) cites this presumption. I suggest that a comparison of how the First Circuit has dealt with impartiality in recent years should provide a guide for practice. I will here discuss two 42 U.S.C. 1983 cases dealing with impartiality to provide some guidelines. In *Rogan, supra,* at 29, the Plaintiff contended "that partiality may be presumed without proof," and presented no proof otherwise. Under these circumstances the presumption of impartiality presents an easy route for decision.

2. The case is different, however, when proof of actual bias is presented. In *Surprenant v. Rivas*, 424 F.3d 5 (1st Cir. 2005), a procedural due process case involving punishment of a pre-trial detainee, there is no need for any presumption and *Brasslett* is not mentioned. The evidence for bias is simply presented. The court, *Surprenant, supra*, at 13, notes two previous cases in which punishment had been meted out only after an impartial disciplinary court had determined that an infraction had actually occurred. The court also notes (at 16) "that the essence of a fair hearing is an impartial decisionmaker." The court then considers the evidence as to whether the decisionmaker was impartial. (at 17-18:) "The record contains enough evidence to allow a rational jury to find that Pendleton was not an impartial decisionmaker. This compendium includes her own testimony that she declined to interview an alibi witness based on her preconceived (and wholly subjective) belief that the witness would lie and her rush to impose sanctions despite having been asked by prison officials to withhold judgment until they had completed a parallel internal investigation into the July 14 incident." The court concludes that the decisionmaker "acted in contravention of the plaintiff's clearly established rights to an impartial decisionmaker. And, moreover, we think it self-evident that any reasonable officer in [the decisionmaker's] position would have understood that prejudging alibi

witnesses without even interviewing them or hearing their testimony and rushing to impose sanctions before an internal investigation could be completed constituted a course of action inconsistent with the proper role of an impartial adjudicator." The lesson here is that prejudgment and hurried judgment are both indicators of unacceptable bias. The volume of evidence of bias in the instant case is much greater than in *Surprenant*. President Norman, two months before any hearing, and before any witnesses had been heard, had written to the Chancellor of the Board of Higher Education clearly stating that he would be dismissing Dr. Jackson, on being questioned he denied any prejudgment, an assertion that the Arbitrator found not to be credible. He sent two letters to Dr. Jackson, prior to any hearing, that he was dismissing him. The investigation, according to the Arbitrator's findings, was a sham designed to build a case. Dr. Jackson, again as found by the Arbitrator, was never given notice, so that he was not even afforded procedural due process. And, as in the rush to judgment by the decisionmaker in *Surprenant*, sent a letter announcing his decision to dismiss Dr. Jackson as soon as possible after the conclusion of the hearings. These, taken together, provide a much greater quantum of evidence than was needed in *Suprenant* to demonstrate the absence of an impartial decisionmaker.

3. The Decision cites *Acosta-Sepulveda v. Hernandez-Purcell*, 889 F.2d 9, 12 (1st Cir. 1989) for the proposition that an impartial decisionmaker is not needed, and that the hearing may be presided over by the employer himself. In this phrasing it is assumed that the employer will not be impartial, so that if the employer can conduct the hearing then any biased decisionmaker can conduct a hearing. This logic is faulty. Also, while this may be true for a procedural due process pre-termination hearing which is followed by

an impartial post-termination hearing, it is certainly not true for a constitutional rights violation, which requires an impartial decisionmaker at *all* stages. Furthermore, *Acosta* attributes the proposition of non-requirement of an impartial decisionmaker to *Feliciano-Angulo v. Rivera-Cruz*, 858 F.2d 40, 44 (1st Cir. 1988). *Feliciano*, however, says nothing about the need *vel non* of impartiality, but does say that the pre-termination hearing can be before the employer, thus ensuring that the employer "will be alerted to the existence of disputes about facts and arguments about cause and effect." The process needed in a pre-termination hearing is in any event not relevant to the instant constitutional rights violation situation. A further indication of the lack of viability of the *Acosta* decision in this regard comes from the fact that since the decision in 1989 only 6 citations to it are found in the First Circuit, and of these only one, decided only two months later, cites *Acosta* for this proposition.

4. The Decision cites *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 68 (1st Cir. 2004) requiring only minimal notice pleadings. The case was brought under 42 U.S.C. 1983, alleging political discrimination, thus including an inquiry into the motives of the defendants. Previously, civil rights cases were subject to a heightened pleading standard. Based on the trend in recent Supreme Court decisions the First Circuit court, in this case, ruled that the heightened pleading standard was now to be replaced with the more liberal minimal notice pleadings of Fed.R.Civ.Proc. 8(a), that is, "minimal facts as to who did what to whom, when, where, and why – although why, when why means the actor's state of mind, can be averred generally." I note here the probability that the "why" in this statement is included only because the specific case used as the vehicle for the change in pleading standards was one in which the motive, thus the why, was an

essential element of the case, though this is not required generally. Fed.R.Civ.Proc. 8(a) requires (1) a statement of the court's jurisdiction; (2) a statement of the claim showing that the pleader is entitled to relief; and (3) a demand for judgment for the relief the pleader seeks. No "why" is required. This arises only when motive is an issue. Adoption by the First Circuit of the simplified notice pleading shows that only the basic preponderance of the evidence standard is required to show violation of a constitutional right.

The court, in *Educadores,* cited, *inter alia*, *Crawford-El v. Britton*, 523 U.S. 574, 140 L. Ed. 2d 759, 118 S. Ct. 1584 (1998). This was a case where heightened evidentiary burden was applied to proof of motive. The Supreme Court ruled that the evidentiary burden was too heavy. *Crawford-El* has interesting implications for the instant case. Here the Decision, by focusing on the presumptions about defendant's motives, has changed the nature of the case, and, in doing this, has significantly increased the evidentiary burden. I submit, following *Crawford-El*, that for a constitutional rights case such as this one, proof of impartiality by a preponderance of the evidence is the appropriate standard. Generally, for a 42 U.S.C. 1983 case, a preponderance of the evidence is the correct standard. *Johnson v. Mahoney, et al.* 424 F.3d 83, 89 (1st Cir. 2005).

5. Furthermore, impartiality is only one of the constitutional violations by defendants. These include violations of the equal protection clause, waiver, and a constitutional violation resulting from asymmetric evidentiary rulings. Thus the need to demonstrate these factors also rules out a motion to dismiss.

<u>DENIAL OF MOTION TO AMEND</u>

1. Plaintiff's Motion to Amend consists of two parts: (a) a revision of the text of Count 1,

the only count in the original motion, and (b) a motion to add the new President as a party to the action. According to Fed. R. Civ. Proc. 15(a) a party has the right to amend his complaint once before there is any responsive pleading. A motion to dismiss is not a responsive pleading. *Albany Insurance v. Almacendora Somex*, 5 F.3d 907, 910-911 (5th Cir. 1993), so that, arguably, Plaintiff simply has the right to amend on this basis alone. In addition, the original complaint noted that an amendment would be forthcoming after the arbitrator's decision and award were available. Arguably, then, the motion for amendment should be dated as of that time, the details to be added later, taking substance over form.

The Decision deals only with the request (b) for amendment by the addition of a new party. We do not ask the Court for reconsideration of this part (b) of the motion for reasons to be given below. We do ask, however, for amendment of that part of the original complaint by the deletion of the paragraph noting the existence of a related complaint.  For purposes of clarification reasons for not contesting the denial of amendment by addition of a new party will be given further below.

2. Complaint *Panse v. Norman*, Civil Action No. 04-11658 (D.C. Mass.) is in many respects similar to that of the present action. Dr. Panse was a colleague of Dr. Jackson, and together they were responsible for a program on forensic biotechnology. Both were dismissed with almost identical charges at the same time. Both grieved their dismissal. Different arbitrators independently held that that each had been dismissed without just cause, and ordered their re-instatement with back pay, and to be made whole. Dr. Panse brought his action, *pro se*, in federal court several months before the present action was brought. The present action was brought prior to the receipt of the arbitrator's award in

8

order to preserve the rights of Dr. Jackson. I anticipated initially that both actions would run similar courses. In this I was mistaken. It soon became apparent that Dr. Panse's confrontational style and his expansion of defendants and causes were significantly different from those of myself. Dr. Panse insisted on representing himself, refusing to hire an attorney. What became abundantly clear over time was that the interactions between Dr. Panse and the opposing attorney, and court personnel were resulting in a highly charged emotional antagonism, which, because of the extensive imbrecation of the two cases, could not avoid influencing the present case1. For that reason my motion to amend included the severance of the paragraph noting the other case.

For these reasons I am asking the Court to (a) reconsider that portion of the motion to amend to replace the original complaint by the language now proposed as Count 1; and (2) to consider transferring one or the other case, the choice to be that of the Court, to another judge.

3. The motion to add a party arose from the following circumstances. On Dr. Jackson's

---

1 The mythology of the legal profession alleges that we are all objective and impervious to emotion. Any practicing attorney knows that this is not so. This was noted as early as the first century C.E. by Quintilian. Though he was writing specifically of judges his comments apply to all of us: "Proofs, it is true, may induce the judges to regard our case as superior to that of our opponent, but the appeal to the emotions will do more, for it will make them wish our case to be the better. And what they wish, they will also believe. For as soon as they begin to be angry, to feel favourably disposed, to hate or pity, they begin to take a personal interest in the case, and just as lovers are incapable of forming a reasoned judgment on the beauty of the object of their affections, because passion forestalls the sense of sight, so the judge, when overcome by his emotions, abandons all attempt to enquire into the truth of the arguments, is swept along by the tide of passion, and yields himself unquestioning to the torrent." Quintilian, *Institutio Oratoria*, Book VI, Chapter 2. Harvard University Press, Loeb Classics, 1920. The same mythology is found today among scientists, and Ferenczi, an early psychoanalyst, pointed out in 1912 the possibility of distortions being introduced into scientific work by unconscious affects of the scientists. He proposed that every scientist should be psychoanalyzed so that the enormous effort "... which is now wasted on infantile controversies and priority disputes, could be put at the disposal of more serious aims." Cited in Silverman and Tuan, Auroral Audibility, in *Advances in Geophysics*, volume 16, 1973, at 158, n.1.

return to the College he was first offered the teaching of several courses unrelated to the program he had built up over more than nine years, clearly retaliatory. The Supreme Court has recently, *Burlington Northern v. White,* (22 June 2006, Docket No. 05-259) cited EEOC decisions on retaliatory work assignments: "the EEOC has consistently found "retaliatory work assignments" to be a classic and 'widely recognized' example of 'forbidden retaliation.'" In addition, at MBCC, the Massachusetts Labor Relations Commission, in a decision of June 21, 2006, SUP-02-4892, found that certain class assignments of a tenured professor were retaliation against him for filing a grievance, and gave a cease and desist order.: "The Commission stated that Associate Dean Sabbagh's decision to consign Prof. Cichocki to course subjects that Sabbagh knew were undesirable and to rescind the choice that he had previously offered to Prof. Cichocki persuades the Commission that Sabbagh gave Prof. Cichocki course subjects containing all math courses to punish Cichocki for filing a grievance." Other incidents involving Dr. Jackson included: the office he had occupied, separated by a narrow corridor from the laboratory where his students would be working, and from which his students would have easy access to him, being given to others whose work was far away from there, and assorted other minor inconveniences. The administration no doubt had the ostensible authority for these actions. But most importantly of all, soon after these actions, a work-study student under Dean Darkazalli's supervision, after two weeks of a course with Dr. Jackson, filed a complaint against him, with basically the same charges as had been filed in the original action against Dr. Jackson which led to his dismissal, and this complaint was placed in his personnel file. What began to develop, in short, was the same pattern of behavior as had occurred three years earlier, and leading to his dismissal. The new

President, in her letter, which we believe was written by others, though signed by her, gave no credence to the arbitrator's award, and assigned the College's budget as a reason for Dr. Jackson's re-instatement. The reminders of faculty responsibility repeated some of the same charges used in justifying Dr. Jackson's dismissal three years earlier. In the interest in, and hope of, preventing a reprise of the earlier actions, with their brutal consequences, I proposed an injunction to prevent retaliation. This proposal was clearly based on the pattern of behavior evinced in the circumstances of the present case, which, however, one not familiar with the facts of the past several years could not perhaps be expected to be sensitive to.

We believed that these actions of the administration could be attributed to only a very few people who had been involved in the prior actions. It also seemed likely that the people involved would be leaving the College after some time, and that after that had occurred we would withdraw the motion to add the new President as a party. This has, in fact, now occurred, and if the motion had not been denied we would have ourselves shortly withdrawn it. For these reasons we do not ask for reconsideration of this part (addition of a Count 2) of the motion to amend.

## MISCELLANEOUS

1. Use of State's attorneys. The Decision allowed defendant's motion to dismiss as to their acting in their official capacities, but denied dismissal in their individual capacities. If this stands on reconsideration, then it would follow that in their individual capacities they have no claim on the state treasury. In addition by using the state's attorneys an inequitable situation arises since plaintiff is responsible for his own expenses, while defendants are free to continue the legal action expense-free. In the event that the

Decision remains unchanged we move the Court to either order the state's attorneys to withdraw from the case, or for defendants to be charged the cost of usage of the state's attorneys.

2. There is a factual error in the Memorandum of Decision. At page 1, line 5, the Decision states: "In response, the Massachusetts Board of Higher Education (the "MBHE") and the Massachusetts Teacher Association held a meeting to consider other options, but Norman insisted on termination." This statement is incorrect, resulting probably from infelicitous phrasing in the parties statement of the facts. The statement of facts should read instead that according to the Collective Bargaining Agreement between the Board of Higher Education and the Massachusetts Community College Council if an appropriate request is made, then a discussion shall be held between the unit member and the President of the College to see if the matter can be resolved at this point. CBA, Article XV, § 15.02(2). Such a meeting was duly requested and held, at the conclusion of which the President presented Dr. Jackson with another letter confirming his dismissal.

Dated: 10 July 2006

/s/ Sam Silverman_____

Sam Silverman, BBO No. 462930
18 Ingleside Road
Lexington, Massachusetts 02420
(781) 861-0368
smpr@rcn.com
Attorney for Plaintiff

LOCAL RULE 7.1 CERTIFICATE

Pursuant to Local Rule 7.1 I emailed the substance of this proposed motion to defendants attorneys on July 6, 2006, with a request for their comments. A response was duly received from Attorney Maite Parsi on July 7, 2006.

/s/ Sam Silverman_____
Sam Silverman, BBO No. 462930
18 Ingleside Road
Lexington, Massachusetts 02420
(781) 861-0368
smpr@rcn.com
Attorney for Plaintiff