UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11429 RWZ

BRUCE JACKSON

V.

LINDSAY NORMAN, Individually and in his former capacity as President of
Massachusetts Bay Community College; PAULA GASTENVELD, Individually and in
her former capacity as Vice-President of Massachusetts Bay Community College;
GHAZI DARKAZALLI, Individually and in his capacity as Dean at Massachusetts Bay
Community College; THOMAS SABBAGH, Individually and in his former capacity as
Associate Dean at Massachusetts Bay Community College; LAURIE TAYLOR,
Individually and in her capacity as Vice-President of Massachusetts Bay Community
College

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT

A. THRESHOLD CONSIDERATION

EFFECTS OF ARBITRATION FINDINGS.

An arbitrator's factual findings (whether explicit or implicit) are not open to

judicial challenge. E*l Dorado Technical Services, Inc.*,   v. U*nion General de*

*Trabajadores de Puerto Rico*,   961 F.2d 317, 320 (1st Cir. 1992):

> Although it may be possible to quibble over various facts found by the arbitrator
> (or implicit in his decision), the standard of review is unrelenting: as a general
> proposition, an arbitrator's factual findings are not open to judicial challenge.
> Even if the arbitrator was seriously mistaken about some of the facts, his award
> must stand. See *Air Line Pilots Ass'n Int'l v. Aviation Ass'n, Inc.,* 955 F.2d 90, 93
> (1st Cir. 1992)   ("Disputes of fact should have been resolved by the arbitrator,
> and may not be addressed by the . . . court, even if the court is convinced that the
> arbitrator committed serious error.").

Note that the facts found by the arbitrator may be implicit as well as explicit. We

emphasize here that in the following memorandum the arbitrator's findings of fact must

be accepted.  See also, *Cytyc Corp. v. Deka Products*, 439 F.3d 27, 34 (1st Cir. 2006) (Court is duty-bound to give effect to an arbitrator's findings of fact.); *Mercy Hosp., Inc. v. Mass. Nurses Ass'n,* 429 F.3d 338, 344 (1st Cir. 2005) (inquiring court is bound by an arbitrator's findings of fact; employer cannot relitigate the facts as found by the arbitrator.); *Georgia-Pacific Corp. v. Local 27, Etc.*, 864 F.2d 940, 944 (1st Cir. 1988) (court does not sit as court of appeal to hear claims of factual error); *United Paperworkers International Union, AFL-CIO, et al. v. Misco, Inc.*, 484 U.S. 29; 108 S. Ct. 364; 98 L. Ed. 2d 286 (1987) (Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts … that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator.)

## B. REQUIREMENT OF IMPARTIALITY AT ALL STAGES

### OVERVIEW

1.  A threshold question involves the presumption that governmental officers are men of conscience and intellectually able to act impartially. Case law demonstrates that presumptions are used in the absence of facts, and that when facts are presented the presumption disappears. This is the case here.

2. Impartiality is constitutionally required at every stage, from the initial to the final stage. It is only *after* a showing of constitutionality that the question of due process comes into play.

3. The facts show conclusively that Norman pre-judged the case for dismissal prior to any hearing on the subject, and that defendants deliberately set out to build a case against Jackson. Also, the Arbitrator found that Norman did not have an open mind.

4. Thus the constitutional requirement for impartiality was not satisfied, and Jackson's rights in this regard were violated.

I. FACTUAL BACKGROUND ON IMPARTIALITY

1.  Jackson began teaching at Massachusetts Bay Community College (hereinafter MBCC) in 1992. He was hired as a full-time associate professor in January 1993, and tenure in 2000 (AA, at 12), and developed the biotechnology program there into a two-year degree program with three specializations (AA[1], at 9). On completion of the program a student is awarded the Associate in Science Degree in Biotechnology (AA, at 10).

2. During his nine and one-half years at MBCC prior to dismissal, Jackson established collaborative relationships with other educational institutions, with community organizations, and with businesses, which provided work and internship opportunities for his students. He received a number of grants, including from the National Science Foundation. Nine of his students received federal Goldwater scholarships, a number greater than any two year college in the United States and most four-year colleges. (AA, at 11).

3.  In March of 1999 Norman took office as President of MBCC. (AH 17:17)

4.  PRIOR ANIMOSITY.

(a) On June 4, 1999 Norman refused tenure to Jackson on the alleged basis of an unsatisfactory summary evaluation and that he had failed to conduct required student

---

[1] In the following references to the Arbitrator's Opinion and Award will be denoted by AA followed by the page number; references to the arbitration hearings by AH x:y, where x is the volume number, y is the page number, and references to the College hearings chaired by Norman as CH x:y, where x is the volume number, y is the page number. The arbitration case number is AAA 11-390-02524-02.  The Arbitration award and the College Hearings are included in Defendant's pleadings, and the appropriate pages from volumes 2, 4, 5, 6, 9, 12, 13 and 17 of the arbitration hearings are included as exhibits to this memorandum.

evaluations, a charge which Jackson denied. Jackson was nevertheless awarded tenure the following year. (AA, at 12)

(b) On October 25, 2000 Jackson met with Darkazalli and Turcotte (an Assistant Vice President) regarding a supplemental grant application to the National Science Foundation. In the course of this meeting there was a sharp exchange between Jackson and Turcotte. This resulted in a memorandum by Darkazalli to Norman on October 31, and a subsequent letter to Jackson by Norman accusing him of unprofessional behavior, and placing a copy of this letter, and other documents on the incident, in Jackson's personnel file. (AA, at 13)

(c) In May 2001 Jackson filed a complaint with the United States Department of Education, Office of Civil Rights charging the College with discrimination against minority students. (AA, at 13)

(d)  On August 2, 2001 Norman denied Jackson's proposal for a visit to Moscow State University, and accused Jackson of making "inaccurate statements" in his NSF Supplemental grant application for this trip, a charge which Jackson denied. Jackson also alleged that placing such documents in his personnel file was an attempt at intimidation. Following this exchange Norman decided to cease all NSF grant activity, accused Jackson of unprofessional behavior, and placed the letter and related documents in Jackson's personnel file. Jackson denied these allegations. As a result of Norman's rejection of NSF grant monies the research opportunities program for minority students was shut down, following which Jackson filed a complaint with the U.S. Dept. of Education, Office of Civil Rights (AA, at 13-14)

(e)  On September 24, 2001 another faculty member held a class in the Biotechnology laboratory, as had been assigned to him. Jackson entered the laboratory, and objected to it being held there on the basis that student eating and other behavior threatened contamination of the laboratory. Norman then suspended Jackson for three days stating that his behavior was "inappropriate, unprofessional and interfered with the instructional process and the operation of the institution." (AA, at 14-15) This letter was also placed in Jackson's personnel file. Jackson denied the charges, and in turn accused the other faculty member of several OSHA violations, and included an email from a student in the class supporting Jackson's denial of misdoing. Jackson also requested an investigation of his charges. Darkazalli did not interview the student (AA, at 15).

5. THE INVESTIGATION

(a) On March 1, 2002 and subsequently Gastenveld, Taylor, Darkazalli and Sabbagh, in response to a student complaint, stating his dissatisfaction with the program and asking about a tuition refund[2],  investigated  Jackson and his colleague Pansė.  (AA, at 15) Over the next two months several students were interviewed, various meetings were held, and on May 23, 2002 Darkazalli and Gastenveld recommended to Norman that Jackson be dismissed. (AA, at 15-23)

(b). During this entire period Norman was kept advised throughout by both Gastenveld and Taylor of the progress of the proceedings. Gastenveld testified that she had regular meetings twice a month with Norman, and informal meetings once a week with him (AH, 5:44). She also testified  that she discussed the student complaint with Norman, and the recommendation for dismissal once she had reached that conclusion (CH 2:305-306).

---

[2] The student testified that his complaint was "lodged to support my request for tuition refund" (AH 2:9). His tuition was subsequently reimbursed (AH 2:33).

Norman testified that Taylor kept him apprised, in general terms, of how the investigation was proceeding. (AA, at 23)

(c) Gastenveld testified that she never told Jackson, with regard to any of the charges, that his job was at risk if he was found guilty of the charges against him. (AA, at 23-24) Further, the Arbitrator found that there was no reason for Jackson to believe, after nine years of teaching with the same methodology, "that the College disapproved of his teaching methods. Thus it cannot be said that the College had put Dr. Jackson on notice that his teaching methods, including his use of mentors, was inappropriate and, if continued, could result in discipline, including dismissal." (AA, at 40)

6. STUDENT GRIEVANCE PROCEDURES.

(a) The College had a well-defined procedure for dealing with student complaints, documented in the Student Handbook (Exhibit 1). The procedure used, different from that in the Handbook, leading to the dismissal of Dr. Jackson is not documented anywhere.

(b) The official Student Grievance Procedure was developed by and accepted by the 15 Community Colleges in the Commonwealth (Milstone, Affidavit, Exhibit 2 ), presented to the Board of Trustees, and accepted as policy by the Board of Trustees of MBCC on May 22, 2001 (Trustee's minutes, Exhibit 3). This procedure was the only documented procedure for handling student complaints other than those of sexual harassment or discrimination. Under this procedure any student grievance should have been brought to the attention of Dr. Milstone, then Dean of Students. Dr. Milstone, during his tenure at MBCC, "was not aware of any grievances brought by students that were formally resolved by any means other than the Student Grievance Procedure. Had I been made aware of one, I would have complained to the appropriate College authority or supervisor

that the incident needed to be sent through the established and agreed-upon procedure."

(Milstone, Affidavit, Exhibit 2).

(c)  The grievance was not brought to the attention of Dr. Milstone and he was unaware

of the complaints brought by the students. He was not told that a complaint was made and

that a different path would be utilized to resolve the complaint.  (Milstone Affidavit,

Exhibit 2)

(d)  Taylor testified that during the period of her employment at MBCC, from at least

1992 on, no other tenured or tenure-track faculty member was terminated as a result of

student complaints. (AH 12:41)    Further, Sabbagh testified that during the period of his

employment at MBCC, from October 2000, this was the only case where students other

than the complaining student were interviewed. (AH 4:57) Gastenveld testified that

during her tenure at MBCC there were no other complaints which resulted in an

investigation similar to this one – that is, with interviews with students, collection of

documentary data, resulting in a report on the complaint and a recommendation to the

president (CH 2:312). Also, one student complained to Gastenveld about her professor's

derogatory comments about women. She was told by Gastenveld that she had no control

over teaching methods, the student was not asked to make a formal complaint, and

nothing ever came of her complaint. (AH 13:73-76).

(e)  The Arbitrator found that "the focus of the investigation seemed to be one of building

a case for dismissal, rather than of ascertaining whether there was a problem and, if so,

developing a plan to remedy it." (AA, at 42)

(f) Thus, to summarize the above, the procedures used to justify dismissal of Dr. Jackson

were not in accordance with the only officially prescribed procedure for dealing with a

student grievance, were applied through an ad hoc process not documented anywhere, were applied to Drs. Jackson and Pansé only, and to no one else, over at least the ten years preceding the dismissal, and were deliberately designed to build a case for dismissal.

7. PREJUDGMENT AND BIAS.

(a)  On June 2, 2002, two months before the hearing which Norman chaired and in which he was the decisionmaker, he notified Judith Gill, Chancellor of the Board of Higher Education for the Commonwealth of Massachusetts: "I am herewith alerting you to two personnel actions now taking place at Mass Bay that could become highly litigious and/or public. … For almost the entire three years that I have been President at Mass Bay, I have had to deal with some very unacceptable behavior from two tenured professors there. Both are minorities … [cites student complaints] … These recent occurrences have now led to the College taking action to terminate the employment of the two professors." (AA, at 25; Exhibit 5)  Norman testified that, in this letter, he was not speaking for himself but for members of the administration. The Arbitrator stated: "This explanation is not credible." (AA, at 42)

(b) This statement that Norman was recommending Jackson for dismissal was reiterated on June 28, 2002: " … I am notifying you that I am recommending you for dismissal … ." (Exhibit 7)

(c) The Arbitrator also found that Norman did not bring an open mind to the hearing process (AA, at 42). "With both Panse and Jackson, President Norman took less than 24 hours to reach a decision to dismiss and, in Jackson's case at least, he did so without benefit of transcripts or notes." (AA, at 42)

(d)  At the hearing conducted by Norman only one student testified, and that testimony was more supportive of Dr. Jackson, "yet there is no indication that her testimony was considered and, if it was, what weight, if any, President Norman gave it." (AA, at 43)

(e)  The Arbitrator stated: "Based on the clear and convincing evidence presented at the hearings, I find that the College's [i.e., the President's] decision to dismiss Professor Jackson was arbitrary and unreasonable." (AA, at 43)

 (f) Testimony by a student states that she was told by Gastenveld that they "were building a case against Dr. Jackson." (AH 13:74; Batzer, Affidavit, Exhibit 8)

(g)  An affidavit by Professor Sarmad Saman (Exhibit 9) states that he was informed by Sabbagh "that both Dr. Jackson & Panse were fired & this decision was taken by the then President Norman during a Retreat in 2002." He stated further that "I was also told that in the same meeting that Norman told Ghazi Darkazalli and Tom Sabbagh that both Bruce Jackson and Chandra Panse must be fired."

(h) Donald Karp, former laboratory manager at MBCC, stated in an affidavit (Exhibit 10) that as part of his duties he was to check spending of all departments. Darkazalli, however, told him to be especially diligent in checking Jackson's laboratory, since he suspected that monies were not being properly spent. Karp found no irregularities.

(i)  A count of rulings by Norman at the hearing which he conducted (August 5, 6, 7, 2002) shows that of about 20 objections by the College counsel all but one were allowed, but that of about the same number of objections by Jackson's counsel, all but one were denied. (CH, passim).

## II. DISCUSSION

<u>1. THERE IS A PRESUMPTION THAT ADMINISTRATORS ARE UNBIASED, BUT THIS PRESUMPTION DISAPPEARS WHEN FACTS TO THE CONTRARY APPEAR.</u>.

(a)  *Brasslett v. Cota*, 761 F.2d 827, 837 (1st Cir. 1985), cites the presumption that "administrators are 'men of conscience' and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances,' " and conclude that a plaintiff alleging impartiality must demonstrate an actual risk of bias or prejudgment. Taken in isolation from its context this quotation is easily misunderstood. The presumption here derives from *Withrow v. Larkin*, 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975),  which states: "*Without a showing to the contrary*, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' *United States v. Morgan*, 313 US. 409, 421 (1941)." (emphasis added).

(b)  The citation from *Withrow*, which, basically, states that a presumption comes into play only when there are no facts available on the issue, is currently codified as Federal Rule of Evidence 301.  Most jurisdictions, including the First Circuit, accept the "bursting bubble" interpretation of Rule 301 – that is, that  "the introduction of evidence to rebut a presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue." *McCann v. George W. Newman Irrevocable Trust*, 458 F.3d 281, 288 (3rd Cir. 2006). For the First Circuit see  *United States v. Jessup*, 757 F.2d 378, 382 (1st Cir. 1985): "Under this theory, the presumption requires the 'presumed against' party to introduce evidence, but, once he does so, the presumption "bursts" and

totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." See also *Bank One, Texas, N.A. v. Montle*, 964 F.2d 48, 51 n.2 (1st Cir. 1992) (a presumption vanishes entirely once rebutted, and the question must be decided as any ordinary question of fact).

(c) <u>Conclusion.</u> There is overwhelming evidence of prejudgment, as, for example, the Arbitrator's finding that Norman did not have an open mind on the dismissal, and Norman's letter to Chancellor Gill, on June 2, 2002, that Norman had already decided to dismiss Jackson some two months prior to the hearing mandated by the Collective Bargaining Agreement to decide that issue. See also the factual material *supra* captioned "Prejudgment and Bias."  Consequently, the presumption totally disappears.

<u>2. IMPARTIALITY IS CONSTITUTIONALLY REQUIRED.</u>

(a) <u>THE CLAIM MUST BE BROUGHT UNDER THE CONSTITUTIONAL RUBRIC OF THE REQUIREMENT OF IMPARTIALITY.</u>  Impartiality at all stages of a proceeding is constitutionally required, see *infra*, next paragraph et seq... As such the appropriate avenue for redress in the instant case is through that provision, rather than through a claim of substantive due process, *Pagan v. Calderon*, 448 F.3d 16, 33 (1st Cir. 2006) ("When a specific provision of the Constitution protects individuals against a particular kind of [misconduct] by government actors, individuals seeking redress . . . must assert their claims under that particular constitutional rubric instead of invoking the more generalized notion of substantive due process.", citing *S. County Sand & Gravel Co. v. Town of S. Kingstown,* 160 F.3d 834, 835 (1st Cir. 1998)). (For a fuller discussion see *infra* in the section on Equal Protection.)

(b) <u>IMPARTIALITY IS DEFINED AS THE LACK OF BIAS BY THE</u>

<u>ADJUDICATOR FOR OR AGAINST EITHER PARTY TO THE PROCEEDING.</u> The

most recent U.S. Supreme Court case considering impartiality is *Republican Party v.*

*White*, 536 U.S. 765; 122 S. Ct. 2528; 153 L. Ed. 2d 694 (2002) (decided on a First

Amendment basis). The Court stated, 122 S.Ct. at 2535:

> One meaning of 'impartiality' in the judicial context -- and of course its root
> meaning -- is the lack of bias for or against either party to the proceeding.
> Impartiality in this sense assures equal application of the law. That is, it
> guarantees a party that the judge who hears his case will apply the law to him in
> the same way he applies it to any other party. This is the traditional sense in
> which the term is used. ... It is also the sense in which it is used in the cases cited
> by respondents and amici for the proposition that an impartial judge is essential to
> due process.

 Impartiality "ensures that no person will be deprived of his interests in the absence of a

proceeding in which he may present his case with assurance that the arbiter is not

predisposed to find against him." *Id.* citing *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242;

100 S. Ct. 1610; 64 L. Ed. 2d 182 (1980).

(c)  <u>IMPARTIALITY MUST BE PRESENT AT ALL STAGES OF A PROCEEDING.</u>

The United States Supreme Court has clearly and unequivocally stated, in several

cases, that impartiality, constitutionally, must be maintained at every stage in a

proceeding, *Ward v. Village of Monroeville*, 409 U.S. 57, 61; 93 S. Ct. 80; 34 L. Ed. 2d

267 (1972):

> Respondent also argues that any unfairness at the trial level can be corrected on
> appeal and trial de novo in the County Court of Common Pleas. We disagree. This
> "procedural safeguard" does not guarantee a fair trial in the mayor's court; there is
> nothing to suggest that the incentive to convict would be diminished by the
> possibility of reversal on appeal. Nor, in any event, may the State's trial court
> procedure be deemed constitutionally acceptable simply because the State
> eventually offers a defendant an impartial adjudication. Petitioner is entitled to a
> neutral and detached judge in the first instance.

Similarly, *Marshall v. Jerrico*, 446 U.S. 238, at 248:

> Appellee correctly points out that in *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), we held that the availability of a trial de novo before an unbiased judge did not remove the constitutional infirmity in an original trial before one whose impartiality was impaired. A litigant, we said, "is entitled to a neutral and detached judge in the first instance." Id., at 61-62.

And, for a case where an administrative agency was involved, *Northern Pipeline Construction Co. v. Marathon Pipe Line Co. et al.*, 458 U.S. 50, 86, n39; 102 S. Ct. 2858; 73 L. Ed. 2d 598 (1982):

> Our precedents make it clear that the constitutional requirements for the exercise of the judicial power must be met at all stages of adjudication, and not only on appeal, where the court is restricted to considerations of law, as well as the nature of the case as it has been shaped at the trial level.

In the present case, then, impartiality was required at the initial stages of the proceeding, that stage where a hearing on the charges was presided over by Norman, who was also the decision maker in the case. If Norman was not impartial, then the proceeding was invalid.

(d) NORMAN'S STATEMENTS PRIOR TO ANY HEARING CLEARLY DEMONSTRATE PREJUDGMENT, THUS A LACK OF IMPARTIALITY.

Implicit in *Republican Party v. White*, 536 U.S. 765; 122 S. Ct. 2528; 153 L. Ed. 2d 694 (2002) is the teaching that while a judge may have predispositions and opinions on general questions involving legal issues, he cannot be impartial in cases which contain elements of some personal involvement or prejudgment of the matter in hand.  In the instant case there are explicit, unequivocal statements by Norman showing such prejudgment. Most importantly in this regard are the statements by Norman months *prior* to the hearing that he was to be dismissed (Exhibits 5, 7), the very issue ostensibly to be

determined by the forthcoming hearing. See the materials listed above under the caption "Prejudgment and Bias." In the letters cited there, there is no tentativeness, the decision is quite definite. Some ambiguity is introduced by the CBA requirement, §15,02(2) that "[t]he President shall notify the unit member that the unit member shall be recommended for dismissal." This ambiguity could have been avoided had the President used some language such as that "a report by Vice-President Gastenveld and Dean Darkazalli have recommended that you shall be dismissed." The ambiguity is more pronounced in Norman's letters of May 28 and June 14 (Exhibits 4, 6) to Jackson, where no one other than Norman is mentioned as being the one who "shall" recommend dismissal. The existence of the ambiguity may have been the reason for the Arbitrator not including these three letters as a basis for her finding of bias on the part of Norman (AA, at 42). The ongoing *ex parte* discussions with Gastenveld and Taylor during the investigation support the finding of prejudice. There is thus no way in which Norman can be considered the impartial decision maker to whom Jackson is constitutionally entitled, and Jackson's due process rights have been violated. Most importantly, there is the finding by the Arbitrator that Norman did not have an open mind, that is, that he had prejudged the outcome of the hearing (see *El Dorado*, *supra*, "arbitrator's factual findings are not open to judicial challenge.")

(e) PERSONAL INVOLVEMENT AND/OR ANIMOSITY ALSO DEMONSTRATE NORMAN'S PARTIALITY.

Personal involvement may come in the form of the decision maker having been involved in law suits with the one he sits in judgment on. See, for example, *Johnson v.*

*Mississippi*, 403 U.S. 212, 215; 91 S.Ct. 1778; 29 L.Ed.2d 423 (1971) (prior involvement in law suit requires another judge since unbiased judge essential to due process).

Personal animosity is one indicator of a lack of impartiality. See, e.g., *Offutt v. United States*, 348 U.S. 11; 75 S. Ct. 11; 99 L. Ed. 11 (1954) (personal animosity precluded an impartial hearing); *Withrow v. Larkin*, 421 U.S. 35, 47; 95 S. Ct. 1456; 43 L. Ed. 2d 712 (1975) (probability of actual bias where decisionmaker has been target of criticism from the party before him is too high to be constitutionally tolerable).

In the present case animosity between Norman and Jackson existed almost from the time that Norman became President of MBCC. See the factual material listed above under the caption "Personal Animosity." In addition Norman was a defendant in several law suits brought by Jackson. See, e.g., *Jackson v. Norman, et al.*, Norfolk Superior Court, CA No. 99-0547; *Jackson v. Darkazalli, Saman, Norman, Gastenveld, Sabbagh*, Norfolk Superior Court, CA No. 02-00660, as well as complaints in other forums. The fact that he was only one of several defendants is irrelevant. We are not concerned here with the validity *vel non* of the facts alleged, only in their bearing as indicating the potential for bias on the part of Norman, the hearing officer.

3. CONCLUSIONS.

Impartiality in an adjudicative proceeding is constitutionally required at every step. Prejudgment and the existence of bias are essentially synonymous. In the instant case there is overwhelming evidence, including a finding by the Arbitrator, that Norman prejudged the dismissal of Jackson months prior to the hearing meant to determine whether just cause existed for such an action, that his rulings during the hearing, and his immediate dismissal of Jackson after the hearing before any transcripts were available,

and in the absence of personal notes, that an atmosphere of animosity existed almost from the time he took office, all of these clearly demonstrate a lack of impartiality, and thus a violation of Jackson's constitutional right to an impartial process. Evidence also shows that Norman's co-defendants participated in preparing a case for dismissal rather than making any real effort at ascertaining the truth of student complaints, thus also violating his constitutional rights. Jackson is entitled to the Court's acceptance and confirmation of the Arbitrator's findings on this issue.

## C. VIOLATION OF EQUAL PROTECTION CLAUSE

OVERVIEW.  The equal protection clause of the Constitution provides that similarly situated individuals must receive the same treatment. Here Jackson was treated in a manner distinct from all other faculty, defendants providing no rational basis for this disparity, and, actually, stating, for example, that they were out to build a case against him. These facts are sufficient to show a violation of the Equal Protection Clause of the Constitution, and thus of his constitutional rights.

## I. FACTUAL BACKGROUND.

1. See, generally, *supra*, captioned "Student Grievance Procedure." The following repeats some of the material collected there.

2. The College has a procedure, documented in the Student Handbook (Exhibit 1), and approved as policy by the Board of Trustees (Exhibit 3), for dealing with student complaints against faculty. Exceptions to this procedure are allowed for in cases of sexual harassment and discrimination (Exhibit 1).

3. In the present case an *ad hoc* process was utilized, a process not documented in any official writing. This process was not used against any other tenured or tenure-track

faculty member, other than Dr. Pansé, Dr. Jackson's colleague.  See the section, *supra*, on student grievance procedures.

4. (a) Dr. David Milstone has stated that during his tenure as Dean of Students, responsible for initial dealing with student complaints, no other student complaint against a faculty member was handled as was the complaint against Dr. Jackson, nor was he even advised of these particular complaints.

  (b) Glenda Batzer, a student, testified that she had complained to Vice-President Gastenveld about bias by one of her professors, and that this complaint was simply brushed off, and nothing was ever done about it. (Batzer, Affidavit, Exhibit 8; AH 13:72-77)

  (c)  Complaints about OSHA violations by Jackson were simply dismissed by Dean Darkazalli. Darkazalli testified that he had neither interviewed any students, even though one student provided an affidavit supporting the fact of violations, nor carried out any investigation of the charges other than speaking to the other professor. (AH 9:60-66)

  (d) Professor Sarmad Saman states that he was told by Associate Dean Sabbagh that at a College retreat in 2002 Norman told Darkazalli and Sabbagh that Jackson and Pansé must be fired. (Saman, Affidavit, Exhibit 9)

5. The Arbitrator found that there had been been "an uneasy, contentious and, indeed, litigious relationship with several of [the College] administrators," and that, specifically, Darkazalli, almost from the beginning of his tenure, "was in a contentious relationship with Dr. Jackson." (AA, at 41). This was demonstrated from at least October 25, 2000 (AA, at 41).

6. The Arbitrator also found that at least one other faculty member had also developed contentious relationships with Darkazalli (AA, at 41, n. 12). The Arbitrator also found that "in much of the correspondence of Darkazalli and Norman one sees a pattern of their accusing assertive and challenging faculty members of being discourteous or engaging in unprofessional behavior." (AA, at 41, n. 12)

7. Moreover, the Arbitrator stated: "This backdrop of strained relationships with the administration suggests at least the possibility that the administration viewed the student complaints as an opportunity to rid the College of a troublesome professor. Whether that was the case or not, the record suggests that President Norman, Vice President Gastenveld and Dean Darkazalli, acted unusually swiftly in moving the College's investigation along. More importantly, the focus of the investigation seemed to be one of building a case for dismissal, rather than of ascertaining whether there was a problem, and, if so, developing a plan to remedy it." (AA, at 41-42).

8. The Arbitrator found that Norman, as hearing officer and decision maker, held a hearing on August 5, 6 and 7, 2002, and notified Jackson of his dismissal on the following day, August 8, 2002, without benefit of transcripts of the hearing or personal notes, not having taken any (AA, at 28). Other testimony at the hearings established further that the notification of dismissal was, in fact, produced on the morning of August 8, 2002 (AH 17:51).

9. The Arbitrator found, on clear and convincing evidence, that Norman's decision to dismiss Jackson was arbitrary and unreasonable (AA, at 43).

II. DISCUSSION.

EQUAL PROTECTION.

1. THE CONSTITUTION REQUIRES EQUAL TREATMENT OF INDIVIDUALS. The equal protection clause of the Constitution provides that similarly situated individuals must receive the same treatment. "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  An equal protection case is not limited to only those instances where property and liberty interests are implicated . "Rather, to properly plead an equal protection claim, a plaintiff need only allege that through state action, similarly situated persons have been treated disparately. *Cf. City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S. Ct. 2382, 2394, 72 L. Ed. 2d 786 (1982)."  as cited in *Thigpen v. Bibb County, Georgia*, 223 F.3d 1231, 1237 (11th Cir. 2000).

2. THE CONSTITUTION ALLOWS FOR "CLASS OF ONE" COMPLAINTS. Equal protection complaints usually occur in the context of a group action. But an individual can also argue disparate treatment, a so-called "class of one" complaint. The most recent U.S. Supreme Court statement on the subject is in *Willowbrook v. Olech*, 528 U.S. 562, 564; 120 S. Ct. 1073; 145 L. Ed. 2d 1060 (2000):

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  … In so doing, we have explained that "'the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'"  (citations omitted)

Thus the plaintiff must show that there has been (a) intentional treatment, (b) different from others similarly situated, and (c) no rational basis for the difference in treatment. *Accord*, *Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006) (**"**class of one" equal protection claim exists when plaintiff can show intentional disparate treatment from others similarly situated, and no rational basis for disparity); *Toledo v. Sanchez*, 454 F.3d 24 (1st Cir. 2006) (same);  *Campagna v. Mass. Dept. of Envtl. Prot.*, 334 F.3d 150 (1st Cir. 2003) (same); *State Police for Automatic Ret. Ass'n v. DiFava,* 317 F.3d 6 (1st Cir. 2003) (same); *Donovan v. City of Haverhill*, 311 F.3d 74 (1st Cir. 2002) (same); *Wojcik v. Mass. State Lottery Comm.*, 300 F.3d 92 (1st Cir. 2002) (same);  *Burns v. State Police Ass'n*, 230 F.3d 8 (1st Cir. 2000) (same; subjective motivation not needed).

3. THE CLAIM CAN REST ON EITHER A SPECIFIC CONSTITUTIONAL PROVISION, OR ON SUBSTANTIVE DUE PROCESS, each having different requirements. The Due Process Clause of the Fourteenth Amendment has both procedural and substantive components. "The substantive due process guarantee functions to protect individuals from particularly offensive actions on the part of government officials, even when the government employs facially neutral procedures in carrying out those actions." *Pagan v. Calderon*, 448 F.3d 16 (1st Cir. 2006), at 32. But, *Id*., at 33:

> "Substantive due process is an inappropriate avenue of relief when the
> governmental conduct at issue is covered by a specific constitutional provision.
> See *S. County Sand & Gravel Co. v. Town of S. Kingstown,* 160 F.3d 834, 835
> (1st Cir. 1998) ("When a specific provision of the Constitution protects
> individuals against a particular kind of [misconduct] by government actors,
> individuals seeking redress . . . must assert their claims under that particular
> constitutional rubric instead of invoking the more generalized notion of
> substantive due process."); accord *Lewis*, 523 U.S. at 843; *Graham v. Connor*,
> 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)."

Here, in the instant case, the complaint is based on the specific constitutional requirement of equal protection, as discussed above. We must then show (a) disparate treatment of Dr. Jackson, as compared to other similarly situated faculty; and (b) that there is no rational basis for the disparate treatment.

5. <u>JACKSON RECEIVED DISPARATE TREATMENT</u>.  In the present instance Dr. Jackson was uniformly treated differently from other faculty against whom complaints had been made. On the basis of student complaints against Dr. Jackson an investigation was instituted (outside of procedures mandated by the College's Student Grievance Procedures), and these complaints, together with a limited and perfunctory investigation by Dean Darkazalli and Associate Dean Sabbagh, served to provide a basis for dismissal. On the other hand, over the periods of employment by the defendants there were no other cases in which such a procedure was used, and several equally important, or even almost identical complaints, were not investigated at all. Here we note a few of these other cases.

 (a)  Dr. Jackson had been charged with negligence with regard to safety. Safety questions were raised in an incident with another faculty member. Dr. Sarmad Saman, had been assigned the Biotech laboratory for a class. Dr. Jackson happened to come upon this class and objected to its use on the basis of contamination of laboratory materials. No students were interviewed regarding this matter, though Dr. Jackson provided an account by one student that Dr. Saman's safety standards were lax (AA, at 15).  Dr. Jackson also provided a list of several OSHA violations. No investigation of these was carried out,  no interviews with students were carried out ( AH, at 9:62ff).

 (b) Dr. Jackson was charged, in the case for dismissal, with using a syllabus at variance with the description of a course in the college catalog. Dr. Jackson and his colleague, Dr.

Pansé, were replaced in teaching the program, by a single teacher with only a Master's

degree. At the arbitration hearings it was brought out that this successor's syllabus was

completely at variance with the description in the college catalog. Yet no investigation of

this variance, which was sufficiently important in the eyes of the College to be one of

five charges justifying the dismissal of Dr. Jackson, was ever carried out, nor was any

action ever taken against the new teacher for this. (AH 9:67f)

  (c) A student complaint was made to Dr. Gastenveld about inappropriate remarks about

females by a teacher, Dr. Nassif. No investigation was ever carried out of this matter, nor

was any action taken against Dr. Nassif. (AH 13:72ff, especially 13:77; Batzer, Affidavit,

Exhibit 8)

6. <u>INTENTIONALITY</u>.  These cases are sufficient to illustrate the disparate behavior

received by Dr. Jackson. But more important in this respect is the finding of the

arbitrator, that in Dr. Jackson's case, "the focus of the investigation seemed to be one of

building a case for dismissal, rather than of ascertaining whether there was a problem

and, if so, developing a plan to remedy it." (AA, at 42). This demonstrates quite clearly

that there was an intention to dismiss Jackson. Supporting this are the statements by

Batzer (Exhibit 8) that Gastenveld told her that "they were building a case against

Jackson;" by Saman (Exhibit 9) that he was told that Norman had said to Sabbagh and

Darkazalli that Jackson had to be fired; that Dean Milstone (Exhibit 2) stated that the

process used against Jackson was not used against any other faculty member, and that the

only process recognized for student grievances against faculty were not followed.

7. <u>THERE WAS NO RATIONAL BASIS FOR THE DECISION TO DISMISS</u>.  The

arbitrator, after a thorough analysis of the charges against Jackson, found that "the

President's decision to dismiss Dr. Jackson was arbitrary and unreasonable based on clear and convincing evidence." The Arbitrator's clear and unequivocal finding is dispositive of this aspect of the case. See *El Dorado, supra* (arbitrator's factual findings are not open to judicial challenge). In addition we note that defendants never, in testimony or otherwise, provided a rational basis for the disparate treatment of Jackson.

8. CONCLUSION. The elements required for a finding that Jackson's equal protection constitutional right was violated are all satisfied, and a finding to that effect is inescapable.

### D. ABSENCE OF PROCEDURAL DUE PROCESS

1. OVERVIEW. Procedural due process involves, minimally, notice and an opportunity to be heard. Notice of dismissal for inappropriate conduct, typically, is understood because of statute or regulation. But notice, especially where the impact is severe, as in loss of livelihood and/or reputation, must include explicit pre-termination notice that the activities justifying dismissal could lead to dismissal. The Arbitrator founf that this did not occur in Jackson's case, so that he never received the constitutionally required procedural due process, and his constitutional rights were thus violated.

### I. FACTUAL BACKGROUND.

1. (a) Sufficient facts may be drawn from the Arbitrator's Award. These findings of fact must be accepted. See, e.g., *El Dorado Technical Services, Inc. v. Union General de Trabajadores de Puerto Rico*, 961 F.2d 317, 320 (1st Cir. 1992) (Although it may be possible to quibble over various facts found by the arbitrator (or implicit in his decision), the standard of review is unrelenting: as a general proposition, an arbitrator's factual findings are not open to judicial challenge.) and cases cited in section A.1, *supra*. As the

Arbitrator in the instant case notes, in arbitral jurisprudence one element is "whether, if guilty, the employer had put the employee on notice that such conduct would lead to discipline." (AA, at 36).

(b) The Arbitrator cites the testimony of Dr. Gastenveld acknowledging that she never told Dr. Jackson "that his job was at risk on account of how he conducted his courses"; nor "if he did not make sure to be present in the lab when any of his students were there"; nor "if he kept on having students demonstrate techniques to each other or answer questions for each other"; nor "if he ever changed the meeting times of a course without reporting it to the registrar"; nor "on account of how he managed safety precautions in his lab"; nor "if he arranged with students to meet with them in the evenings if they were unable to attend classes during the day." (AA, at 22-23, citing AH 6:95-96). In her opinion, the Arbitrator finds (under Charge 1) that Gastenveld explicitly acknowledged that she had not put Dr. Jackson on notice that his methods would lead to discipline, and that "the record does not establish that any other administrator did." (AA, at 37). She concluded that: "There was no reason for Dr. Jackson to believe that the College disapproved of his teaching methods. Thus, it cannot be said that the College had put Dr. Jackson on notice that his teaching methods, including the use of mentors, was inappropriate and, if continued, could result in discipline, including dismissal." (AA, at 40).

(c) Thus, we have a clear and unambiguous statement by the Arbitrator that Jackson received no notice that the College's complained of actions could lead to his dismissal, and a basic component of minimal procedural due process is lacking.

## II. DISCUSSION.

1. (a) <u>JACKSON DID NOT RECEIVE NOTICE THAT HIS ACTIONS COULD RESULT IN HIS DISMISSAL, THUS WAS DEPRIVED OF DUE PROCESS.</u>  The Arbitrator found that Jackson did not receive adequate due process because he did not receive notice that his actions could result in his dismissal (AA, at 40). *Cotnoir* (*Cotnoir v. University of Maine Systems and George Connick, et al.*, 35 F.3d 6 (1st Cir. 1994)), is instructive in this respect, with several pertinent similarities to the present case. Cotnoir was a tenured professor at the University of Maine, Augusta, accused of misconduct. He was interviewed on these at different stages by several of the University staff, all recommending dismissal, but was never specifically told that the result of these investigations could result in his dismissal. Eventually Cotnoir brought an action under 42 U.S.C. §1983 alleging denial of procedural due process. The Court (*Id.*, at 11), concluded that Cotnoir had not received meaningful notice that his alleged misconduct could result in dismissal: "Based on the facts now appearing in the record, it appears that the individual defendants failed to provide Cotnoir with any notice that they were considering terminating his employment, prior to making the decision to do so," nor did he have an opportunity to respond to, or defend himself against the evidence presented. Furthermore (*Id.*, at 12) the constitutional deprivation is complete where there is a lack of such pre-termination notice.

 (b) <u>NOTICE OF THE CONSEQUENCES IS ESPECIALLY IMPORTANT WHERE THE INDIVIDUAL FACES LOSS OF EMPLOYMENT AND STIGMA TO HIS REPUTATION.</u> Dismissal of a tenured faculty member has the consequences of loss of employment, and a stigma on his professional reputation. An analogous series of cases to *Cotnoir* derives from disbarment proceedings. There the attorney is also faced with the

loss of employment and a stigma to his reputation. This principle, that notice must include a statement of the consequences for an employee facing loss of livelihood, can be found in an early U.S. Supreme Court case, *In re Ruffalo*, 390 U.S. 544; 88 S. Ct. 1222; 20 L. Ed. 2d 117 (1968), which dealt with the disbarment of an attorney. The Court, after noting that the attorney had had no notice that his actions could lead to disbarment until after testifying fully on the matter, cited a dissenting judge in the trial below: ""Such procedural violation of due process would never pass muster in any normal civil or criminal litigation." *Id.*, at 550-551. White, J. (concurring) noted, *Id*, at 554: "A relevant inquiry in appraising a decision to disbar is whether the attorney stricken from the rolls can be deemed to have been on notice that the courts would condemn the conduct for which he was removed." The principle is equally valid in the present situation. See also, *Dailey v. Vought Aircraft Company*, 141 F.3d 224 (5th Cir. 1998) (notice, to be effective for due process considerations, must include the consequences of the charged conduct, at 230; citing *Cotnoir*, that the constitutional deprivation is complete when the employee is fired without these pre-termination protections, at 231); *Johnson v. Waddell & Reed*, 74 F.3d 147 (7th Cir. 1996) (requiring notice of sanctionable conduct).

(c) The Collective Bargaining Agreement states that dismissal cannot be invoked except through due process, *Section 15.02*. Due process demands notice. The Arbitrator has noted that in arbitral jurisprudence the employer must "put the employee on notice that such conduct would lead to discipline." (AA, at 36). Failure to do so thus constitutes a violation of procedural due process. The arbitrator's interpretation of the CBA is not open to judicial review, E*l Dorado Technical Services, Inc.*, v. U*nion General de Trabajadores de Puerto Rico*, 961 F.2d 317, 319-320 (1st Cir. 1992). Hence it follows

that the Court is compelled to recognize the Arbitrator's finding that Jackson did not receive notice, and was therefore denied procedural due process.

(d) Parenthetically, we note, as showing a pattern of behavior on the part of defendants, that the Arbitrator in the case of Pansé stated "the grievant was not on notice that he must change his program or face discipline and discharge. The absence of notice to the grievant prevents there being just cause to discipline, much less to discharge the grievant." *Award of the Arbitrator*, AAA Case No. 1139-2407-02, November 9, 2004, at 18.

2. CONCLUSION. Jackson did not receive notice that the conduct for which he was charged could lead to his dismissal (AA, at 40). Consequently he did not receive the required constitutional due process protection, and his civil rights under 42 U.S.C. §1983 were violated. Judgment in his favor is justified under this alone.

E. EVIDENTIARY ASYMMETRY CONSTITUTES A DUE PROCESS VIOLATION.

1. An asymmetrical application of evidentiary standards is unconstitutional. *Gray v. Klauser*, 282 F.3d 633, 641 (9th Cir. 2002), *vacated on other grounds*, 537 U.S. 1041, 154 L. Ed. 2d 512, 123 S. Ct. 658 (2002). This conclusion is based on a Sixth Amendment right, in criminal cases, or on due process, applicable in all cases, or on both. *Id.* at 645. A ruling that imposes a greater evidentiary burden on a defendant without justification violates due process. "Other cases confirm and apply the principle that a state rule or ruling that imposes a greater evidentiary burden on a defendant without justification violates due process." *Id*., at 646. In *Klauser* the asymmetry arose in the judge's rulings on admissibility of hearsay evidence, and reversal resulted. See also, *Albright v. Oliver*, 510 U.S. 266; 114 S. Ct. 807; 127 L. Ed. 2d 114 (1994) (Due Process

27

Clause is violated by deliberate suppression of evidence favorable to the accused)

(Stevens, J., dissenting from plurality opinion, at 298).

2.  While the logic here seems persuasive we have found no other Circuit which has followed this case, and subsequent cases in the 9th Circuit have also not followed it. We therefore mention it here, for completeness, only as a possibility, but do not pursue it further.

3. Norman's asymmetric rulings can also be a factor in showing bias, and are included above in that connection.

<u>F. CONCLUSIONS</u>

Jackson was entitled to an impartial arbiter at every stage of the process, and Norman, presiding over the hearing to determine whether he should be dismissed, and the only decision maker on this, was not impartial. Jackson was constitutionally entitled to treatment equal to others similarly situated by the Equal Protection Clause, but was instead dealt with by an *ad hoc* process designed to find him guilty of conduct justifying dismissal, while no other tenured or tenure-track faculty member was so treated. Jackson's constitutional right to equal treatment was thus violated. Jackson also did not receive notice that his conduct could lead to dismissal, thus his constitutional right to procedural due process was denied. Any of these three results compels a finding that his constitutional rights were violated. In addition there is a weaker argument, without much support in case law, that asymmetrical evidentiary rulings also constitute a violation of due process.

Dated:  12 February 2007

/s/ *Sam Silverman*_____

28

SAM SILVERMAN, BBO No. 462930
18 Ingleside Road
Lexington, Massachusetts 02420
(781) 861-0368
Smpr111@verizon.net
Attorney for Dr. Jackson,  Plaintiff

organization, or member of the MassBay community for reasons of age, ethnicity, national origin, gender, marital status, disability, race, religion, political/social affiliation, or sexual orientation.

6. **The Right to Exercise Beliefs**
   Students have the right to state and exercise their beliefs (including but not limited to religious, political and social beliefs) and to associate with or create organizations in accordance with these beliefs.

7. **The Right to a Safe Environment**
   Students have the right to an environment in which the College takes reasonable measures to offer students protection from foreseeable danger.

8. **The Right to Privacy**
   Students have the right to reasonable privacy in their academic, co-curricular, and personal lives.

9. **The Right to Confidentiality**
   Students have the right to access and control access to their educational records as provided in the federal Family Educational Rights and Privacy Act (FERPA) of 1974, also known as the Buckley Amendment. This includes the right to review and challenge the content of educational records, to control disclosure of personal and academic information to third parties, and to limit the routine disclosure of all or some information defined as "directory information" by the College's FERPA Notification of Rights Policy. This policy can be found in the College Catalog and the Student Handbook.

10. **The Right of Access to College Documents**
    Students have the right to view and/or obtain any public College documents.

11. **The Right to Fair Practice in Disciplinary Matters**
    Students have the right to a fair process to address all alleged violations of the Code of Student Conduct. Massbay's judicial process follows procedures of "Fair Practice" as defined in the Code of Student Conduct. Fair Practice includes an initial interview with the person bringing the complaint to determine if judicial action is warranted and if so, an interview with the student responding to the complaint, written notification of the alleged violation of the Code of Student

Conduct, an Administrative Disposition or College Judicial Board Hearing, and the right of appeal.

12. **The Right to Utilize a Grievance Procedure**
    Students have the right to a fair process to address alleged violations of their rights.

## Student Grievance Procedure

**Policy Goal: Conflict Resolution**
Before invoking the Student Grievance Procedure, a reasonable effort shall be made by those involved in a dispute to resolve it amicably. A dispute is most effectively handled and resolved by those closest to the problem, having the best understanding of the issues, and having the ability to formulate a mutually acceptable resolution. Therefore, it is in the best interest of the student, the potential subject of a grievance, and the College to resolve disputes through open and cooperative dialogue. Only when such efforts are unsuccessful should the Student Grievance Procedure be invoked. Throughout all phases of the Student Grievance Procedure, all reasonable efforts shall be made to maintain confidentiality in accordance with applicable law.

**DEFINITIONS**
1) COMPLAINT: the informal, unwritten stage of an allegation of mistreatment.
2) GRIEVANCE: a written complaint filed by a student with the person designated by the President as the Student Grievance Officer specifically alleging an abridgment of his or her rights as a student.
3) GRIEVANT: the student or students filing the complaint or grievance. The Grievant must have been a registered student of the College at the time of the alleged mistreatment.
4) RESPONDING PARTY: the person against whom a complaint or grievance is directed.
5) STUDENT GRIEVANCE OFFICER: a College employee assigned responsibility for administering the Student Grievance Procedure, including the maintenance of specified records. The Student Grievance Officer shall ordinarily be the Senior Student Affairs Officer. If this individual is the person against whom the grievance is filed, the President shall designate another College official to act as the Student Grievance Officer.
6) TIME: the number of days indicated at each level shall be considered as a maximum. All reasonable efforts shall be made to expedite

the process, but the President or his/her designee may extend the time limits in extenuating circumstances with notice to both parties in writing, or by mutual written agreement between the Grievant and the Responding Party.

7) DAY: as used in this policy, shall mean a calendar day.

8) SENIOR OFFICER: senior level employee who reports to the President for the Responding Party's work area.

9) INSTRUCTIONAL PERIOD: the academic semester, summer session or intersession when a Grievant knows or should have known of a grievable act or inaction. The Instructional Period shall end on the last day of final exams.

**Utilizing the Student Grievance Procedure**

The Student Grievance Procedure may be used by a student to address complaints concerning the alleged abridgment of the student's rights, as stated in the College's Student Handbook and/or Policy Guide. The student Grievant or the Responding Party may consult with the Student Grievance Officer at any time. The College's Student Grievance Officer is Dean of Students, David Milstone.

The Student Grievance Procedure may not be used for complaints alleging sexual harassment or discrimination. When a student believes that he/she has been discriminated against due to his/her race, creed, religion, color, sex, sexual orientation, age, disability, veteran status, genetic information or national origin, the College's Affirmative Action Grievance Procedure is a mechanism for resolution. The College's Affirmative Action Grievance Procedure is contained in the College's Affirmative Action Plan. The College's Affirmative Action Officer is Ms. Laurie Taylor.

If a complaint involves a grade dispute, a student shall process the complaint in accordance with the Student Grievance Procedure, even if the student alleges that a grade was improper because of discrimination.

At any Level of the Student Grievance Procedure, either party may request mediation by contacting the Student Grievance Officer. Mediation shall be mutually agreed upon, and not unreasonably refused by either party. The Student Grievance Officer shall select an impartial mediator who shall be mutually agreed upon and not unreasonably refused by either party, make the arrangements, determine the timetable for the mediation process, and inform the parties of the

timetable in writing. Where practicable, a mediation session shall be conducted no later than thirty (30) days after requested and agreed to by the parties. The purpose of mediation is to resolve the dispute to the satisfaction of both parties. If a resolution cannot be achieved, the Grievant may proceed with the Grievance Process.

A claim of physical or sexual assault shall not proceed under the Student Grievance Procedure. A student claiming physical or sexual assault by an employee of the College shall report the incident to the College's Security Department and/or the Director of Human Resources. A student claiming physical or sexual assault by another student or an employee claiming physical or sexual assault by a student shall report the incident to the College's Security Department and/or the Dean/Vice President of Student Affairs.

Further, in matters involving physical assault, students and employees are strongly encouraged to report the incident to the local authorities.

Except for under extenuating circumstances, as determined by the President or his/her designee, failure by either party to comply with the Student Grievance Procedure during the course of a grievance shall result in the waiving of the noncompliant party's rights under the Procedure.

Level One - Informal Procedure

This is the informal stage where most complaints are resolved. The Grievant and the Responding Party should consult with the Student Grievance Officer at this time.

A student grievant initiates the informal phase of the grievance process. As students are strongly encouraged to address complaints as soon as possible so that the Responding Party may take corrective action, if necessary, an informal complaint shall be brought to the Responding Party's attention by the Grievant within thirty (30) calendar days from when the Grievant knew or should have known of the grievable act or inaction.

The Responding Party must respond to the Grievant's complaint within ten (10) days. Though this phase of the process is informal, the parties may present their positions in writing. If the matter is not resolved informally within ten (10) calendar days from the date a response to the complaint was due, the Grievant may proceed to Level Two.

In some cases, due to the nature of a Grievant's complaint, a Grievant may be unwilling to confront a Responding Party during the instructional period. Under such circumstances, in order for a Grievant to initiate the grievance procedure and preserve his/her rights under the procedure, the Grievant must submit his/her informal complaint to the Student Grievance Officer within thirty (30) calendar days from when the Grievant knew or should have known of the grievable act or inaction. Thereafter, the Grievant may request the Student Grievance Officer to notify the Responding Party of the informal complaint without identifying the Grievant, or the Grievant may request that the Responding Party not be notified until the conclusion of the instructional period. In either case, the student may file a formal complaint no later than thirty (30) calendar days following the end of the instructional period during which the Grievant knew or should have known of the grievable act or inaction.

Level Two - Formal Procedure
Prior to filing a written grievance at Level Two, a Grievant must consult with the Student Grievance Officer. The Responding Party should also consult with the Student Grievance Officer at this phase of the process.

*L2 - Step One*
The Student Grievance Officer shall notify the parties in writing when a complaint is not resolved informally at Level One.

The Grievant may, within ten (10) calendar days after receipt of the Student Grievance Officer's written notice, file with the Student Grievance Officer a formal written grievance. The grievance shall contain the following information:  the name and title of the person(s) against whom the grievance is directed, a statement of all known facts, documents and materials supporting the grievance, a list of individuals who have information pertinent to the grievance, and the relief sought by the Grievant. All supporting documents, if any, shall be attached to the grievance as part of the grievance. The grievance shall also state the date it is filed and that it is being filed at "Level Two, Step One."

The grievance may be filed with the Student Grievance Officer by regular mail, certified mail, or in hand. Thereafter, the Student Grievance Officer shall deliver the grievance, and all supporting documents, if any, to the Responding Party within five (5) calendar days. If the Responding Party is unavailable at the time the grievance is filed, the Student

Grievance Officer shall use reasonable means to deliver the grievance within a reasonable period of time.

The Responding Party shall forward a written Level Two - Step One response to the Student Grievance Officer within ten (10) calendar days of his/her receipt of the grievance. The Student Grievance Officer shall deliver the written response to the Grievant within five (5) calendar days of receipt.

*L2 - Step Two (Supervisor Level)*
If the grievance is not resolved to the satisfaction of the Grievant within ten (10) calendar days after his/her receipt of the Step One response, or if no written response is submitted, the Grievant may within ten (10) calendar days after the written response was received or due, request the Student Grievance Officer to forward the written grievance and response, if any, to the supervisor of the Responding Party, with a copy to the Senior Officer of the work area of the Responding Party.

The supervisor shall investigate the grievance and confer with the Senior Officer. The supervisor shall forward his/her written decision to the Student Grievance Officer, within ten (10) calendar days after receipt of the Step Two grievance. Thereafter, the Student Grievance Officer shall deliver the decision to the Grievant and the Responding Party within five (5) calendar days.

At any time before the issuance of the Supervisor's Step Two decision, the Senior Officer may request that the parties meet to discuss the issue and attempt to resolve it.

Grade appeals do not go beyond this Step (Level Two - Step Two) per the section on Grade Appeals.

Either party to a grievance may raise no new issues or allegations after Step Two.

*L2 - Step Three (Student Grievance Committee Level)*
If the grievance is not resolved to the satisfaction of the Grievant within the period allowed at Level Two - Step Two, the Grievant may request a hearing before a Student Grievance Committee. Such a request must be in writing and presented to the Student Grievance Officer within ten (10) calendar days from the issuance of the Supervisor's Level Two - Step Two decision.

Within ten (10) calendar days of the Student Grievance Officer's receipt of the Grievant's request for a hearing, the Student Grievance Officer shall arrange a hearing before a Student Grievance Committee. The Student Grievance Officer shall use reasonable efforts to schedule the hearing at a time mutually convenient to the parties. At least twenty-four (24) hours prior to the hearing, the Student Grievance Officer shall provide each member of the Committee and all parties to the grievance with copies of the grievance, responses to the grievance, decisions issued, and all relevant supporting documentation and materials. The Committee's make-up and hearing rules are discussed later in this policy.

The Committee shall deliver its findings and recommendations to the Student Grievance Officer within ten (10) calendar days following the hearing. A copy of the Committee's findings and recommendations shall be delivered to the Grievant, the Responding Party, and the President or his/her designee, within five (5) calendar days of receipt.

Within ten (10) calendar days of the President's receipt of the Committee's findings and recommendations, the President or his/her designee, shall issue a written statement accepting, modifying or rejecting the Committee's recommendations.

The decision of the President, or his/her designee, shall be final and binding on all parties.

## Grade Appeals

Complaints or grievances filed in connection with assigned grades represent a special case within the grievance procedure. Grading reflects careful and deliberate assessment of a student's performance by the instructing professional(s). As such decisions are necessarily judgmental, the substance of those decisions may not be delegated to the grievance process. Nevertheless, the College recognizes that in rare cases the process of grading may be subject to error or injustice.

Except as otherwise provided by separate appeals procedures for clinical programs as approved by the President of the College, a student who alleges an error or injustice in the grading process may file a grievance under the Student Grievance Procedure. A grade appeal grievance shall proceed no further than Level Two, Step Two. For purposes of a grade appeal, the Senior Academic Officer of the College, or his/her designee, shall serve as the Student Grievance Officer throughout the grade appeal process.

If the faculty member who assigned the challenged grade is no longer employed by the College or is not available within the timelines specified (see "Time" definition), the student may initiate his/her Level One complaint with the chief administrator of the appropriate instructional division (who shall be identified by the Senior Academic Officer).

If at any level substantial evidence of error is produced, the grading process may be remanded to the instructor of record for reassessment. If the instructor of record is no longer available, the chief administrator of the appropriate instructional division or his/her designee shall instead reassess the grading process.

## Membership of the Student Grievance Committee

The composition of the College's Student Grievance Committee shall consist of five members: one student, one unit professional, one faculty member, one non-unit professional and one unit classified employee. The President or his/her designee shall appoint each member from among the recommendations submitted by the Student Grievance Officer.

Service on a Committee shall be voluntary, provided that a member who has a personal interest in the particular grievance shall be ineligible to serve on a Grievance Committee. All College employees serving on a Student Grievance Committee, and acting within the scope of their official duties on the Committee, shall be covered to the full extent provided under Massachusetts General Laws, Chapter 258, including, the indemnification provision contained in M.G.L., Chapter 258, Section 9.

All Student Grievance Committee members, as well as all others in attendance at a student grievance proceeding, shall maintain the confidentiality of the proceedings. The Student Grievance Officer shall attend all Committee hearings but shall not vote.

## Guidelines for Committee Hearings

The following guidelines provide the framework for conducting a Student Grievance Committee Hearing:

1) Prior to the hearing, the newly impaneled Committee shall meet to elect a Committee Chairperson. The Chairperson shall be selected by a simple majority vote.
2) The Chairperson on the Committee shall be responsible for conducting the hearing and drafting the decision of the Committee, but shall

vote only in the event of a tie.

3)  All hearings shall be closed and deliberations of the Committee shall be confidential and conducted in private.

4)  The Grievant and the Responding Party shall be in attendance at the hearing. Each party may be accompanied by an advisor at the hearing. The advisor, however, may not participate in the hearing or question witnesses. Either party may at anytime during a hearing consult in private with his/her advisor.

5)  Witnesses may be asked by the Committee to remain outside of the hearing room until they are called to testify.

6)  The Grievant will address the Committee first. The Grievant will state the nature of his/her grievance and may present relevant evidence and/or witnesses in support of the grievance.

7)  The Responding Party may respond to the Grievant's complaint and present relevant evidence and/or witnesses in opposition to the grievance.

8)  Once the parties have presented their respective positions, the Committee may question the parties and/or witnesses.

9)  After the Committee has questioned the parties, each party will be given the opportunity to question the other party and their respective witnesses. All questions must be directed through the Committee. If the Committee determines that a question is relevant to the grievance, the party or witness to whom it is addressed will be asked to respond.

10) Following the parties' questioning of each other, the Committee will have another opportunity to question the parties and witnesses.

11) Hearings before the Committee shall not be subject to the formal rules of evidence. In all cases, the hearing shall be conducted in a fair and impartial manner.

12) If a party to a grievance fails to appear for a scheduled hearing, the Committee has the discretion to proceed with the hearing and issue its findings and recommendations in the party's absence.

13) The decision of the Committee shall be based on the relevant evidence presented at the hearing. The decision shall be in writing and include:  a list of all documentary evidence and witnesses presented; a summary of the testimony offered by both parties and their respective witnesses; the findings of the Committee and its recommendations. Copies of the decision and recommendations of the Student Grievance Committee shall be forwarded by the Student Grievance Officer, to the Grievant, the Responding Party, and the President or his/her designee.

14) When deciding upon a grievance, the Committee shall consider whether a finding against the Responding Party is fundamentally fair and reasonable under the circumstances and in accordance with applicable College rules and procedures.

**Withdrawal**
A student may withdraw his/her complaint or grievance at any time. Withdrawal must be accomplished in writing or by oral agreement confirmed in writing.

**Reprisals**
No member of the College community shall retaliate or threaten to retaliate against, interfere with, restrain, or coerce any student in the exercise of his/her rights under the Student Grievance Procedure or his/her participation in any grievance proceedings.

**Collateral Rights of Person Grieved by Student**
If the recommendations made at any level of the grievance procedure result in sanctions against a college employee, the sanctions shall be regarded as administrative actions subject to all conditions of applicable collective bargaining agreements and College or Board of Higher Education personnel policies.

**Alternative Forums**
Filing a grievance in accordance with the Student Grievance Procedure in no way abrogates a student's right to file a complaint with an appropriate state or federal agency or in another forum.

Dated: March 2001

## AFFIDAVIT

I, Dr. David Milstone, am presently the Associate Vice Chancellor for Student Affairs at the University of Massachusetts Dartmouth (previously the Dean of Students at MassBay Community College from 1999-2002) and have been asked to prepare an affidavit with regard to information I have pertaining to the Dr. Bruce Jackson legal case against MassBay Community College.

1)      It is my understanding that the Student Grievance Procedure included in the 2001 Massbay Community College Student Handbook was approved by the chief attorney of the Massachusetts Community Colleges and College Presidents representing all 15 Massachusetts Community Colleges.  This procedure was shared with the faculty and staff union leaders representing all 15 Massachusetts Community Colleges as well.  The procedure, in short, outlined a protocol which was to be used by the Grievants for all cases involving students, and included a special provision for grieving grades.  The only types of incidents that were to be handled outside the Student Grievance Procedure were cases not involving students and cases involving students that alleged sexual harassment (including sexual assault) and discrimination. Cases involving sexual harassment and discrimination were referred to the College's Affirmative Action Officer.

2)      To the best of my knowledge, there was no agreed-upon alternative protocol for formally resolving cases against faculty or staff when involving students.  Incidents could be resolved (and were encouraged to be resolved) informally by virtually anyone, such as when there was a simple misunderstanding between two people.  During my term at MassBay Community College (December 1999-July 2002) I was not aware of any grievances brought by students that were formally resolved by any means other than the Student Grievance Procedure.  Had I been made aware of one, I would have complained to the appropriate College authority or supervisor that the incident needed to be sent through the established and agreed-upon procedure.

3)      With regard to the termination of Drs. Panze and Jackson, the grievance was not brought to my attention and I was unaware of the specific complaint(s) brought by one or more students. I was not told that a complaint was made and that a different path was to be utilized to formally resolve the complaint.  My understanding of the Student Grievance Procedure was that it was created as a vehicle for students to gain support when they believed that their rights had been abridged and at the same time to provide a vehicle for an accused faculty and staff person that was fair and transparent.

SIGNED UNDER THE PAINS AND PENALTIES OF PURJURY THIS 15TH DAY OF JANUARY 2007.


David Milstone        Date

Susan Costa
My commission expires -
Date    Jan 10, 2008

*Mass Bay Community College, Board of Trustee*
*May 22, 2001*

Exhibit 3

**Change in Rank and Tenure**.  A summary of the changes in rank and tenure recommended by the President were presented.   They are as follows:

**Faculty Change of Rank**:

| Name | From | To |
|------|------|-----|
| Susan Mullaney | Associate Professor | Professor |
| Patricia Kelliher | Associate Professor | Professor |
| Joyce Ilfill | Assistant Professor | Associate Professor |
| Arthur John | Assistant Professor | Associate Professor |

**Professional Change of Rank**

| | | |
|---|---|---|
| Cynthia Bailey | Admissions Recruiter III | Admissions Recruiter IV |
| Christopher Daniele | Acad. Tech. Spec. Level I | Level II |
| Linda Stern | Librarian Level I | Level II |

**Tenure**

| | |
|---|---|
| Joan Alegi-Feeney | Respiratory Care |
| Patricia Kelliher | Nursing, ADN |
| Robert Whitman | Writing |

**Report of the Nominating Committee and Election of Officers**.
Felix Juliani reported on the recommendations of the Nominating Committee.  The report is submitted to the Trustees for consideration and is attached to the minutes of this meeting as Addendum A.

Chairman Forbes asked if there are any other nominations. There were none.  There was a vote and the vote was unanimous.

**Approval of the Commencement List**

**Motion**:  A motion was made by Felix Juliani and seconded by Bonnie Clendenning to approve the list of candidates for graduation as presented and subject to the faculty's approval.

**FY2002 Proposed Meeting Calendar**.  The calendar of meetings as presented was accepted and approved.  The schedule is attached to the minutes as Addendum B.

**Student Grievance Policy**.  President Norman presented a summary of the new Student Grievance Policy and some background on why a new policy was proposed.  The President recommends approval.

**Motion**:  A motion was made by Felix Juliani, and seconded by Walter Zuschlag to accept the new student grievance policy as presented.  The motion was passed unanimously.

**Special Reports**.



OFFICE OF THE PRESIDENT

WELLESLEY HILLS CAMPUS:
50 Oakland Street
Wellesley Hills, MA 02481

t. 781.239.3100
f. 781.237.1061

May 28, 2002

Professor Bruce Jackson
9 Hemlock Road
Wayland, MA  01778

Dear Professor Jackson:

This letter is to notify you that you shall be recommended for dismissal. I am charging you with failing to fulfill the duties of the position in which you are employed. On March 15, 2002, you were notified that the College had received student complaints about you. An investigation into those complaints, including conversations with you, has been completed. I have been advised of the results of the investigation and the conclusions and recommendation of Vice President Gastenveld and Dean Darkazalli in a letter dated May 23, 2002, copy attached hereto and incorporated herein.

Pursuant to Article 15.02 of the collective bargaining agreement, you have the opportunity to meet with me to discuss the matter, at which time the matter may be concluded by mutual consent.

Should you wish to meet, I am available to meet with you on May 31, 2002, at 10:00 a.m., in my office. You must notify my office by May 30, 2002 by 3:00 p.m. if you wish to meet. Your failure to notify me will be considered a waiver of your right to this meeting.

If this meeting does not result in conclusion by mutual consent, or if you waive this meeting, you will receive a formal statement of charges and the opportunity for a formal hearing.

Sincerely,

Lindsay D. Norman
President

OFFICE OF THE PRESIDENT

WELLESLEY HILLS CAMPUS:
Oakland Street
Wesley Hills, MA 02481

781.239.3100
781.237.1052

June 2, 2002

Dr. Judith I. Gill
Chancellor
Board of Higher Education
One Ashburton Place
Boston, MA

Dear Judy:

I am herewith alerting you to two personnel actions now taking place at MassBay that could become highly litigious and/or public. I alert you to avoid any surprises for you or the Board of Higher Education.

For almost the entire three years that I have been President at MassBay, I have had to deal with some very unacceptable behavior from two tenured professors there. Both are minorities – one black and the other Indian. Over the course of the last couple years, the College has instituted progressive discipline of these professors while attempting to correct the most egregious of the problems with their performance. One professor was even suspended for three days without pay just last month for repeatedly violating the rights of a fellow faculty member.

More recently, and in response to a number of student complaints, we have determined that each professor has failed to supervise their classes, changed class schedules without authority, and exposed students to unsafe laboratory situations, to name but few problems with these faculty. These recent occurrences have now led to the College taking action to terminate the employment of the two professors. The recent performance history for each individual is summarized in the enclosed materials.

Professor Panse has been officially served with his dismissal notice. Professor Jackson is out of state and should be served this week. They each will have the opportunity for a formal hearing with me. They then can request a hearing with you or your designate.

Please let me know if you need more information on these matters.

Sincerely,

Lindsay D. Norman
President

OFFICE OF THE PRESIDENT

**MassBay**
COMMUNITY COLLEGE

WELLESLEY HILLS CAMPUS:
50 Oakland Street
Wellesley Hills, MA 02481

t. 781.239.3100
f. 781.237.1061

June 14, 2002

Professor Bruce Jackson
9 Hemlock Road
Wayland, MA 01778

Dear Professor Jackson:

The College has attempted several times to serve you with the enclosed notice that you shall be recommended for dismissal. This letter is to notify you that the dates referenced in the May 28, 2002 notice related to the opportunity to meet with me regarding this matter are changed.

Should you wish to meet, I am available to meet with you on June 21, 2002 at 3:00 p.m., in my office. You must notify my office by June 20, 2002 by 3:00 p.m. if you wish to meet. Your failure to notify me will be considered a waiver of your right to this meeting.

You are reminded that if this meeting does not result in conclusion by mutual consent, or if you waive this meeting you will receive a formal statement of charges and the opportunity for a formal hearing.

Sincerely,

*Lindsay D. Norman*

Lindsay D. Norman
President

cc:    Personnel File



MASSBAY
COMMUNITY COLLEGE

WELLESLEY HILLS CAMPUS:
50 Oakland Street
esley Hills, MA 02481-5399

t. 781.239.3000
f. 781.239.1047

June 28, 2002

Professor Bruce Jackson
9 Hemlock Road
Wayland, MA  01778

Dear Professor Jackson:

Pursuant to Article 15.02(3) of the collective bargaining agreement, I am notifying you that I am recommending you for dismissal based on the following charges:

1. You failed to teach and/or supervise and/or be present in the laboratory during significant parts of your scheduled laboratory/class periods, or, at times for the entire scheduled class periods, during the 2001-2002 academic year;

2. You jeopardized the safety of students and/or equipment by failing to provide direct supervision of students during scheduled laboratory times;

3. You rescheduled your class time without authorization and/or you reduced the scheduled course time;

4. You inappropriately assigned students to teach or supervise other students in the laboratory; and

5. You failed to provide instruction consistent with the course description.

You have previously received a copy of the report and recommendations of Vice President Paula Gastenveld, and Dean Ghazi Darkazalli. This document is again included for your reference.

You are entitled to a hearing if you make a written request by July 10, 2002.  If you so request, the hearing dates will be  August 5, 6 and 7, 2002.  If notice is not received by you requesting a hearing you will be presumed to have waived your right to this hearing.

Sincerely,

Lindsay D. Norman
President

cc:  Personnel File

1

*Exhibit 8*

# AFFIDAVIT

I was a part time student in the Biotechnology Program at Massachusetts Bay Community College from 2000-2002.

In Spring 2002 , I was enrolled in Molecular Biology that was taught by Dr. Bruce Jackson and I was also enrolled in Chemistry II taught by Dr. Peter Nassif.

I came home from class to find a message on my answering machine from Paula Gastenfeld asking that I contact her regarding the Biotech program at Mass Bay.

I returned her call and she said that she knew that I was enrolled in the Biotech Program and that I had been in the program for several semesters. She informed me that she was aware that I am enrolled in Molecular Biology with Dr. Jackson. I said that is correct, I am currently taking Molecular Biology with Dr. Jackson. She informed me that she was "contacting students that had taken classes with Bruce Jackson and that Mass Bay was building a case against him".

After our conversation, I told her it was funny she called, because I was contemplating filing a complaint regarding the Chemistry teacher, Dr. Peter Nassif.
Even though academically I was doing okay in Dr. Nassif's class, he was verbally abusive to my mostly all female class and always called us "a bunch of losers". He worded the questions on exams like the following "My dumb brunette assistant". I said that he was unprofessional and it should not be allowed to teach this course. Paula Gastenfeld told me that the school had no control over how material was presented, but I could send her a copy of my exam to look at.

How is it one professor (Dr. Jackson) is criticized for absolutely doing nothing wrong and yet another professor (Dr. Peter Nassif) can behave openly inappropriate and nothing is done. Dr. Nassif has a reputation of abuse and sexist behavior toward women. Ask any female that has ever taken a class with him.

I have since completed my B.S. degree and went to work at Tufts University, MIT and I currently work at UCSD in San Diego. I am a Staff Research Associate III /Lab Manager and the senior staff in our laboratory.

I have attached my recent resume with my most current publications.

I, Glenda M. Batzer of 18635 Caminito Cantilena#202, San Diego California
do swear under the pains and penalties of perjury that all of the following is true and to the best of my knowledge.

_____     1/30/07
Glenda M. Batzer                                   Date

**Glenda Batzer**
18635 Caminito Cantilena #202
San Diego, CA 92128
gbatzer@ucsd.edu
858-676-2544 home or 858-335-3287 cell phone

*In Vitro & In Vivo* **work as follows:**

- Molecular biology techniques - cloning, real-time PCR, shRNA-expressing lentiviral vector construction and preparation.  RNA isolation, cDNA synthesis and Inverse PCR,

- Primary/ tissue culture cell techniques - isolation and activation of primary splenocyte, lymph nodes and lung cells.  In vitro activation with Ova, peptide, aCD3 and PMA/Ionomycin. Several years experience with tissue culture, maintaining cell lines , media preparation, freezing and thawing cell lines (to include BWZ-5147, THZ, DO11, 293Fts,  Transfections, proliferation assays, ELISAS and Western blots.

- Three Color FACS staining for surface markers and Intracellular staining for cytokines.

- Retroviral and lentiviral production and infection of primary or tissue culture cells, including delivery and validation of shRNA.

- Animal husbandry - mouse and gerbils; surgical procedures bleeding, injecting, genotyping, organ harvesting, generation of chimeras by adoptive transfer of bone marrow from 5-FU treated animals.  Experience with wild-type (C57bl/6 & Balbc) and several transgenic mouse lines (OTIIxIL2 KO, Rag129 x IL2 KO, OTII KO,)  other strains include Iifng KO, Akt1 KO, RasGRP1 KO, and MIGCre Chimeras.

- Over 7 years experience with major survival surgery, alzet pump implantation, husbandry, genotyping, organ harvest, bleeding, 5FU injections and dexamethasone , anesthesia and irradiating recipient mice and reconstitution of bone marrow into the recipients.

- Adoptive transfer of antigen specific CD4 + cells to naïve mice and  subsequent vaccination modeling  in vivo.

- Experience generating T cell activated hybridomas, transfections using lentiviral and retroviral vectors for virus production.

**TRAINING/CERTIFICATIONS**
HUMAN SUBJECTS TRAINING
RESEARCH ANIMAL TRAINING
LABORATORY SAFETY CERTIFIED
CERTIFIED RADIATION SAFETY
MANAGING HAZARDOUS WASTE

**EMPLOYMENT**

**University of California San Diego, Department of Medicine**                                        2006-Present
SRA III/Lab Manager
Independent research projects:
"Understanding the molecular mechanisms of T-Cells in an asthma model".
Our lab studies the role Th1 vs Th2 phenotypes in the development of asthma.  Skills for this position include Adoptive Transfer, 3 color Flow Cytometry, Elisas, Tissue culture and extensive in-vivo modeling.

 I am responsible for keeping all of our projects on track and moving forward.   Manage 2 full time technicians, a graduate student and an undergrad students.  Maintaining mouse colonies, submission, maintenance of Mouse and Human protocols, ordering and budgets

**University of California San Diego, Department of Medicine**                                        2005-2006
SRA II
Independent research projects:
"Understanding the molecular mechanisms of T-Cells in an asthma model".
Our lab studies the role TH1 vs TH2 phenotypes in the development of asthma.  Skills for this position include Adoptive Transfer, 3 color Flow Cytometry, Elisas, Tissue culture and extensive in-vivo modeling.

**Massachusetts Institute of Technology- Center for Cancer Research**     2003-2004
Research Scientific Staff /Lab Mgr

 Independent research projects:
"Development of a model to study autoreactive CD4$^+$ T Cells"
Research to generate T cell hybridomas of auto-reactive cells, clone the TCR by reverse PCR, express alpha and beta
chain using a bicistronic retroviral vector in cell lines and bone marrow to generate mouse chimeras.

"*In vivo* delivery of DNA using a commercially available transfection reagent".
Research to deliver shRNA expression vectors by transfection *in vivo* to knockdown genes in target organs or
specific cell types.

*Lab Manager*
Manage the daily operations of a research lab of 18.  Responsible for hiring and supervision of support staff members.  Manage $750K
annually in funding for lab development and operations.  Authorize all purchases of reagents, equipment and animals for use in our
laboratory.  Supervised mouse colonies across 5 housing locations.

Development and submission of all protocols for the lab.  Designated manager for all environmental aspects of the lab to ensure full
compliance with MIT's training, safety, radiation and waste management programs.  Conducted independent research project over and
above Lab Manager responsibilities.

**Tufts University – Division of Infectious Diseases**     2000-2003
*Senior Research Technician*
Used molecular biology techniques to study *cryptosporidium* parvum and *giardia* lamblia parasites.  Constructed vectors to study
promoters of c. parvum.  The PI had a grant funded in 2004 for the work that I did for this project.

**Core Scientific**     1998-2000
*Research Associate I*
Sequenced DNA for customers using automated radioactive methods. Performed a variety of assays, poured and ran agarose and
acrylamide gels. Designed oligos for primer walking.  Tracked bases/finished gels, aligned sequences and resolved discrepancies.

**Millennium Pharmaceuticals**     1997-1998
*Research Lab Technician II*
Member of sequencing production core to isolate and purify DNA as well as load the ABI 377 sequencers.  Proficient with several robotic
delivery systems to provide high throughput sequencing for the company.  Performed preps/reactions on ssDNA and dsDNA.  Trained new
personnel and functioned as weekend shift supervisor.  I co-authored several original SOPs.

**Dana-Farber Cancer Institute**     1993-1995
*Laboratory Technician*
I volunteered after hours as a lab technician learning basic lab skills.  I carried SV40 cells and made media.
**Dana-Farber Cancer Institute -Cancer Epidemiology**     1992-1997
*Senior Research Administrator/Grant Manager*
I supported a staff of 20 MD's and fellows.  I assisted the group with grant proposal preparation and managed post award funding, which
exceeded a million dollars annually.  I designed and edited slides and overheads used in journal submissions, grants and speaking
engagements.

**California Closet Company-Independent Franchise**     1986-1991
*Office Manager*
Managed the day-to-day operations of an independently owned franchise.

**United States Navy-Active Duty**     1982-1986
*Radiological Controls Monitor*
Second class petty officer assigned to RADCON Division; responsible for repair of nuclear submarines home-ported at SUBASE Pearl
Harbor Hawaii.  Was one of only 25 females who held this qualification in the entire Navy.

**EDUCATION**
        Northwestern International University BS Molecular Biology 2002

**ABSTRACTS**

". **Batzer G**, Lam DP, Ng N, Horner AA.  IMMUNOBIOLOGY Review (2006).

"Using House Dust Extracts to Understand the Immunostimulatory Activities of Living Environments". **Batzer G**, Lam DP, Paulus P, Boasen J, Ng N, Horner AA.  IMMUNOBIOLOGY  Review (In Press 2006).

"House Dust Extracts have both TH2 Adjuvant and Tolerogenic Activities".  Ng N, Lam DP, Paulus P, **Batzer G** and Horner AA.  J Allergy and Clin Immunology  177(5) 1074-1081. (May 2006).

"Class B Alkaline Stabilization to Achieve Pathogen Inactivation". Christine L. Bean, Jacqueline J. Brabants, Giovanni Widmer, **Glenda Batzer**, Helene Balkin, and Aaron B. Margolin.  Water Env Research; 2004 (submitted June 2006).

"Detection of infectious parasites in reclaimed water".  Huffman DE, Gennaccaro AL, Berg TL, **Batzer G**, , Widmer G. Water Environment Research Volume 78, Number 19; 2006 (pages 2297-.2302)

"Giardia cysts in treated wastewater effluents; are they infective?  Garcia A., Yanko W., **Batzer G**., Widmer G. Water Environment Research; 2002 Nov-Dec 74(6)541-544 (2002).

"Structural and Biochemical Alteration in Giardia Lamblia cysts exposed to ozone".  Widmer G., Clancy T., Ward H., **Batzer G**., Pearson C., Bukhari Z.  J of Parisitology; Dec 88(6) 1100-1106 (2002).

"Detection and Genotyping of cryptosporidium parvum by real time PCR and melting curve analysis" Tanriverdi S., Tanyeli A., Bailam F., Koksal F., Kilinc Y., Feng X., **Batzer G**.,Tzipori S., and Widmer G.

"Evidence of random mating in a population of *Cryptosporidium parvum* from cattle" Sultan Tanrıverdi, M. Özkan Arslan H. Metin Erdoan , Mustafa Kose, **Glenda Batzer** and Giovanni Widmer. (unpublished).

## REFERENCES

DR. MARIPAT CORR- UCSD, Asst Prof- 858-534-7817
DR. PATRICK STERN -POSTDOC- MIT  pstern@mit.edu
COLLEEN LESLIE – ASSISTANT DIRECTOR-CANCER CENTER - MIT (617) 258-6402
DR. GIOVANNI WIDMER - PI- TUFTS SCHOOL OF VET MEDICINE (508) 887-4931

Exhibit 9

## AFFIDAVIT

1. My full, true, and correct name is Sarmad Saman.  I am a permanent resident of the United States, currently making this affidavit regarding Dr. Bruce Jackson's case against Lindsay Norman and others. I am currently employed at the Massachusetts Bay Community College.

2. I was born in Baghdad- Iraq on April 5th 1962.

3. In January 2003 while being hired by Massbay Community College to fill a position vacant due to a retirement of a Faculty member, I was informed by the then Associate Dean Tom Sabbagh that both Dr. Jackson & Panse were fired & this decision was taken by the then President Norman during a Retreat in 2002.

4. I was also told that in the same meeting that Norman told Ghazi Darkazalli and Tom Sabbagh that both Bruce Jackson and Chandra Panse must be fired.

5. As far as I know they were fired later that summer.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 15th DAY OF January 2007.

Sarmad Saman

<u>AFFIDAVIT</u>

I, Donald F. Karp, hereby depose and say:

That on January 5, 2001, I was hired by MassBay Community College, to fill the position of Laboratory Manager in the Division of Science and Engineering, of which Dr. Bruce Jackson was a Professor and Department Chairman of Biotechnology.

I have a Masters degree in Microbiology and have worked in many small laboratories gaining many skills besides the bench work, as is commonly needed by small companies. This included managerial and administrative experience.

At the start of my employment, the Dean of the Department, Dr. Ghazi Darkazali, toured me around the Department laboratories, including the Biotechnology labs, at which point he specifically mentioned to me that part of my duties would involve determining why so much money was spent on regular maintenance fees: if the work was in fact done, and if it was necessary. I cannot remember the exact words, but the implication was that I was to be checking up on the expenditures for which Dr. Jackson and his department were making.

The Biotechnology labs were taken care of by Dr. Jackson's students, and as this was a research facility, it was run differently than the rest of the labs for which I was responsible.

Other duties included supervision of laboratory assistants. Together we were responsible for having lab experiments set up for teachers and cleaning up afterwards for seven or more types of classes. I was also responsible for ordering supplies and maintaining equipment in good working order, keeping stocks of supplies in good order, and seeing that safety equipment and hazard disposal met standards. Part of my function was to prevent duplicate orders to save funds.

I did not notice any deviations from lab cleanliness or order or dangerous situations any more than other labs in the facility or any greater than a normal research facility. In fact the level of neatness was very high, in my opinion.

I noticed that the Biotechnology Department had a large budget, and often had more problems than other departments within Science and Engineering, in obtaining purchase order numbers for ordering supplies.

To conclude, I admire Dr. Jackson in creating and maintaining a very high quality research/ teaching lab, at the level of a graduate school, at this junior college, even in the midst of what I observed was constant harassment from the administration. When I asked why he does not leave, his answer was his high regard for the students and the good feelings he has about filling their needs, in spite of the hardships.

Sworn to under the pains and penalties of perjury this day of the 30th of July, 2002.

Donald F. Karp

Exhibit 11, Arbitration hearing, volume 2, pps. 8-10, 33, Testimony of Anthony Allen

0008
```
 1        Q.   And you understood that you were being
 2   asked to come and testify at this hearing as a
 3   witness for the college so to speak in the sense of
 4   a witness in the service of the college's desire to
 5   discipline Dr. Jackson; is that correct?
 6        A.   Yes.
 7        Q.   Okay.  And you declined to appear at the
 8   hearing; is that correct?
 9        A.   Yes.
10        Q.   Why did you decline?
11        A.   It wasn't something I was interested in
12   really.
13        Q.   Okay.  What do you mean you weren't
14   interested in it?  Is that to say you were not
15   interested in seeing Dr. Jackson disciplined on
16   account of the complaints that you had made?
17        A.    It had no -- it had no relevance in my life
18   at the time.  I was home watching kids, remodeling
19   my house.  I had no plans to go back to school.  I
20   had nothing to gain from it so I wasn't interested
21   in it.
22        Q.   Did you -- when you made the complaints
23   against Dr. Jackson, however, you understood that
24   those were serious allegations that you were making,
```

0009
```
 1   did you not?
 2        A.   I understood that they were complaints
 3   basically lodged to support my request for tuition
 4   refund.
 5        Q.   Did you make a request for a tuition refund
 6   in any formal -- is there a formal mechanism for
 7   doing that that you followed?
 8        A.   Yes.
 9        Q.   And what was that?
10        A.   To fill out a form.
11        Q.   Did you do that?
12        A.   I did.
13        Q.   To whom did you submit that form?
14        A.   I'm not familiar with the names of the
15   departments.  I haven't had much experience with it.
16   I can show you where the office was but -- I don't
17   know if it was a bursar or who it was actually.
18        Q.   How did you learn of the process for
19   requesting a tuition reimbursement?
20        A.   From Assistant Dean Sabbagh.
21        Q.   When did you learn of that from him?
22        A.   Sometime after I wrote the letter of
23   complaint.
24        Q.   When you went to Assistant Dean Sabbagh at
```

0010
```
 1    that point in time did you have in mind to request a
 2    tuition reimbursement before your first conversation
 3    with him?
 4        A.   It was in the back of my mind, but the
 5    major focus of that initial contact was to validate
 6    what I was -- the situation as I was perceiving it.
 7        Q.   What do you mean "to validate it"?
 8        A.   I didn't believe that Dr. Jackson was
 9    operating under the official sanction of the
10    college.  I believe that he was working
11    independently of what policies and procedures at the
12    college was expecting of him.
13        Q.   And at the point in time that you went to
14    Dean Sabbagh you had not approached Dr. Jackson to
15    tell him directly of your concerns, correct?
16        A.   Correct.
17        Q.   Okay.  Were you aware -- by the way, had
18    you received a student manual when you began classes
19    at the community college?
20        A.   I believe so.
21        Q.   And if I --
22            MS. EHRENBERG:  Can we go off the record
23    for a moment?
```

0033
```
 1    hearing?
 2        A.   It sounds like a familiar conversation.
 3        Q.   Okay.  Did you ever get your tuition
 4    reimbursed by the way?
 5        A.   I did.
 6        Q.   When?
 7        A.   I don't have a date, but it took at least a
 8    couple of months.
 9        Q.   When is your best recollection of when you
10    put the request in?
11        A.   It was the day before it was the last day
12    possible to put in the request.  It was at the end
13    of the semester.  So whatever date the college
14    catalog lists as a last chance to do it I put it in
15    the day before.
16        Q.   Okay.  And does -- when was the first
17    occasion on which you received any response to that
18    request?  In other words, is there a process between
19    putting in the request and getting an answer?  Are
20    there conversations or is there an interview?
21        A.   Well, I put in the request.  I assumed that
22    the check would come back within a reasonable period
23    of time, and it continued past what I would consider
24    to be a reasonable period of time so I initiated a
```

2

Exhibit 12, Arbitration hearing, volume 4, p. 57-58, Testimony of Thomas Sabbagh

0057
```
    1    written complaint, have you not?  You've received
    2    complaints from students other than the students
    3    involved with Professor Jackson?
    4        A.   During this time period?
    5        Q.   From the time you arrived in 2000 through
    6    the present.
    7        A.   Yes, I advised students, yes.
    8        Q.   As of the hearing in front of President
    9    Norman -- so that was in August of 2002 -- from the
   10    time you arrived until August of 2002, you had
   11    received complaints from 20 or more students; is
   12    that correct?
   13        A.   Correct.
   14        Q.   And you don't recall any other case other
   15    than this one in which you interviewed students
   16    other than the complaining student; is that
   17    correct?
   18        A.   This was a totally unique case, and it
   19    didn't warrant that type of investigation, that's
   20    correct.
   21        Q.   So your answer is, yeah, you can't recall
   22    another case where you interviewed students other
   23    than the complaining student; is that correct?
   24        A.   Since the time I was there, until the time
```

0058
```
    1    of the incident in -- I'm sorry, I'm getting
    2    confused about the time period you're talking about
    3    now.
    4        Q.   From the time you arrived until August of
    5    2002, this was the only case in which you
    6    interviewed students other than the complaining
    7    student; is that right?
    8        A.   I can't recall any other time.
    9        Q.   Now, you mentioned that -- when you
   10    testified in front of President Norman, you
   11    mentioned some notes that you kept concerning
   12    student complaints.  Do you typically keep notes of
   13    your meetings with students on the subject of their
   14    complaints?
   15        A.   It depends on the nature of the complaint.
   16    Sometimes it's necessary; sometimes it isn't.
   17        Q.   Do you have any sort of habitual
   18    recordkeeping with respect to student complaints?
   19        A.   It depends on the nature of the complaint.
   20        Q.   So then the answer is no?
   21        A.   It depends on the nature of the complaint.
   22        Q.   But you don't have any sort of ongoing,
   23    regularly kept log or record of student complaints
   24    and how they were disposed?
```

<u>Exhibit 13, Arbitration hearings, volume 6, pages 44, 95-96. Testimony of Paula Gastenveld</u>

0044

```
          1       A.   Well, I think every step along the way is
          2  important.
          3       Q.   Now, when you became the Vice President for
          4  Academic Affairs, with what frequency did you speak
          5  with President Norman?  I mean, did you have regular
meetings with him?  What was the nature of your
          7  reporting relationship to him?
          8       A.   We had some regular meetings.
          9       Q.   How frequently?
         10       A.   Pardon me?
         11       Q.   How frequently?
         12       A.   I would say in the beginning more
         13  frequently than as I worked with him for a while and
         14  understood what he expected and what he wanted.  But
         15  I would say that we met probably, on a formal basis,
         16  twice a month just one-on-one and on a more informal
         17  basis at least once a week.
         18       Q.   Did you discuss with him things like course
         19  content of particular courses?
         20       A.   I don't remember.
         21       Q.   Did you discuss with him program
         22  development of specific programs at the College?
         23       A.   Yes, we did speak about program
         24  development, I believe.
```

0095

```
          1  aspects of how he taught the course?
          2       A.   I don't see it that way.
          3       Q.   Okay.  Did you ever tell Dr. Jackson that
          4  his job was at risk on account of how he conducted
          5  his courses?
          6       A.   Do you mean verbally or in writing?
          7       Q.   Either.
          8       A.   Not verbally.  And you said on how he
          9  conducted his classes?
         10       Q.   Courses.  His courses, how he conducted his
         11  courses.
         12       A.   No.
         13       Q.   Did you ever tell him that his job was at
         14  risk if he didn't make sure that he was present in
         15  the lab at any time that any of his students were
         16  present in the lab?
         17       A.   No, I don't think I did.
         18       Q.   Did you ever tell him that his job was at
         19  risk if he kept on having students demonstrate
         20  techniques to each other or answer questions for
         21  each other?
         22       A.   No.
         23       Q.   Did you ever tell him that his job was at
         24  risk if he ever changed the meeting times of a
```

4

0096
```
 1    course without reporting it to the registrar?
 2        A.   No.
 3        Q.   Did you ever tell him that his job was at
 4    risk on account of how he managed safety precautions
 5    in his lab?
 6        A.   No.
 7        Q.   Did you ever tell him that his job was at
 8    risk if he arranged with students to meet with them
 9    in the evenings if they were unable to attend
10    classes during the day?
11        A.   No.
12            MS. TAYLOR:  Do you need a break?
13            MS. EHRENBERG:  I object.  I object.  I
14    object to counsel addressing the witness.
15            ARBITRATOR PEACE:  I agree.
16            MS. MORRIS:  I haven't addressed the
17    witness.
18            ARBITRATOR PEACE:  No, it wasn't counsel,
19    it was Laurie.  You shouldn't be speaking to her.
20            MS. TAYLOR:  She just looked like --
21            ARBITRATOR PEACE:  But you can just ask me.
22    Your sense is she's looking like she needs a drink
23    of water or something?
24            MS. TAYLOR:  Yes.
```

Exhibit 14, Arbitration hearings, volume 9, pps. 60-68, Testimony of Ghazi Darkazalli

0060

```
 1        A.    Definitely.   The faculty who was teaching
 2   the class is in charge of that class.   Any
 3   interruption without permission, I knock on the door
 4   and ask the faculty to go into the class, and I am
 5   the dean.
 6        Q.    If there are biohazardous materials in the
 7   lab about which you have expressed tremendous
 8   concern, would it not be Dr. Jackson's
 9   responsibility, if he sees a non-biotech class
10   meeting there, to go in and ascertain the safety of
11   the situation?   Would that not be his
12   responsibility?
13        A.    The faculty who is in charge of that
14   class's responsibility is to be in the class.   You
15   could have called the faculty outside and told them,
16   "Listen, there's some safety issues here I would
17   like to address."
18        Q.    There are reports in fact that's exactly
19   what Dr. Jackson did, aren't there?   There are
20   students who have testified --
21        ARBITRATOR PEACE:   Let him answer.
22        A.    I am not aware of any report.
23        Q.    You are not aware of them because you
24   didn't interview any students, did you?
```

0061

```
 1        A.    I did not interview any students.
 2        Q.    You didn't interview one student to get one
 3   student's account of whether Dr. Jackson had
 4   attempted to get Dr. Saman's attention and call him
 5   out of the room, did you?
 6        A.    Dr. Jackson --
 7        Q.    "Yes" or "no."
 8        A.    I answered.   I did not interview any
 9   students.
10        Q.    So you don't know for a fact that Dr.
11   Jackson didn't call Dr. Saman out of the room, do
12   you?
13        A.    No, I don't.
14        Q.    In the e-mail to you on Tuesday, September
15   25, 2001, Page 33, about two thirds of the way down
16   the page there is a numeral "1," and the e-mail
17   reads, "Dr. Jackson complained about the
18   contamination."   So it is fair to say as of Tuesday,
19   September 25, Dr. Saman was aware of complaints by
20   Dr. Jackson concerning contamination of the
21   experiments going on in the lab, correct?
22        A.    Can you repeat the question.
23        Q.    Sure.   As of Tuesday, September 25, Dr.
24   Saman is aware of complaints that Dr. Jackson has
```

0062
```
 1   raised concerning possible contamination of
 2   work-in-progress in the lab, correct?
 3        A.   That's what he said.
 4        Q.   Okay.  Dr. Saman in Point 3 references that
 5   Dr. Jackson asked Dr. Saman whether a particular
 6   water bottle was Dr. Saman's.  Do you see that?
 7        A.   In No. 3?
 8        Q.   Mm-hmm.  It goes over from 33 to 34.
 9        A.   Yes.
10        Q.   Now, isn't it true that if biohazardous
11   materials are present in the lab, that it is a
12   safety violation of the gravest proportions for an
13   individual to be drinking water in the lab?
14        A.    Is somebody drinking the water?  I don't
15   know if somebody is drinking water in the lab.
16        Q.   That isn't my question.
17        A.   I am not aware of that.
18        Q.   You don't know?
19        A.   No.
20        Q.   If you turn to Page 35, that's a memo from
21   Dr. Jackson to you, is it not?
22        A.   That's correct.
23        Q.   And it is dated October 9 and it is on the
24   subject of this incident, correct?
```

0063
```
 1        A.   That's correct.
 2        Q.   And in it Dr. Jackson informs you, in the
 3   second paragraph, that a number of students have
 4   come forward and will testify about this incident,
 5   and he includes some -- he includes in this memo to
 6   you an e-mail from at least one such student, Teesha
 7   Perryman.  Do you see that?
 8        A.   Yes, I see it.
 9        Q.   You never made any effort to talk with
10   Teesha Perryman, did you?
11        A.   No.
12        Q.    And you never made any effort to talk with
13   any of the other students that Dr. Jackson said were
14   willing and available to tell you what they
15   observed, did you?
16        A.   No.
17        Q.    In his memo of October 9 Dr. Jackson also
18   listed eight OSHA violations that he observed on the
19   occasion of Dr. Saman having his class in the back
20   lab.  Do you recall reviewing those?
21        A.   I'm sorry?
22        Q.    In the memo Dr. Jackson lists at least
23   eight OSHA violations that he observed --
24             ARBITRATOR PEACE:  You are looking at Pages
```

0064
```
 1   35 and 36; is that correct?
 2         MS. EHRENBERG:  Yes.  Sorry.  That's the
 3   October 9 memo.
 4      Q.   From Page 35 over to Page 36 Dr. Jackson
 5   lists at least eight OSHA violations that he
 6   observed on the occasion of Dr. Saman meeting his
 7   class in the back lab.  Do you recall reviewing
 8   those?
 9      A.   Yes.
10      Q.   You didn't investigate any of them, did
11   you?
12      A.   What do you mean by "investigate"?  We
13   asked the faculty who was in the class, and he
14   denied most of it or all of it.
15      Q.   He would be responsible if they were true,
16   wouldn't he?
17      A.   Well --
18      Q.   Wouldn't he?
19      A.   It is one against the other, right?
20      Q.   Wouldn't he be responsible -- if those
21   violations had occurred on his watch, wouldn't he,
22   as the faculty member present, be held responsible
23   for them?  "Yes" or "no."
24      A.   Professor Jackson --
```

0065
```
 1      Q.   "Yes" or "no."
 2      A.   Professor Jackson --
 3         ARBITRATOR PEACE:  I would ask you to
 4   answer her question.  I think it is a pretty
 5   straightforward one.
 6      A.   Who would be responsible?
 7      Q.   The professor who was leading the class.
 8      A.   Yes, the professor who is leading the class
 9   is responsible for the safety of that class.
10      Q.   So if eight OSHA violations were going on,
11   Dr. Saman would be responsible, wouldn't he?
12      A.   That's what Professor Jackson is claiming.
13      Q.   You did nothing to investigate it other
14   than talk to the guy who would be held responsible
15   if it were true, didn't you?
16      A.   That is true.
17         MS. EHRENBERG:  Excuse me.  There are ten,
18   not eight, just for the record.
19      Q.   Dr. Jackson also informed you that a number
20   of lines of clone research had been contaminated by
21   Dr. Saman's class meeting in the lab.  Do you recall
22   that?
23      A.   He mentioned that, yes.
24      Q.   Did you investigate that at all?
```

0066
```
 1        A.   No.
 2        *Q.  Was any action taken to educate or
 3   discipline Dr. Saman for being responsible for the
 4   contamination of ongoing research in the lab?
 5        A.   The lab --
 6        Q.   "Yes" or "no."
 7             MS. MORRIS:  Objection.  There is no
 8   evidence in the record that the College found that
 9   Dr. Saman was in fact responsible for contamination
10   of clone research.  This allegation has been stated
11   as a fact.
12             MS. EHRENBERG:  Could you read back my last
13   question, please.
14             *(Question read)
15             MS. EHRENBERG:  Withdrawn.
16        Q.   Did you ever discuss with Dr. Saman Dr.
17   Jackson's report to you that lines of clone research
18   had been contaminated?
19        A.   No, I didn't.
20        Q.   You never talked with him about it, did
21   you?
22        A.   No, I didn't.
23        Q.   So clearly you never made any effort to
24   ascertain whether that was true or not, did you?
```

0067
```
 1        A.   No, I didn't.
 2        Q.   Now, another of the complaints against Dr.
 3   Jackson was that he was not teaching the techniques
 4   that were listed in the College catalog; is that
 5   correct?
 6        A.   That's correct.
 7        Q.   I am showing you a two-page document that
 8   is titled "MassBay Community College, Spring 2003,
 9   Biotechnology Laboratory Rotation IV Syllabus."  Do
10   you have that in front of you?
11        A.   Yes, I do.
12        Q.   This is the syllabus for the Biotechnology
13   Laboratory Rotation IV that is taught by Dennis
14   Walsh who was hired to replace Dr. Jackson, correct?
15        A.   That's correct.
16        Q.   Let's look at the college catalog.  I am
17   showing you Employer Exhibit 18, which is the
18   college catalog.  And at the top left-hand corner of
19   Page 135 is the listing for Biotechnology Laboratory
20   Rotation IV, BT 221.  Do you see that?
21        A.   Yes.
22        Q.   I think we read that into the record plenty
23   of times.  But could you tell me where on the
24   syllabus the techniques that are listed in the
```

0068
```
 1   college catalog are shown?
 2          MS. MORRIS:  Objection, relevance.  This
 3   postdates the period in question in the case.
 4          MS. EHRENBERG:  All the more reason why, if
 5   they fired this professor for not conforming his
 6   syllabus to the catalog, it would be relevant to see
 7   whether they assured that his successor did.
 8          ARBITRATOR PEACE:  I would agree.
 9   Overruled.
10      A.   There is no direct statement.
11      Q.   I'm sorry?
12      A.   There is no direct statement of the --
13   there is a project, approved project, detailing the
14   program.  And this does not preclude what is in the
15   catalog.
16      Q.   But the syllabus doesn't mention any of the
17   techniques that are in there, does it?
18      A.   No.
19      Q.   And in fact Dennis Walsh doesn't know how
20   to perform most of those techniques, does he?
21          MS. MORRIS:  Objection, relevance.
22      Q.   Do you know?
23          ARBITRATOR PEACE:  Overruled.
24      A.   Yes, he does.
```

Exhibit 15, Arbitration hearings, volume 12, p. 41-42, Testimony of Laurie Taylor

```
00041
        1    part-time?  Would it be fair to say that there's a
        2    distribution over all of the various classifications
        3    of faculty about whom such complaints arise?
        4        A.    Yes.
        5        Q.    Have any tenured faculty, other than Dr.
        6    Jackson and Dr. Panse, ever been terminated during
        7    the years that you've been at MassBay as a result of
        8    student complaints?
        9        A.    Tenured faculty?
       10        Q.    Yes.
       11        A.    No.
       12        Q.    Have any nontenured faculty been terminated
       13    on account of or as a result of student complaints?
       14        A.    No.  Well, what are you including in
       15    nontenured?
       16        Q.    Well, I'm thinking of the categories that
       17    appear on the EEO reports, just for purposes of
       18    organization.  Let's start with nontenured tenure
       19    track faculty.

       20        A.    No.
       21        Q.    Nontenured nontenure track faculty.
       22        A.    No.
       23        Q.    Okay.  Has a faculty member ever been
       24    terminated on account of or as a result of

00042
        1    complaints arising or originating from students?
        2        A.    Adjunct, yes.
        3        Q.    By "adjunct" you're referring to part-time
        4    faculty who are hired term to term on separate
        5    contracts?
        6        A.    Yes.
        7        Q.    On how many occasions has it happened that
        8    an adjunct faculty has been terminated on account of
        9    student complaints?
       10        A.    At least once.
       11        Q.    Was that faculty member -- is it fair to
       12    say that what happened there was the faculty
       13    member's contract was not renewed?
       14        A.    No.
       15        Q.    The faculty person was discharged in the
       16    middle of a term?
       17        A.    Yes.
       18        Q.    When did that happen?
       19        A.    '92.
       20        Q.    What were the circumstances?  What was the
       21    subject matter of the complaint that led to that
       22    action?
       23        A.    Reporting to class in an inappropriate
       24    condition.
```

Exhibit 16, Arbitration hearings, volume 13, pps. 72-77, Testimony of Glenda Batzer

00072
```
 1   abilities to be able to teach them to someone else,
 2   to explain them to someone else.
 3       Q.   Now, at some point in time did you learn
 4   that any complaints had been made against Dr.
 5   Jackson?
 6       A.   No.
 7       Q.   Had you ever made a complaint about a
 8   professor or instructor at MassBay?
 9       A.   No.
10       Q.   Had you ever brought to the attention of
11   any administrator at MassBay contact by a teacher
12   that you felt was objectionable or inappropriate?
13       A.   Yes.
14       Q.   And when was that and what were the
15   circumstances?
16       A.   I was in the second semester chemistry
17   class with Dr. Nassif.  And he was a little
18   difficult to deal with at times.  And he seemed to
19   patronize women somewhat and call us names, verbal
20   names in the class.  And a group of us had decided
21   we were going to say something to the school.  And
22   as it turned out, that very next day when I reached
23   home from school, there was a message on my machine
24   from someone at the school that had called to ask me
```

00073
```
 1   some questions.  So I called her back.
 2       Q.   Who was that?
 3       A.   Her name was Paula Gastenveld, I think is
 4   her last name.
 5       Q.   And what position did she hold as far as
 6   you understood?
 7       A.   I don't remember.
 8       Q.   Did you speak with her on the telephone?
 9       A.   I did.  I returned her phone call.
10       Q.   And for how long did you speak with her?
11       A.   An hour.
12       Q.   And what, if anything, do you recall about
13   the content of that conversation?  And to the extent
14   as you recall it as who said what, that would be
15   useful.
16       A.   I sort of chuckled on the phone that it was
17   interesting she was calling me, because I was
18   thinking of calling her to complain about this
19   chemistry professor.  So I told her, you know, how
20   his behavior had been.
21       Q.   What did you tell her?
22       A.   We had take-home exams in chemistry.  They
23   usually took you about two weeks to complete.  They
24   were pretty thorough exams.  He had worded some of
```

12

00074

```
 1    the questions in the exam -- it was things like "My
 2    dumb brunette assistant" -- like every other
 3    question was "My brunette assistant here" and "My
 4    brunette assistant did this."  We just thought it
 5    was completely inappropriate that he would word his
 6    exam questions in that manner.
 7          And he would also -- there was only one
 8    male student in the class.  It was all females.  And
 9    in lab, he would always say, "What a bunch of
10    losers."  He would pick on certain people.  It was
11    just the way he was.  So that's what I told her on
12    the phone that I was complaining about.
13       Q.   And did she respond?
14       A.   She said she's happy to look at the exam if
15    I sent her a copy, but that she has no control over
16    the teaching methods by teachers at MassBay.
17       Q.   Did she say anything else to you?
18       A.   We finally got around to -- I asked her why
19    she was calling me, because I didn't have a chance
20    up until that point.  She said that she saw that I
21    was registered in the biotech program at MassBay.
22    And she said they're building a case against Dr.
23    Jackson and wanted to know my feelings on my
24    experiences in the biotech program.
```

00075

```
 1       Q.   Now, when she said, "they're building a
 2    case against Dr. Jackson," I think it would be
 3    important to clarify to what extent you're recalling
 4    her words and to what extent you're paraphrasing.
 5          What's the state of your recollection of
 6    that conversation?
 7       A.   That was exactly the way she worded the
 8    statement.
 9       Q.   What did she say?
10       A.   "We are building a case against Dr.
11    Jackson."
12       Q.   "We are building a case"?
13       A.   That's exactly what she said.
14       Q.   And where did the conversation go from
15    there?  Who said what?
16       A.   She obviously had a copy of my transcript
17    in front of her, because she asked me specific
18    questions about all of my classes.
19       Q.   What did she ask?
20       A.   In particular, she was interested in my
21    molecular biology class, whether I was taught
22    anything in the class.
23       Q.   Did you answer her?
24       A.   Yes.
```

13

00076

1     Q.    What did you say?
2     A.    I said, "Yes."  She asked me if we met on a
3  regular basis, and I said, "Yes, twice a week."  And
4  she asked me why I wasn't in the daytime class, and
5  I explained it was because of my schedule conflict;
6  that I worked a full-time job, that I needed to take
7  it at night, and Dr. Jackson arranged for that to
8  happen for two of us.
9     Q.    Do you remember anything else from that
10  conversation, either in terms of her questions or
11  your -- what you told her about Dr. Jackson?
12     A.    Other than I told her that I really enjoyed
13  the program and thought it was an excellent science
14  program.
15     Q.    Do you recall anything else from the
16  conversation?
17     A.    No.
18     Q.    At any point in that conversation or
19  thereafter, were you made aware of an opportunity to
20  meet with Deans Darkazalli and Sabbagh, one or the
21  other or both?
22     A.    No.
23     Q.    With respect to your complaint about Dr.
24  Nassif, what, if anything, happened after that

00077

1  conversation with Dr. Gastenveld on that subject?
2     A.    Nothing.  Nothing.  I didn't pursue any
3  type of formal complaint.
4     Q.    Were you invited to?
5     A.    No.
6     Q.    Do you know whether any other students were
7  interviewed or questioned about the conduct that you
8  had brought to Dr. Gastenveld's attention?
9     A.    I don't know.
10     Q.    Let me move now to your experiences since
11  leaving MassBay.  You've left MassBay?
12     A.    Yes.
13     Q.    Did you earn a degree there?
14     A.    No.
15     Q.    Why not -- strike that.
16           What did you do when you left MassBay?
17     A.    I had enough previous life lab experience
18  and military experience to acquire a degree without
19  finishing the program at MassBay.
20     Q.    And so you have earned a degree, but not
21  from MassBay; is that correct?
22     A.    Correct.
23     Q.    What sort of degree?
24     A.    I have a bachelor's degree in molecular

14

<u>Exhibit 17, Arbitration hearings, volume 17, pps. 17, 51, Testimony of Lindsay Norman</u>

00017
```
     1        A.    I am.
     2        Q.    For how long have you been the president of
     3   the College?
     4        A.    Since March 1999, just slightly in excess
     5   of five years.
     6        Q.    Can you summarize briefly for the
     7   Arbitrator your employment history prior to arriving
     8   at MassBay.
     9        A.    Surely.  Would you like me to start from
    10   the beginning or go backwards?
    11        Q.    The immediately preceding position first.
    12        A.    Prior to coming to Massachusetts, I was
    13   chancellor and before that president of Montana Tech
    14   in Butte, Montana.
    15        Q.    For how long did you hold that position?
    16        A.    13 years.  Prior to that I was technical
    17   director of the Chase Manhattan Bank in New York
    18   City.  Prior to that I was vice president for
    19   research and marketing for Jones & Laughlin Steel
    20   Corporation in Pittsburgh, Pennsylvania.
    21              Prior to that I was presidential appointee
    22   as director of the United States Bureau of Mines in
    23   the Department of the Interior under Presidents
    24   Reagan and Carter, and I was acting director under a
```

00051
```
     1        Q.    When exactly did you draft the letter
     2   that's dated August 8, 2002, concerning Dr.
     3   Jackson's termination?  Did you have it drafted
     4   before the hearing concluded?
     5        A.    I don't believe so, no.
     6        Q.    So you drafted it after the hearing
     7   concluded on August 7; is that correct?
     8        A.    That is correct.
     9        Q.    And before you left the College to go to
    10   the golf tournament; is that right?
    11        A.    That would have to be correct, if that's
    12   the date of the accident.
    13        Q.    So in fact, it's impossible for you to have
    14   spent even 24 hours thinking about the body of
    15   evidence that you had heard over the previous three
    16   days, because before 24 hours had passed, you had
    17   issued a termination letter, correct?
    18        A.    I think that's incorrect.  I spent over 72
    19   hours considering the testimony.
    20        Q.    From the time that the hearing ended until
    21   the time that the termination letter issued was a
    22   period of less than 24 hours, was it not?
    23        A.    That is correct.
    24        Q.    In fact, the hearing on August 7th
```

00052
```
     1   concluded at 20 of six in the evening, did it not?
```

15

```
 2       A.   It was late in the day.
 3            MS. EHRENBERG:  Can I have a minute,
 4  please?
 5            ARBITRATOR PEACE:  Yes, you may.  Will it
 6  be five minutes?
 7            MS. EHRENBERG:  It will be five minutes.
 8            ARBITRATOR PEACE:  Then I would like to
 9  give everybody a break.
10       (Recess)
11            MS. EHRENBERG:  Nothing further.
12            ARBITRATOR PEACE:  Do you want to consult?
13            MS. MORRIS:  Do we want to take a lunch
14  break?
15            ARBITRATOR PEACE:  If you're going to have
16  cross, this might be a good time to do that.  Can we
17  do half an hour?  I don't care at this point because
18  it looks like we're doing better than we would have
19  anticipated timewise.  I can't figure out
20  everybody's time constraints, and if you need more
21  time to prepare, then I don't want to rush back.  On
22  the other hand, if people would like to get done
23  sooner, I'm willing to accommodate.
24            MS. EHRENBERG:  I thought we were only
```