UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRUCE JACKSON                              CIVIL ACTION

V.                                         NO. 1:05-cv-11429 RWZ

LINDSAY NORMAN, Individually and in his former capacity as President of
Massachusetts Bay Community College; PAULA GASTENVELD, Individually and in
her former capacity as Vice-President of Massachusetts Bay Community College;
GHAZI DARKAZALLI, Individually and in his capacity as Dean at Massachusetts Bay
Community College; THOMAS SABBAGH, Individually and in his former capacity as
Associate Dean at Massachusetts Bay Community College; LAURIE TAYLOR,
Individually and in her capacity as Vice-President of Massachusetts Bay Community
College

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

## I. FACTUAL BACKGROUND

1. Plaintiff accepts the factual material given in the Arbitration Opinion and Award, in

the section captioned "Background," pages 9 to 30, included as Exhibit A in Defendants'

Memorandum accompanying their Motion for Summary Judgment. Plaintiff also accepts

the factual material included in Plaintiff's Memorandum accompanying his Motion for

Summary Judgment, captioned at different parts as "Factual Background."

## II. THRESHOLD CONSIDERATION

### A. STANDARD FOR MOTION FOR SUMMARY JUDGMENT.

1.  "Summary judgment is appropriate as long as 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law.' Fed. R. Civ. P. 56(c)."  Further, the court "must view the

entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990). *Kearney v. Town of Wareham*, 316 F.3d 18 (1st Cir. 2002).

2. Specifically, to defeat a motion for summary judgment by defendants under § 1983, as in the present case, the non-movant must show, by a preponderance of the evidence, that: "(1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States." *Johnson v. Mahoney*, 424 F.3d 83, 89 (1st Cir. 2005).

3. There is no dispute that Defendants, as State employees, were acting under color of state law. Further, when all reasonable inferences from the facts presented in Plaintiff's motion and memorandum are taken in Plaintiff's favor, then it is clear by a preponderance of the evidence that Defendant's conduct deprived the plaintiff of rights secured by the Constitution. Defendant's motion for summary judgment must therefore fail.

4. <u>DEFENDANTS' MEMORANDUM IS TAKEN IN LARGE PART FROM THE EARLIER CORRESPONDING MEMORANDUM IN *Pansé, et al. v. Norman et al.*</u> We note also that Defendants' memorandum (hereinafter Walsh), prepared by AAG Teresa Walsh is taken largely from the earlier memorandum, filed on 27 October 2006, accompanying the motion for summary judgment by Defendants in *Pansé, et al. v. Norman et al.*, U.S.D.C. Mass., Docket No. 04-cv-11658 (hereinafter Wyzanski). We have compared the two memoranda paragraph by paragraph, and find that perhaps 80% to 90% of the Walsh memorandum is either word for word, very similar to, or precisely the same argument as is found in Wyzanski, with omissions of sections relating to what

appears to be Pansé's reliance on First Amendment rights, and, of course with appropriate changes in names. Walsh's analysis is presented in three sections, captioned "Jackson was not deprived of procedural due process"; "Jackson was not deprived of substantive due process"; and "Defendants are entitled to qualified immunity." The captions are identical, with the name changes, with Wyzanski.

5. We will nevertheless comment on the points in Defendants memorandum, sequentially as presented there.

6. <u>WALSH DOES NOT ADDRESS PLAINTIFF'S ISSUES, AND THEREFORE WAIVES OBJECTIONS TO THESE.</u>We note here that Walsh makes no mention of the issues presented by Plaintiff, that is, the violation of the specific constitutional rights of an impartial arbiter, equal protection, and of the Arbitrator's finding of the absence of the required notice. "It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Collins v. Marina-Martinez*, 894 F.2d 474 (1st Cir. 1990), at 481 n.9. In Walsh these issues are not only not treated in a perfunctory manner, they are not treated at all, and must therefore be considered waived and accepted as presented by Plaintiff..

B. PROCEDURAL DUE PROCESS.

1. <u>JACKSON NEVER RECEIVED NOTICE AS REQUIRED BY PROCEDURAL DUE PROCESS.</u> Walsh, at 5 (Wyzanski, at 8 for Pansé), admits that Jackson had a property interest in his tenured position, citing *Cotnoir v. University of Maine Systems,* 35 F.3d 6 (1st Cir. 1994) for this proposition, but neglecting the primary finding of that case, with a similar fact pattern,  that plaintiff was denied procedural due process because he was never told that his conduct could lead to dismissal, as was also true for Jackson (Jackson

memorandum, at 25). Additional case law is given below. The Arbitrator also found that Jackson received no notice (AA, at 40), an essential element of procedural due process. Walsh's statement that Jackson was provided with procedural due process is therefore error.

2. In *Newman v. Burgin*, 930 F.2d 955 (1st Cir. 1991), the court listed the requirements of due process. These included, *Id.*, at 960, "notice of proposed action." "Notice" in these cases refers to notice prior to the filing of formal charges.

3. THE ARBITRATOR FOUND THAT JACKSON DID NOT RECEIVE NOTICE, HENCE THERE WAS A FAILURE OF PROCEDURAL DUE PROCESS. As noted in Plaintiff's memorandum, the Arbitrator found that Jackson had never been given notice that his conduct could lead to dismissal (AA, at 40). This finding must be accepted by the court, and leads immediately to a failure of procedural due process. We add here some additional cases bearing on this. In *Collins v. Marina-Martinez*, 894 F.2d 474, 478 (1st Cir. 1990), a case involving the dismissal of a tenured academic, "the evidence suggests that, through the end of July 1985, plaintiff had no reason to believe his tenure was being questioned," so that he had no actual notice of potential termination. Compare with the Arbitrator's finding that Jackson had no reason to believe that his methods, which had been used for almost ten years without complaint by the College, could lead to dismissal.

3. FORMAL PROCEDURES DO NOT NEGATE CONSTITUTIONAL REQUIREMENTS. Walsh, at 5-6 (Wyzanski, at 9, for Pansé), argues that Jackson received the full panoply of procedures called for in the Collective Bargaining Agreement (hereinafter CBA). The formal carrying out of mandated procedures is of no avail if the antecedent requirement of an impartial arbiter is not present. See Jackson memorandum,

at 2ff. It cannot be said that a Collective Bargaining Agreement pre-empts the United

States Constitution. Walsh ignores this point, and thus waives any objection to it. In any

event, whether or not the constitutional requirements of an impartial arbiter and equal

protection were satisfied presents a triable issue, and Defendants' motion for summary

judgment must fail.

4. Walsh, at 6 (Wyzanski, at 10, for Pansé), indulges in irrelevant innuendo, arguing a

lack of specificity in the complaint. Defendants' argument here consists of a confused

mixture of law. Arguing that the Complaint cannot withstand summary judgment is

simple error. The proper motion on a complaint is a motion to dismiss, and here the

notice pleading requirements of F.R.Civ.Proc. 8(a) "need only include 'a short and plain

statement of the claim showing that the pleader is entitled to relief.' This statement must

'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which

it rests.'" *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. ,

2004)，citing *Conley v. Gibson,* 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); see

also, especially, *Swierkiewicz v. Sorema N. A*., 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct.

992 (2002) (no heightened pleading requirement). Plaintiff's complaint obviously

satisfies these requirements. In addition *Feliciano de la Cruz*, cited by Defendants, is a

Title VII employment discrimination case, inapplicable here, and, in any event, would

only apply to plaintiff's summary judgment motion. *Matthews*, also cited by Defendants,

and also an employment discrimination case, where the State adopts the Federal

framework for Title VII cases, is inapplicable for the same reasons. Defendant then states

that there is nothing in the record to support the allegations in the complaint. This

statement ignores completely the voluminous record given, in part, as exhibits

accompanying Defendants' own motions, such as, for example, the Arbitrator's award,

the hearings before Norman, excerpts from the hearings before the Arbitrator, and

numerous affidavits provided to Defendants in the course of discovery.

5. DEFENDANTS MOTION RELIES HEAVILY ON SELECTIVE PRESENTATION

OF FACTS. Indicative of the selective presentation of facts of Defendants is the

statement, (Walsh, at 7) that Norman was "not involved in the investigation" until

receiving the recommendation for dismissal by Gastenveld and Darkazalli, citing

Norman's testimony that he simply made sure of due process by handing the problem

over to Gastenveld. But Norman kept in touch with the investigation as it proceeded, as

shown by the following testimony (AH 17:30, Exhibit 1 – Norman testimony at pages 16-

69):

> Q.  Now, at some point in time Ms. Taylor did
> begin to keep you posted of the progress of the
> investigation; is that correct?
> A.  Oh, most assuredly.
> Q.  And she spoke with you on a number of
> occasions as the investigation was proceeding, did
> she not?
> A.  I'm sure she did, yes.

Defendants' statements in this regard are thus clearly incorrect.

6. FOLLOWING FORMALITIES DOES NOT PROVE IMPARTIALITY. Defendants

claim that merely following the formalities of the CBA is sufficient to prove impartiality

(Walsh, at 7). This is nonsense. It serves only to show that the formalities are being

followed. A complete discussion of the presumption of impartiality, and the

overwhelming evidence that Defendants were not impartial is discussed in the Jackson

memorandum, at 2ff, and need not be repeated here.

7. <u>DEFENDANTS PROVIDE NO CASE LAW SHOWING THAT IMPARTIALITY IS NOT REQUIRED.</u>  Defendants (Walsh, at 7-8) cite *Acosta-Sepulveda v. Hernandez-Purcell*, 889 F.2d 9 (1st Cir. 1989) for the proposition that "an employee facing discharge is not entitled to a wholly impartial decision maker." This statement is a simplex dictum ("a mere assertion; an assertion without proof." Black's Law Dictionary, 5th ed., 1979). The entire sentence in *Acosta* reads: "Contrary to the district court's premise, it is not required that a hearing be conducted before an 'impartial decisionmaker.' 679 F. Supp. at 158."  The citation given is to the lower court's decision, in which the trial judge stated the opposite proposition, also without citations.

Dicta are "observations relevant, but not essential, to the determination of the legal questions then before the court. Dictum constitutes neither the law of the case nor the stuff of binding precedent. In short, dictum contained in an appellate court's opinion has no preclusive effect in subsequent proceedings in the same, or any other, case." [citations omitted] *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992). Dicta are comments "made while delivering a judicial opinion, but . . . unnecessary to the decision in the case," and are not binding on future panels. *Tomas Diaz-Rodriquez v. Pep Boys Corp.*, 410 F.3d 56, 60 (1st Cir. 2005). The rationale behind the maxim that dicta carry no precedential weight in any other case is that the court lacks the benefit of a vigorous discussion of the issue so necessary to the discovery of truth. *Commonwealth v. Rahim*,  441 Mass. 273, 284; 805 N.E.2d 13 (2004).

In *Acosta, supra,* the holding was based on the criteria of notice and the opportunity to respond, the comment on impartiality being dicta. There was no analysis, no discussion of the issue of impartiality. *Acosta*, therefore has no precedential weight for

the present situation. Defendants cite no other case in support of the proposition that an

impartial arbiter was not necessary. Plaintiff's memorandum, at 2ff, cites many cases in

support of the proposition that an impartial arbiter is required at every stage. The

Arbitrator states unambiguously and unequivocally that Norman had made up his mind

before the hearing scheduled to determine whether Jackson should be dismissed or not,

(AA, at 42) and this finding must be accepted. Taking all of these facts into account there

is an inescapable conclusion that Jackson's constitutional rights to an impartial arbiter

were violated.

8. <u>SUPREME COURT DECISIONS MANDATE AN IMPARTIAL ARBITER.</u> In any

event, courts are constrained to act within the holdings of the Supreme Court. As noted in

Plaintiff's memorandum these clearly and unambiguously state the requirement of an

impartial arbiter at every stage. See also *Hamdi v. Rumsfeld*, 542 U.S. 507, 535; 124 S.

Ct. 2633; 159 L. Ed. 2d 578 (2004) (citizen has core right to be heard by an impartial

adjudicator). And, "[i]t is axiomatic that a tenured academic at a public institution of

higher education has property rights which cannot be eviscerated without due process of

law." *Collins v. Marina-Martinez*, 894 F.2d 474, 478 (1st Cir. 1990). Clearly, an impartial

arbiter is included within this rubric.

9.  <u>FIRST CIRCUIT DECISIONS CONFIRM THE NEED FOR AN IMPARTIAL</u>

<u>ARBITER.</u> Furthermore, First Circuit cases subsequent to *Acosta* have noted the

requirement of an impartial decision maker. In *Newman v. Burgin*, 930 F.2d 955, 960 (1st

Cir. 1991), a case involving a tenured Assistant Professor, the court noted, as one of the aspects

of procedural due process, impartial decision makers at every stage.  See, also, *Surprenant v.*

*Rivas*, 424 F.3d 5, 15 (1st Cir. 2005) (essence of a fair hearing is an impartial

decisionmaker); *N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Commission*,

198 F.3d 1 (1st Cir.1999) (individual has a constitutional right to a fair and impartial hearing in any disciplinary proceeding conducted against him); *United States v. Chantal*, 902 f.2d 1018, 1021 (1st Cir. 1990) (constitution demands that judicial proceedings be conducted by a neutral and detached judge).

10. <u>THE RULE OF NECESSITY IS NOT APPLICABLE</u>. Walsh, at 8, appeals to the Rule of Necessity, basing this on the CBA requirement that the President chair the pre-termination hearing and make the decision, citing *United States v. Will* [not Mill, as in Walsh], 449 U.S. 200 (1980). To begin with, even assuming that necessity applies, this does not mean that the decisionmaker has no obligation to act impartially. Also, as Walsh points out in the next paragraph, Norman was not the ultimate decisionmaker, so the Rule does not apply in the first instance. Furthermore, Norman had several other choices available to him. First of all, under the authority granted to him by the Board of Trustees to take all personnel actions (Board of Trustees, Bylaws, K.2.) Norman could have delegated running the hearing, and making the decision in his name, to an impartial other. He could also have done the equivalent of a judge certifying to a higher court by having a very short perfunctory hearing, then issuing a decision with a disclaimer stating that the decision was only for the purpose of satisfying the formalities, and allowing the matter to continue on to an impartial tribunal. These are likely to be only some of the possibilities.

11. <u>POST-DEPRIVATION REMEDIES ARE NOT APPLICABLE</u>. (Walsh, at 8-9, Wyzanski, at 11-12) This proposition is inapplicable for two reasons. First of all, the issue here is impartiality, and Supreme Court decisions (see Plaintiff's memorandum) make clear that impartiality is required at every stage. Cases cited in Walsh do not involve the issues of violations of constitutional rights other than procedural due process

and are thus irrelevant. Secondly, the cases cited are for the series of cases, *Parratt v. Taylor*, 451 U.S. 527 (1980) and its progeny, in which the state actors conduct was "random and unauthorized." The context here is thus completely different from the instant case. As Walsh has pointed out, at 5f, Defendant's actions were neither random nor unauthorized, but consisted rather of intentional actions on the part of Defendants, which Plaintiff argues amounted to a deprivation of his constitutional rights. These cases, therefore, are inapplicable and irrelevant to the case at hand. Also, the discussion of damages in Walsh-Wyzanski is irrelevant here. Plaintiff is simply asking for damages allowable under §1988 for violation of his civil rights, not (a) solely because "relief might be delayed and damages unavailable, and (b) because the procedures are constitutionally adequate – they are not, in any event.

C. SUBSTANTIVE DUE PROCESS

1. No comment on this (Walsh, at 9f, Wyzanski, at 12f) is necessary, since Plaintiff does not claim this, but rather bases his case on the rubric of violations of specific constitutional rights. *Pagan v. Calderon*, 448 F.3d 16, 33 (1st Cir. 2006).

D. QUALIFIED IMMUNITY

1. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. Walsh, at 11f, Wyzanski, at 18f. The contours of a defense of qualified immunity are well established. "Following the dictates of *Saucier v. Katz,* 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), [1[st]] circuit uses a three-part test when evaluating a question of qualified immunity. "In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." Id., at 200. The court "generally [should] address first the question

whether at some abstract level the plaintiffs have asserted a violation of constitutional rights, second whether those rights are clearly established, and third whether a reasonable officer could have concluded that his actions did not violate plaintiffs' constitutional rights." *Tremblay v. McClellan,* 350 F.3d 195, 199 (1st Cir. 2003)." *Buchanan v. State of Maine*, 469 F.3d 158, 167 (1st Cir. 2006).

(a) The first part involves the question of whether the plaintiff has asserted a violation of constitutional rights. In a motion for summary judgment the testimony is reviewed in the light most favorable to the plaintiff. *Tremblay, supra*, at 196. Here plaintiff has alleged at least three violations of his civil rights: the lack of an impartial arbiter; violation of his right to equal protection; and an absence of notice violating his right to procedural due process, and has presented evidence to substantiate these charges. Jackson memorandum. The first prong is satisfied.

(b) Secondly, are these rights clearly established. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." [citations omitted]. *Hope v. Pelzer*, 536 U.S. 730; 122 S. Ct. 2508; 153 L. Ed. 2d 666 (2002), at 739. "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.*, at 741. The CBA states that a proceeding for dismissal of a tenured faculty member must be carried out with due process. The decisional case law, see the Jackson memorandum, has firmly established that impartiality, equal protection and procedural

due process are constitutional rights. The degree of specificity asked for by Defendants, Walsh, at 12-13, has been ruled out by the Supreme Court. "Our opinion in *Lanier* [*United States v. Lanier*, 520 U.S. 259, 137 L. Ed. 2d 432, 117 S. Ct. 1219 (1997)] thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." The case need not have "fundamentally" or "materially" similar facts to previous cases. The salient question is whether the law gave Defendants fair warning that their alleged treatment was unconstitutional. *Hope, supra*, at 741. There is no question that the long-standing decisional law satisfied this requirement. The second prong is satisfied.

(c) The third prong is whether a reasonable officer could have concluded that his actions did not violate plaintiffs' constitutional rights. We note first of all that both *Jordan v. Carter*, 428 F.3d 67 (1st Cir. 2005) and *Mihos v. Swift*, 358 F.3d 91 (1st Cir. 2004), cited by Defendants, are cases in which the constitutional right involved is that of the First Amendment, which is an issue in the Pansé case, but not the Jackson case. For such cases a balancing test of various factors is carried out, making the decision more difficult (though in both cases the defendants were denied immunity). Here the question is more clear cut. The following facts were in evidence: (i) all defendants were, or should have been, aware that the CBA called for due process; (ii) all defendants were aware, prior to the hearing before President Norman, that impartiality was an issue, since the case alleging this had already been brought in Federal court; (iii) Norman testified that he had told Gastenveld to insure due process (Walsh, at 7), and it is a fair inference that Gastenveld so informed the other defendants. In the analogous case of *Surprenant v. Rivas*, 424 F.3d 5 (1st Cir. 2005) the court found, *inter alia*, that it was self-evident that a

reasonable officer would have understood that prejudgment, in that case of alibi witnesses, would constitute a course of action inconsistent with the proper role of an impartial adjudicator. The third prong is satisfied. Defendants knowingly violated the law, and the request for qualified immunity should be denied.

### E. DEFENDANTS' CONCLUSIONS

Walsh's (at 13) conclusions are taken word for word from Wyzanski (at 21), with the omission of the words in the first sentence following "… substantive due process."

### F. PLAINTIFF'S CONCLUSIONS

For reasons given in the preceding comments, and in Plaintiff's memorandum, Plaintiff believes that Defendant's motion for summary judgment is without merit and should be denied. Furthermore, considering the overwhelming overlap between the Walsh and the much earlier Wyzanski memorandum, Plaintiff believes that Defendants' motion is more suitable as a motion in *Pansé et al. v. Norman et al.*, and should be denied as inapplicable to Dr. Jackson's case.

### G. REQUESTS FOR DOCUMENTS AND INTERROGATORIES

1. Walsh, at 6,  has attacked Plaintiff's attorney's integrity stating that he furnished no responsive answer to Defendant's interrogatories. This unwarranted accusation, based on misrepresentations and omissions of fact, cannot be left unchallenged, even though it has no bearing on the merits of the case. A brief comparison of the parties responses can make this clear. In the following I do not attach any exhibits since, in my opinion, these have nothing to contribute to questions on the merits of the case, but I am prepared to do so if requested to.

2. Walsh omits any mention of Plaintiff's response to the request for production of documents. Reference to this shows that Plaintiff supplied Defendants with copies of performance evaluations by external parties; media reports on the program; all medical reports; and affidavits of students. As to other documents requested, Plaintiff referred Defendants to documents in the possession of the College, all of which were available to Defendants through the co-operation of the Community College counsel. This co-operation was evidenced by the presence of the Community College counsel at the pre-trial conference, and by the copies of material to her by Defendants.  By contrast, the number of documents provided to Plaintiff by Defendants is: *Zero*.

3. Similar results are obtained in the interrogatories. Plaintiff provided specific references to where information in the possession of the College could be found. Defendants provided, essentially, little more information than "name, rank and serial number."

4. Finally we may note that Plaintiff's answers were provided on November 20, in order to allow Defendants to renew their requests. Defendants answers were provided on December 8, a week after discovery was to be completed. At the pre-trial conference Defendants attorney promised to provide materials responsive to specific requests. A letter was then sent to them with such requests. No response to this letter was ever received.

5.  Such tactics are usually applied when Defendants have a weak case. We may speculate that that is the situation here.

 Dated:   14 February 2007

                                        /s/ Sam Silverman_____

                                        SAM SILVERMAN, BBO No. 462930

18 Ingleside Road
Lexington, Massachusetts 02420
(781) 861-0368
Smpr111@verizon.net
Attorney for Dr. Jackson,Plaintiff

00001

```
                          Volume XVII
                          Pages 17-1 to 17-70
                          Exhibits-None
                 AMERICAN ARBITRATION ASSOCIATION
                      AAA No. 11-390-02524-02
         - - - - - - - - - - - - - - - - - - -x
                                             :
         In the Matter of Arbitration between:   :
                                             :
         THE BOARD OF HIGHER EDUCATION       :
                                             :
                       and                   :
                                             :
         MASSACHUSETTS COMMUNITY COLLEGE      :
         COUNCIL, Re:  Termination of Dr. Bruce  :
         Jackson                             :
                                             :
         - - - - - - - - - - - - - - - - - - -x
         BEFORE ARBITRATOR:  Nancy E. Peace
         APPEARANCES:
              Massachusetts Community Colleges, Office of the
                   General Counsel (by Haidee Morris, Esq.)
                   c/o Middlesex Community College, Springs
                   Road, Bedford, MA 01730, for the Board of
                   Higher Education.
              Pyle, Rome, Lichten & Ehrenberg, P.C.
                   (By Betsy L. Ehrenberg, Esq.)
                   18 Tremont Street, Suite 500, Boston,
                   MA 02108, for the Massachusetts Community
                   College Council.
         ALSO PRESENT:  Lindsay D. Norman
                        Laurie Taylor
                        Thomas Sabbagh
                        Bruce Jackson
```

00002

```
                          Held at:
                 American Arbitration Association
                      133 Federal Street
                      Boston, Massachusetts
                   Wednesday, April 21, 2004
                          10:16 a.m.
         (Anne H. Bohan, Registered Diplomate Reporter)
                          * * *
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
```

```
              20
              21
              22
              23
              24
```

00003
```
     1                      I N D E X
     2
         WITNESS:           DIRECT  CROSS  REDIRECT  RECROSS
     3
         Vincent B. Jette
     4   (By Ms. Ehrenberg)  17-4
     5   Lindsay D. Norman,
         Ph.D.
     6   (By Ms. Ehrenberg) 17-16       17-59,17-64
         (By Ms. Morris)             17-54            17-62
     7
     8
     9                   E X H I B I T S
    10
                             (None)

    11
    12                      *   *   *
    13
    14
    15
    16
    17
    18
    19
    20
    21
    22
    23
    24
```

00004
```
     1               P R O C E E D I N G S
     2           ARBITRATOR PEACE:  We'll let Ms. Ehrenberg
     3   introduce everybody.
     4           MS. EHRENBERG:  Mr. Jette, I'm Betsy
     5   Ehrenberg, I represent the Union who is pursuing the
     6   grievance on behalf of Dr. Jackson.  You know Dr.
     7   Jackson.  Our arbitrator has just introduced herself
     8   to you.  This is our court reporter, Anne Bohan.
     9   Haidee Morris is representing the College in this
    10   hearing.  I believe you know Laurie Taylor.  I
    11   suspect you know the president of the College and
    12   the Associate Dean, Mr. Sabbagh.
    13           VINCENT B. JETTE, Sworn
    14           DIRECT EXAMINATION
    15   BY MS. EHRENBERG:
    16   Q.   Mr. Jette, would you state and spell your
    17   name for the record, please.
    18   A.   Vincent Jette, V-i-n-c-e-n-t, J-e-t-t-e,
```

```
19    middle initial B.
20         Q.    Are you currently employed by MassBay
21    Community College?
22         A.    Yes, I am.
23         Q.    What's your position?
24         A.    Campus police.
```

00005

```
 1         Q.    For how long have you -- well, first of
 2    all, what is your position with the campus police?
 3         A.    Police officer.
 4         Q.    For how long have you held that position?
 5         A.    20 years.
 6         Q.    20 years?
 7         A.    20, 21 years.  Actually 22, going on 22.
 8         Q.    Have you worked for the College
 9    continuously for those 22 years?
10         A.    Other than being sick, yes.
11         Q.    Now, what are your duties and
12    responsibilities as a police officer for the
13    College?
14         A.    Maintain a safety field for the students,
15    the staff.  Patroling the building, parking lots.
16    Signing people in and out.  Just regular duties,
17    regular police duties.
18         Q.    When you say "signing people in and out,"
19    can you explain to the Arbitrator what you're
20    referring to?
21         A.    During the day there's not a sign-in sheet;
22    at night there's a sign-in sheet.  At night we have
23    a contract security company.
24         Q.    At what time does the contract security
```

00006

```
 1    company begin its supervision or oversight of the
 2    campus?
 3         A.    11 p.m.  Excuse me.  11 p.m. we have a full
 4    campus police.  Other than that, we have three to
 5    eleven.
 6         Q.    I'm sorry, I'm not following you.
 7         A.    We have contract security three to eleven,
 8    before we had a full complement of campus police.
 9         Q.    So you have campus police on duty overnight
10    but you have contract --
11         A.    No, no.  Contract security overnight,
12    campus police, which was me, seven to three.
13         Q.    Okay.
14         A.    And then contract security comes three to
15    eleven, eleven to seven.
16         Q.    I see.  Now, you mentioned that you worked
17    seven to three.  Have those always been your hours,
18    your shift hours?
19         A.    Yes, unless I work overtime.
20         Q.    But you've been on days as your regular
21    shift for as long as you've worked there?
22         A.    Right.
23         Q.    Now, when you come in at seven o'clock in
```

```
      24    the morning, is there a routine by which you are

00007
       1    informed of what, if anything, has happened on the
       2    evening or overnight shifts?
       3        A.    Sometimes; not all the time.  It depends on
       4    the guard.
       5        Q.    When it's working correctly, what is the
       6    procedure by which you are informed of events of the
       7    previous shifts?
       8        A.    Well, whatever took place overnight on the
       9    three to eleven shift or the eleven to seven.  If it
      10    was a problem, like a water leak, a fire alarm,
      11    things out of the ordinary, they would report it to
      12    us in the morning when we come in.
      13        Q.    Is there a logbook of any sort where
      14    incidents or events are to be recorded when they
      15    occur between three and eleven or eleven to seven?
      16        A.    Do you want to explain to me by "incident,"
      17    explain what you mean by "incident."
      18        Q.    Sure.  Any event that is notable that
      19    occurs between three and eleven or eleven to seven,
      20    is there a logbook on which such notable events are
      21    to be reported?
      22        A.    Yes.  If it's out of the ordinary, there
      23    would be an incident report, if that's what you
      24    mean.

00008
       1        Q.    Okay.  Let me ask you, in terms of what's
       2    out of the ordinary, if, for example, a student is
       3    found to be in a building alone or unaccompanied, is
       4    that a notable event such as should be recorded in
       5    the log?
       6        A.    Yes, it is.
       7        Q.    And with respect to that particular kind of
       8    incident, I want to direct your attention to the
       9    years 1996, 1997, that period of time, by which I
      10    mean simply the late '90s.  Did any incidents come
      11    to your attention as the 7 a.m. security officer
      12    concerning Professor Jackson's students being in the
      13    labs unsupervised --
      14        A.    A couple of times, yes.
      15        Q.    -- at night?
      16        A.    A couple of times.
      17        Q.    What do you recall of such incidents?
      18        A.    I remember one security officer was going
      19    to escort the student out of the building, because
      20    they said there was no supervisor, and they said
      21    that Dr. Jackson went to get coffee or pizza,
      22    something like that, and they weren't authorized to
      23    be there.
      24        Q.    So the student said Dr. Jackson had gone to

00009
       1    get --
       2        A.    Get coffee and pizza.
```

```
 3      Q.   And in fact, did the report include
 4   information on whether -- on when, if at all, Dr.
 5   Jackson did in fact return to the lab?
 6      A.   No.  Because the fellow that was on duty
 7   never wrote the incident saying that this particular
 8   thing happened.  What happens if they're not sure,
 9   they will put in a call to somebody.  When I say
10   somebody, it would be our director, Bob Irvine,
11   myself, and at the time Mike Crenshaw; we were on a
12   beeper.
13      Q.   Now, did you ever get a beeper call
14   concerning such an incident?
15      A.   I got a call on a beeper with a student
16   being there.
17      Q.   What, if anything, did you do in response
18   to that call?
19      A.   I asked the security officer if Bruce
20   Jackson was there.
21      Q.   And what were you told?
22      A.   That's what I was told, about the pizza and
23   the coffee.
24      Q.   And did you take any steps after that
```

00010
```
 1   report came to your attention with respect to Dr.
 2   Jackson?
 3      A.   There was a time or two Dr. Jackson, if the
 4   student is going to be there, he had to be there.
 5   They have to sign in.  After 10 p.m. anybody in the
 6   building has to sign in, whether they're faculty or
 7   whether -- a student couldn't stay there unless
 8   there was a faculty member or a staff member.
 9      Q.   Was it your experience that Dr. Jackson did
10   or did not enforce that particular rule of having
11   students sign in?
12      A.   Let me put it this way, yes, he did, after
13   I told him that they had to sign in in order to be
14   up in the building after ten o'clock.
15      Q.   Now, on that occasion that you just
16   described when it came to your attention that an
17   officer had reported a student was in the lab and
18   Dr. Jackson was not there, did you at any time speak
19   with Dr. Jackson about that incident?
20      A.   Yes, it was on the phone, because that's
21   the incident I'm talking about when the guard was
22   going to escort the student out of the building, and
23   I explained to Dr. Jackson the guard was in his
24   right because somebody is supposed to be there, you
```

00011
```
 1   can't leave a student.  And again, that's when he
 2   said he's going to out to get coffee, coffee and
 3   pizza, whatever it was.
 4      Q.   When did you speak to Dr. Jackson about the
 5   incident?
 6      A.   The next morning, when I came in, the guard
 7   told me.
```

```
 8        Q.   How did Dr. Jackson respond when you raised
 9   that issue with him?
10        A.   He told me he didn't realize that it had
11   had happened or whatever the incident happened
12   between the guard and the student, but he would take
13   care of it.
14        Q.   Following your conversation with Dr.
15   Jackson, what, if anything, occurred with respect to
16   future recurrences of that problem?
17        A.   I didn't hear much any more about it after
18   the contract security was told that people could be
19   in the building as long as they were supervised.
20        Q.   Now, I want to draw your attention to the
21   time frame of December of 2000.  Do you recall an
22   incident involving a student receiving a cut on her
23   arm?
24        A.   Yes, I believe so, yes.
```

00012

```
 1        Q.   What do you recall?
 2        A.   I remember getting -- I know it was after
 3   morning break, but anyway, we got a call about a
 4   student being injured up in the biotech lab.
 5        Q.   Who is "we"?
 6        A.   Bob Irvine and myself.
 7        Q.   And where were you when the call came in?
 8        A.   Down on the first floor, the main lobby.
 9        Q.   Who took the call?
10        A.   I can't remember; I can't remember offhand.
11        Q.   What, if anything, did you do after you
12   received the call?
13        A.   I went up to the biotech lab on the fifth
14   floor.
15        Q.   Can you describe for the Arbitrator what
16   you observed when you arrived at the fifth floor.
17        A.   Bob Irvine and myself, we got up on the
18   fifth floor, and then the nurse, Venice Sahley, came
19   behind us.  When we got up there, there was a
20   student standing like in between the biotech lab and
21   Dr. Jackson's office, and Dr. Jackson had gauze or a
22   sheet or whatever it was, something, putting
23   pressure on the young lady's arm.
24        Q.   And what, if anything, happened next?
```

00013

```
 1        A.   Well, the college nurse took over, and it
 2   was deemed that the young lady should go to the
 3   hospital.
 4        Q.   Did you have any conversation, or were you
 5   present during any conversation, with the young lady
 6   as to how the cut had occurred?
 7        A.   I just heard a rumor that she cut her
 8   arm --
 9             MS. MORRIS:  Objection.
10        Q.   I'm not going to ask you for a rumor.
11        A.   No, I didn't.  No, I didn't.
12             ARBITRATOR PEACE:  Sustained.
```

```
        13        Q.    Fair enough.
        14              Then when the nurse took over, can you just
        15    describe in a bit more detail what exactly happened.
        16        A.    Well, once the nurse takes over, we back
        17    off.  In other words, the paramedics would come,
        18    911, we had the paramedics coming.  Once they arrive
        19    on the scene, we back off, and the nurse would give
        20    any information she can when they're transporting
        21    the student.
        22        Q.    Then following that incident, were you
        23    copied on an e-mail that Dr. Jackson sent out
        24    concerning the incident?

00014
         1        A.    I don't recall.
         2        Q.    Let me show you a copy of an e-mail --
         3              MS. EHRENBERG:  Can we go off the record a
         4    moment while we just try to locate this document.
         5              (A pause)
         6              MS. EHRENBERG:  Let's go back on the
         7    record.
         8        BY MS. EHRENBERG:
         9        Q.    I'm showing you, Mr. Jette, a copy of an
        10    e-mail dated Wednesday, December 6, 2000 at 1:23
        11    p.m.
        12              ARBITRATOR PEACE:  Is this one that counsel
        13    for the College has seen?
        14              MS. EHRENBERG:  I believe so.
        15              ARBITRATOR PEACE:  Can you just show it to
        16    her first.
        17              MS. EHRENBERG:  Sure.
        18              MS. MORRIS:  That's Union Exhibit 13B.
        19              MS. EHRENBERG:  Great.  Thank you for
        20    telling me what my exhibits are.
        21        Q.    I'm showing you a copy of the e-mail dated
        22    December 6, 2000 and ask if you recognize it.
        23        A.    (Witness reviews document) Vaguely.  I
        24    mean, we do so many, I can't particularly remember

00015
         1    this, but I must have got a copy because my name is
         2    on it.
         3        Q.    Okay.  Thank you.
         4              Let me just ask one or two more questions,
         5    Mr. Jette.  With respect to your arrival at the
         6    fifth floor after receiving the call concerning the
         7    student, was there anyone else present besides Dr.
         8    Jackson and the student at the time that you arrived
         9    on the scene?
        10        A.    There were about three or four other
        11    students that were concerned about the young lady.
        12        Q.    Where were they?
        13        A.    Just standing around, standing around the
        14    corridor outside the elevator.
        15        Q.    Other than Dr. Jackson, were there any
        16    other faculty or staff present?
        17        A.    My supervisor, Bob Irvine.
```

18    Q.    Anyone else?
19    A.    Not that I know of offhand.
20          MS. EHRENBERG:  I have nothing further.
21  Thank you very much.
22          ARBITRATOR PEACE:  Just wait a minute.  Do
23  you want a couple of minutes to prepare?
24          MS. MORRIS:  Yes.  Thank you.

00016
1          ARBITRATOR PEACE:  You're welcome.
2          (A pause)
3          ARBITRATOR PEACE:  Mr. Jette, you need to
4  wait; the College has a chance to cross-examine you,
5  but they just want to prepare for a minute.  You're
6  welcome to stand up, use the men's room, you just
7  can't talk about your testimony.
8          (Recess)
9          MS. MORRIS:  We have no questions.
10         ARBITRATOR PEACE:  Mr. Jette, you're
11  excused.  We thank you very much.  There are no
12  questions for you.
13         So President Norman, Dr. Norman, I think
14  you're next.
15              LINDSAY D. NORMAN, Ph.D., Sworn
16                   DIRECT EXAMINATION
17  BY MS. EHRENBERG:
18    Q.    Would you state and spell your name for the
19  record, please.
20    A.    My name is Lindsay D. Norman.  The first
21  name is L-i-n-d-s-a-y, middle initial D as in David,
22  last name Norman, N-o-r-m-a-n.
23    Q.    You are currently president of MassBay
24  Community College; is that correct, Dr. Norman?

00017
1    A.    I am.
2    Q.    For how long have you been the president of
3  the College?
4    A.    Since March 1999, just slightly in excess
5  of five years.
6    Q.    Can you summarize briefly for the
7  Arbitrator your employment history prior to arriving
8  at MassBay.
9    A.    Surely.  Would you like me to start from
10  the beginning or go backwards?
11    Q.    The immediately preceding position first.
12    A.    Prior to coming to Massachusetts, I was
13  chancellor and before that president of Montana Tech
14  in Butte, Montana.
15    Q.    For how long did you hold that position?
16    A.    13 years.  Prior to that I was technical
17  director of the Chase Manhattan Bank in New York
18  City.  Prior to that I was vice president for
19  research and marketing for Jones & Laughlin Steel
20  Corporation in Pittsburgh, Pennsylvania.
21          Prior to that I was presidential appointee
22  as director of the United States Bureau of Mines in

```
         23    the Department of the Interior under Presidents
         24    Reagan and Carter, and I was acting director under a

00018
          1    portion of Mr. Ford's presidency.  Prior to that I
          2    held many different positions in the United States
          3    Bureau of Mines:  assistant director, director of
          4    planning, research supervisor, research scientist,
          5    and so forth.
          6        Q.    Thank you.
          7        A.    If I may add one thing.
          8        Q.    Sure.
          9        A.    Since about 1980, I've also had a private
         10    consulting practice entitled Norman Associates where
         11    I have done, more or less on a moonlighting basis,
         12    financial and management consulting.
         13        Q.    Now, do you have an advanced degree in
         14    engineering or mineral science of some sort?
         15        A.    My Ph.D. is in material science and
         16    solid-state physics.
         17        Q.    Am I correct that prior to becoming
         18    president and then chancellor of Montana Tech, you
         19    held no academic positions at any other college or
         20    university?
         21        A.    I held no academic positions but did
         22    consult to universities.
         23        Q.    Now, when you left Montana Tech, the
         24    cessation of that employment was not voluntary, as

00019
          1    far as you were concerned; is that a fair statement?
          2        A.    I don't believe that is a fair statement.
          3        Q.    Your contract was not renewed, was it?
          4        A.    It was a negotiated settlement of my
          5    contract.
          6        Q.    Well, there was a negotiated settlement
          7    following the college's determination not to renew
          8    the contract; is that right?
          9        A.    That is incorrect.
         10        Q.    Well, the negotiated settlement followed
         11    upon your filing a lawsuit in Montana arising from
         12    the cessation of your employment, did it not?
         13        A.    That is absolutely not correct.
         14        Q.    How would you describe the circumstances of
         15    your departure from Montana Tech?
         16        A.    As totally voluntary, in that I had reached
         17    a point with the state Board of Regents -- Montana
         18    Tech was not my employer, the state Board of Regents
         19    was my employer.  And in 1998 or thereabouts, it
         20    became obvious that the state Board of Regents of

         21    Montana and Lindsay Norman had different views as to
         22    where the future of Montana Tech lay.
         23            At that time I entered into negotiation
         24    with the commissioner of higher education, the

00020
```

```
 1    chairman of the board of regents, the president of
 2    the University of Montana, and others, to try to see
 3    if we could resolve those differences of opinion.
 4    It became quickly clear, because it became a
 5    political issue with the governor as well involved
 6    in this process, that where I saw -- my vision for
 7    the College was different than theirs, at which
 8    point we said, "How can we negotiate an acceptable
 9    end to this with the appropriate severance and what
10    have you?"  And that's what occurred.
11        Q.  I'm showing you a document that's entitled
12    "Complaint and Demand For Jury Trial" in the Montana
13    Second Judicial District Court, Silver Bow County,
14    and ask if you recognize this document.
15            MS. EHRENBERG:  Let me first show it to
16    College counsel.
17            MS. MORRIS:  This hasn't been offered, but
18    I'm objecting to this line of questioning on the
19    basis of relevance to the case we're here today on.
20            ARBITRATOR PEACE:  I think that's a fair
21    question.
22            MS. EHRENBERG:  Well, at this point I'm
23    into impeachment, because the witness has just
24    testified that he left voluntarily after engaging in
```

00021
```
 1    negotiations because of what I think he fairly
 2    describes as philosophical differences, and I now am
 3    seeking to impeach that testimony by evidence of the
 4    complaint filed on his behalf in Montana state court
 5    in which one of the allegations is that the
 6    university system would not recommend renewal of his
 7    employment contract to the Board of Regents.
 8            ARBITRATOR PEACE:  Okay.  I'm going to
 9    allow this.  I overrule your objection for the
10    moment, and I'm going to allow the question.
11        Q.  Do you --
12        A.  I'm familiar.
13        Q.  Yes, you recognize this document?
14        A.  Surely.  Let me read one thing, the date
15    when it was filed.
16        Q.  Sure.
17        A.  Would you show me where that is?
18        Q.  Oh, sure.
19        A.  (Examining document)  February 19, '98.
20    Thank you.
21        Q.  February 19, 1998.  And was David M. McLean
22    your attorney as of February 19, 1998?
23        A.  He was.
24        Q.  Did you authorize him to file this suit on
```

00022
```
 1    your behalf?
 2        A.  I did.
 3        Q.  And did you review the complaint prior to
 4    his filing the suit?
 5        A.  I did.
```

```
 6        Q.    Were the allegations of the complaint
 7   truthful?
 8        A.    Absolutely.
 9        Q.    Would you read allegation Paragraph XVIII.
10        A.    The entire allegation?
11        Q.    Sure.
12        A.    "NORMAN received a contract for the fiscal
13   year beginning July 1, 1997 and ending July 30,
14   1998.  He was also informed on September 19, 1997
15   that the president of his unit of the Montana
16   University system would not recommend renewal of his
17   employment contract to the Board of Regents for
18   their consideration at their meeting scheduled for
19   September 18 and 19, 1997.  At these meetings, the
20   Board of Regents voted not to renew Norman's
21   employment contract.  However, Norman justifiably
22   believed that this action meant that he would be
23   employed from July 1, 1998 through June 30, 1999
24   because he was entitled to at least one year's
```

00023
```
 1   notice before nonrenewal could be effective under
 2   the established policies of the Board of Regents,
 3   particularly Section 702.5."
 4        Q.    Thank you.  So is it fair to say that in
 5   this complaint, your legal claim was not that the
 6   Board of Regents did not have the authority not to
 7   renew your contract but that you had not received
 8   sufficient notice; is that correct?
 9        A.    I don't know if that's correct or not.  But
10   under existing Board of Regents policy -- they had a
11   handbook, a policy handbook -- presidents of the
12   college were entitled to one year's notice at the
13   beginning of each contract year.  Since we had
14   agreed that my contract would expire on June 1998, I
15   was operating under the assumption that I would then
16   have one more year of employment or at least
17   compensation pursuant to the Board of Regents'
18   policy manual.
19              At that time, then January or February, I
20   forget which, came around, and I was informed that I
21   would not be given that compensation, because in
22   1995, my title changed from president to chancellor.
23   I then filed a lawsuit saying, I'm sorry, I was
24   hired under one set of conditions that cannot be
```

00024
```
 1   unilaterally changed without proper notice, and
 2   therefore I believe I'm still entitled to that extra
 3   year of compensation as part of our agreement that
 4   my employment would end on June 1998.  And that was
 5   the whole gist of that lawsuit that you just showed
 6   me.
 7        Q.    Now, when you arrived at MassBay Community
 8   College, you assumed the role of president; is that
 9   correct?
10        A.    That is correct.
```

```
11        Q.   And in your role as president, what are
12   your duties and responsibilities with respect to
13   personnel matters concerning faculty?
14        A.   Well, I don't specifically supervise
15   faculty, but I am concerned that faculty follow
16   College policies.  I am exceedingly concerned and
17   provide oversight that we are properly pursuing the
18   Employer's responsibilities under the Collective
19   Bargaining Agreement.  I am concerned about faculty
20   and staff safety and health and well-being.  But
21   generally, my role as president is not only to make
22   the College policy but to ensure that it is being
23   properly followed.
24        Q.   We have in evidence in this case as
```

00025

```
 1   Employer Exhibit 12G a copy of the bylaws of the
 2   College.  And you are authorized under those bylaws
 3   to take all personnel actions with respect to all
 4   classified employees at the College, correct?
 5        A.   If I may have some clarification, please.
 6   When you say "the bylaws," this is of the Board of
 7   Trustees of the College?
 8        Q.   Yes.
 9        A.   Okay.  The Board of Trustees, which is the
10   governing board for the institution, has delegated
11   all responsibility for personnel actions to the
12   President with the exception of the granting of
13   tenure.
14        Q.   Who has responsibility for the granting of
15   tenure?
16        A.   I ultimately will make recommendations to
17   the Board of Trustees, and it is their ultimate
18   authority.
19        Q.   The bylaws also require that you refer to
20   the Finance and Personnel Committee for review major
21   personnel actions prior to final action; is that
22   correct?
23        A.   Well, as the normal course of doing
24   business, the Personnel, Finance and, as it is now
```

00026

```
 1   known, Audit Committee has overall responsibility
 2   for reviewing these matters as may come up that are
 3   appropriate for board consideration.  So as a matter
 4   of due course, I refer these items or discuss these
 5   items, formally or informally, as the case may be,
 6   with the members of that committee.
 7        Q.   Now, in her position as director and then
 8   vice president for human resources at the College,
 9   Laurie Taylor is the person that you rely on to
10   assure that such matters as discipline and faculty
11   personnel actions are taken in accordance with the
12   requirements of the Collective Bargaining Agreement,
13   correct?
14        A.   She is one of the primary sources of
15   consultation.
```

16    Q.   She is also a primary source of
17  consultation to ensure that such actions are taken
18  consistent with external law; is that correct?
19    A.   One of several, yes.
20    Q.   Yes.  And you in fact often called upon Ms.
21  Taylor to write letters and memos that in fact come
22  from the deans to you but that in fact are written
23  by Ms. Taylor, correct?
24    A.   Well, I don't recall any specific instances

00027

1  of that.  I'm sure that Ms. Taylor not only provides
2  consultation to me but she does to other members of
3  the administration as well, and so it's conceivable
4  that could have happened.
5    Q.   Well, there certainly have been times when
6  she in fact has drafted letters that then were
7  addressed from deans to you, correct?
8    A.   I can't speak to that; I don't have any
9  specific recollection of that.
10    Q.   Now, with respect to the investigation of
11  Dr. Jackson that led to his termination, you're
12  aware that she drafted or participated in the
13  drafting of the recommendation to you that Dr.
14  Jackson be terminated, correct?
15    A.   I think she participated in all
16  discussions with subordinate personnel during the
17  entire process that led to the instance that you're
18  talking about.
19    Q.   During that investigation, in fact she also
20  kept you apprised of how the investigation was
21  proceeding and what information was being developed,
22  didn't she?
23    A.   In very general terms.
24    Q.   Well, she spoke with you several times on

00028

1  this subject concerning the interviews that were
2  taking place and the information being developed in
3  those interviews, did she not?
4    A.   My questions at the time dealt more with
5  the process than actual specifics.
6    Q.   So is it your testimony that she did not
7  inform you of the information that was being
8  developed?
9    A.   No.  She did inform me in general terms.  I
10  think I already answered that.
11    Q.   When did you first learn of student
12  complaints concerning Dr. Jackson, the complaints
13  that were investigated in the spring of 2002?  When
14  did they first come to your attention?
15    A.   I can only hazard a guess.
16    Q.   I don't want you to guess.  Do you have any
17  recollection of either the time frame or the
18  circumstances when those complaints came to your
19  attention for the first time?
20    A.   I would guess the spring semester of 2000

```
21   or 2001; I just don't remember the years.
22        Q.   Do you recall what, if any, steps you took
23   upon first learning that certain students had filed
24   certain complaints about Dr. Jackson?

00029
1        A.   I can answer specifically that my standard
2   response when faced with whether there were
3   complaints about Dr. Jackson or any other faculty
4   member is to make sure that we had due process occur
5   and that these complaints, each one is taken
6   seriously.
7        Q.   How did you go about ensuring that due
8   process occurred with respect to Dr. Jackson?
9        A.   By making sure that the vice president for
10   academic affairs was apprised of these matters and
11   that it was being handled.
12        Q.   The vice president for academic affairs, at
13   the time was that Ms. Gastenveld?
14        A.   I believe it was.
15        Q.   Do you recall any conversations you had
16   with her on the subject of these complaints and how
17   they were to be handled?
18        A.   Not at those early stages I don't believe.
19        Q.   Do you recall any conversations that you
20   had with Ms. Taylor concerning the nature of the
21   complaints or how they were to be handled?
22        A.   I recall none.
23        Q.   Now, is that to say that you didn't have
24   any or that you may have had some and you simply

00030
1   don't recall them specifically?
2        A.   My recollection at this time is I had none.
3        Q.   Is that you had no --
4        A.   At the early stages I had no specific
5   conversation on these matters.
6        Q.   When is the first conversation that you
7   recall having with Ms. Taylor on the subject of the
8   complaints that had been made or the procedures for
9   investigating them?
10        A.   I don't remember.
11        Q.   Do you recall what the substance of that
12   conversation was?
13        A.   Well, if I can't remember the conversation,
14   then I can't remember that, I believe.
15        Q.   Now, at some point in time Ms. Taylor did

16   begin to keep you posted of the progress of the
17   investigation; is that correct?
18        A.   Oh, most assuredly.
19        Q.   And she spoke with you on a number of
20   occasions as the investigation was proceeding, did
21   she not?
22        A.   I'm sure she did, yes.
23        Q.   You had some e-mail exchanges with her on
24   the subject; is that right?
```

00031

```
 1       A.   I don't recall.

 2       Q.   Now, you discussed with Ms. Taylor the
 3  subject of terminating Dr. Jackson's employment
 4  before the point in time when you received the
 5  recommendation of Dean Darkazalli and Vice President

 6  Gastenveld, correct?
 7       A.   Any discussion that I would have had with
 8  Ms. Taylor at that time I'm sure would be because I
 9  would ask that same question today:  If this
10  particular action proceeds in a certain direction,
11  what are the potential outcomes?
12       Q.   Well, but beyond asking what the potential
13  outcomes were, you specifically discussed
14  termination with her, did you not?
15       A.   I don't recall that.
16       Q.   Now, prior to your receipt of the
17  recommendation from Vice President Gastenveld and
18  Dean Darkazalli, Ms. Taylor advised you of the
19  responses that she believed you could expect should
20  a personnel action be taken against Dr. Jackson, did
21  she not?
22       A.   What Ms. Taylor advised me on were the
23  requirements of the Collective Bargaining Agreement
24  and what the various steps were of complying with
```

00032

```
 1  that agreement.
 2       Q.   Well, so is it your testimony that at no
 3  time did she discuss with you what actions she
 4  anticipated would be forthcoming from Dr. Jackson or
 5  from the Union on his behalf were there to be a
 6  personnel action taken against him?  Is it your
 7  testimony that she never discussed that with you?
 8       A.   Not that specifically.
 9       Q.   So she never told you that she thought that
10  Dr. Jackson would probably grieve any personnel
11  action?
12       A.   Ms. Taylor's consultation with me, I
13  believe, as I recall it, dealt primarily with if Mr.
14  Jackson were to grieve this, then these are the
15  steps that the College and you as the president are
16  expected to take, again in compliance with the
17  Collective Bargaining Agreement.
18       Q.   So your testimony -- strike that.  I guess
19  I want to just make clear for the record, is it your
20  testimony that Ms. Taylor never discussed with you
21  what might happen were the College to terminate Dr.
22  Jackson's employment?
23       A.   It is my testimony that Laurie Taylor
24  discussed with me that as one option.  I don't
```

00033

```
 1  believe Ms. Taylor assumed a specific outcome at
```

```
 2    that time.
 3        Q.   But that's not my question.  My question
 4    is, did she discuss with you what she expected
 5    might happen were the College to terminate Dr.

 6    Jackson's employment?  Yes or no.  It's a yes-or-no
 7    question.
 8        A.   Well, I don't recall that, in that
 9    question.
10        Q.   So you don't recall her talking with you
11    about the fact that Dr. Jackson would probably
12    grieve termination as an infringement on his
13    academic freedom?
14        A.   I don't recall that.
15        Q.   You don't recall that she -- strike that.
16    Did Ms. Taylor tell you that she expected that Dr.
17    Jackson would file a lawsuit arising from any
18    termination?
19        A.   I absolutely don't remember that.
20        Q.   So is it your testimony that she did not
21    tell you that Dr. Jackson would sue the College?
22        A.   I don't remember that.
23        Q.   Did she tell that you Dr. Jackson would
24    probably sue you?
```

00034
```
 1        A.   No.  I don't remember that.
 2        Q.   Did she tell you that Dr. Jackson would
 3    probably sue her?
 4        A.   I don't recall that.
 5        Q.   Did she tell you that Dr. Jackson would
 6    probably file a discrimination complaint?
 7        A.   I don't recall her saying that.
 8        Q.   Now, on June 2, 2002, you sent a memorandum
 9    to Judith Gill.  Who is Judith Gill?
10        A.   Judith Gill is chancellor for the Board of
11    Higher Education for the Commonwealth.
12        Q.   Do you recall sending her a memorandum on
13    June 2nd on the subject of personnel action being
14    contemplated with respect to Dr. Jackson and Dr.
15    Panse?
16        A.   I do.
17        Q.   What do you recall of that memorandum?
18    What was your purpose in sending it?
19        A.   If I have my dates correctly, I believe
20    that was about the time when the complaints about
21    both Drs. Jackson and Panse had reached a point
22    where it was appearing -- it was beginning to appear
23    that there would be some formal charges made, or had
24    been made, I don't remember in the context.
```

00035
```
 1            At that point I believed that it was very
 2    important that the chancellor be aware of those
 3    potential actions, primarily because of prior
 4    efforts that Dr. Jackson had made to embarrass the
 5    administration over a previous employment action,
```

```
 6    and at a time when Dr. Jackson had made an attempt
 7    to have the press pick up on some actions that the
 8    College had taken, in an effort to embarrass the
 9    College.  And as a public official, the chancellor
10    is concerned about adverse publicity, adverse press,
11    in the higher ed case system, and so I therefore
12    felt it important that she be aware that this was
13    always a potential.
14        Q.   When you say that Dr. Jackson made an
15    effort to embarrass the College, you're referring to
16    incidents when in fact what he did was protest
17    actions that had been taken against him, correct?
18    That's what you're referring to?
19        A.   Not exactly.
20        Q.   So when Dr. Jackson, for example, filed a
21    lawsuit in Federal Court arising from personnel
22    action concerning him taken at MassBay, is that what
23    you were referring to as an effort to embarrass the
24    College?
```

00036
```
 1        A.   It is not.
 2        Q.   Now, when you wrote to Dr. Gill --
 3             MS. EHRENBERG:  Well, let me ask, do we
 4    have a clean copy of Union 21 that we might show the
 5    witness?
 6             ARBITRATOR PEACE:  Yes.
 7             MS. EHRENBERG:  Thank you.
 8        Q.   I'm showing you what's been entered into
 9    evidence as Union Exhibit 21.  Now, that's the
10    letter that we've just been discussing that you sent
11    to Dr. Gill concerning the personnel actions now
12    taking place, in your words, concerning Dr. Jackson
13    and Dr. Panse; is that right?
14        A.   That is correct.
15        Q.   Now, at the time that this letter was sent,
16    you had just received the recommendation for
17    dismissal from Dr. Gastenveld and Dean Darkazalli;
18    is that correct?
19        A.   That seems like the reasonable time that
20    would have occurred.
21        Q.   Had you reviewed all of the documents
22    accompanying that recommendation at the time you
23    sent this letter to Dr. Gill?
24        A.   I knew I had reviewed quite a few.
```

00037
```
 1        Q.   At this time you stated to Dr. Gill that
 2    for the entire -- for almost the entire three
 3    years that you had been president at MassBay, you
 4    have "had to deal with some very unacceptable
 5    behavior from two tenured professors there."  And
 6    those are references to Dr. Jackson and Dr. Panse,
 7    correct?
 8        A.   That is correct.
 9        Q.   You mentioned to Dr. Gill that both are
10    minorities.  Do you see that?
```

```
11        A.   I do.
12        Q.   Now, why did you bring that to her
13   attention?
14        A.   For the sole reason, as I indicated
15   earlier in this testimony, that Dr. Jackson at an
16   earlier time had played what I called the race card
17   in his efforts to embarrass the administration of
18   the College and its Board of Trustees, and I had
19   every reason to believe he might attempt to do that
20   again, and I did not want to embarrass the
21   chancellor.
22        Q.   And what do you mean when you say Dr.
23   Jackson had "played the race card"?  What are you
24   referring to?
```

00038

```
1         A.   I'm referring to an outburst at a Board of
2    Trustees meeting in September of '99, I believe it
3    was, as I was attempting to get him tenure, that he,
4    with an attorney from the NAACP, attempted to
5    disrupt a formal Board of Trustees meeting to make a
6    personal statement.
7              And when he was denied that opportunity,
8    screaming to a room of 40-some people something to
9    the effect, "There's more than one way to lynch a
10   nigger," he then proceeded to leave that room and
11   went and visited with reporters from at least two
12   newspapers that I'm aware of, one of which was the
13   Metrowest Daily News, trying to get them to print
14   articles on the racist administration and governance
15   at MassBay Community College.  And from that
16   experience, I simply was unsure or did not trust Dr.
17   Jackson not to do that again.
18             MS. EHRENBERG:  Well, as to any statements
19   made by this witness concerning what Dr. Jackson
20   may have done or said to representatives of
21   newspapers, I move to strike them, since there's no
22   foundation for this witness' representation to that
23   effect.
24             ARBITRATOR PEACE:  Do you want to say
```

00039

```
1    anything before I make a ruling?
2              MS. MORRIS:  Yes.  It was in response to a
3    question asked, it was a fair response, about what
4    he heard and we have a lot of hearsay testimony in
5    this case already.  So I think it's relevant to the
6    question, she asked him his reason, now she's moving
7    to strike it.
8              ARBITRATOR PEACE:  I overrule the
9    objection.  You asked the question; you got the
10   answer.
11             In terms of what his motivation was and
12   what he was thinking, it doesn't go to the proof of
13   what actually happened, but it goes to the answer of

14   your question about what was the basis of his
```

```
15    concern, and I think it's legitimate to keep it in.
16          MS. EHRENBERG:  Okay.
17     Q.   Now, the meeting that you had discussed --
18    strike that.  The meeting that you had just
19    referenced at which Dr. Jackson called out in the
20    way that you described, that meeting had adjourned
21    at the time of his statements, had it not?
22     A.   It was in the process of adjourning.  It
23    was at the conclusion of the meeting but had not
24    formally adjourned.
```

00040
```
 1     Q.   It was in the process of adjourning, but it
 2    hadn't formally adjourned?
 3     A.   That is correct.  The chairman was prepared
 4    to lower the gavel to adjourn the meeting when Dr.
 5    Jackson and his associate made their scene.
 6     Q.   Now, it wasn't in fact Dr. Jackson who had
 7    yelled out the phrase that you just quoted, was it,
 8    it was his lawyer?
 9     A.   I don't know, because I wasn't looking at
10    the time, I just heard the phrase.
11     Q.   So you don't know in fact whether it was
12    Dr. Jackson who had called out the sentence that you
13    just quoted to us; it was one of the two of them as
14    far as you knew; is that correct?
15     A.   That is correct.
16     Q.   Now, in the third paragraph of your June
17    2nd memorandum to Dr. Gill, you state that "In
18    response to a number of student complaints we have
19    determined that each professor has failed to
20    supervise their classes, changed class schedules
21    without authority, and exposed students to unsafe
22    laboratory situations, to name but a few problems
23    with these faculty."
24          Now, you had not been personally involved
```

00041
```
 1    in the investigation of the allegations; is that
 2    correct?
 3     A.   That is correct.
 4     Q.   You received a report from Dr. Gastenveld
 5    and from Dean Darkazalli concerning their
 6    interviews with the students who had complained,
 7    correct?
 8     A.   That is correct.
 9     Q.   Now, you represented to Dr. Gill that you
10    had already made a determination that Dr. Jackson
11    had failed to supervise classes, had changed
12    schedules without authority and so on.  How is it
13    that you represent to her in June a conclusion
14    reached and then in August conduct a hearing
15    designed to determine whether the charges have been
16    sustained?
17     A.   This is truly a poor use of the royal "we."
18    It probably would have been better to state "members
19    of my administration have determined."
```

```
20        Q.   So what you're saying is, when you said
21   "we," you didn't mean "we"?
22        A.   I didn't mean me.
23        Q.   So when you said "we," you didn't mean to
24   include yourself in the pronoun; is that correct?
```

00042
```
 1        A.   That is correct.  Because at that time I
 2   had the charge letter, or whatever we call it, that
 3   came from the dean and the vice president and that
 4   was what I had.
 5        Q.   Now, with respect to the process, did you
 6   notice when you reviewed the materials that
 7   accompanied the recommendation that the interview
 8   questions that were asked were taken directly from
 9   the language of the complaints that had been filed?
10   Did you notice that?
11        A.   I did not observe that.
12        Q.   Did you notice that there were only a
13   handful of interviews conducted, whereas the number
14   of students in Dr. Jackson's classes in the fall and
15   the spring combined probably totalled what, 30
16   maybe, something like that, and yet there were just
17   a handful of interviews?  Did you notice that?
18        A.   I did not make that comparison.
19        Q.   Did you notice that the vast majority of
20   the people who were interviewed and whose interviews
21   were reported upon were the same students who had
22   brought complaints to Dean Darkazalli and Associate
23   Dean Sabbagh?
24        A.   I did not observe that.
```

00043
```
 1        Q.   Now, with respect to the procedure that's
 2   called for under the contract, following the receipt
 3   of the recommendation, you convened a hearing; is
 4   that correct?
 5        A.   Yes, I believe so.
 6        Q.   The purpose of the hearing, is it not, is
 7   to give the faculty member a full and fair
 8   opportunity to present all relevant evidence
 9   concerning the charges that were at issue, correct?
10        A.   That's correct.  But I would also add,
11   it's also to provide me as complete a record as
12   possible, as the hearing officer and the deciding
13   officer on that recommendation, as much information
14   as possible.
15        Q.   Certainly.  And in fact, it would be
16   important for the purpose of providing you with the
17   most complete information possible for the faculty
18   member to have the opportunity to present his
19   evidence, correct?
20        A.   I would believe so.
21        Q.   Is it also not your opportunity to assess,
22   to sort of put the recommendation to the test, in
23   other words, a termination has been recommended, and
24   isn't that hearing the point at which the validity
```

00044
```
 1    of that recommendation and the facts that it rests
 2    on should be tested?
 3        A.   I believe so.
 4        Q.   Is it fair to say that your job as the
 5    hearing officer is to take a fresh look at all of
 6    the evidence that can be marshaled on the subject,
 7    both from the College and from the faculty member?
 8        A.   I believe it is my job to look at all
 9    information related to the charges.
10        Q.   Do you see yourself as an independent
11    factfinder at that stage in the proceeding?
12        A.   Well, yes, of course.
13        Q.   So as an independent factfinder at that
14    stage in the proceeding, you don't see your role as
15    to come in with a conclusion that you wished to
16    confirm but to come in with an open mind; is that
17    correct?
18        A.   Absolutely.
19        Q.   The hearing that was held was held over a
20    period of three days, I believe, is that correct, if
21    you recall?
22        A.   I think that's correct, yes.
23        Q.   Now, I don't know if you're aware that the
24    transcript of that hearing has been entered as an
```

00045
```
 1    exhibit in this case.  And so let me just ask you if
 2    it's consistent with your recollection that that
 3    hearing was held on August 5th, 6th and 7th of 2002?
 4        A.   I'll accept your dates, if that's what the
 5    transcript says.
 6        Q.   Okay.
 7             ARBITRATOR PEACE:  You going to refer to
 8    those specifically?
 9             MS. EHRENBERG:  I don't know.
10             ARBITRATOR PEACE:  Okay.
11             (Discussion off the record)
12        Q.   Now, the College had a transcript made of
13    the hearing, I mean, clearly this might be an
14    obvious point, but in order to preserve the
15    testimony and the record of evidence placed before
16    you, correct?
17        A.   I believe that's required by the Collective
18    Bargaining Agreement.
19        Q.   Would you not agree with me that it is also
20    useful to you to have a transcript to review the
21    evidence before issuing your decision in order to be
22    able to look at the body of evidence as a whole?
23        A.   Not necessarily.
24        Q.   Not necessarily?  Okay.  You didn't take
```

00046
```
 1    notes at the hearing, did you?
 2        A.   I did not.
 3        Q.   But you considered all the evidence
```

4    carefully before rendering your decision; is that
5    correct?
6        A.    I believe I did.  I gave it considerable
7    thought and introspection and tried to consider
8    every scrap of testimony.
9        Q.    And you had some conversations with Laurie
10   Taylor, you discussed your decision with Laurie
11   Taylor between the conclusion of the administrative
12   hearing and the writing of your decision; is that
13   correct?
14       A.    I came to a decision and then discussed it
15   with Laurie Taylor.
16       Q.    But you had that conversation between the
17   conclusion of the hearing and your writing of your
18   decision; is that right?
19       A.    Well, I believe I was -- as I recall, I had
20   a conversation with Laurie Taylor to ensure that I
21   was not violating anything in the Collective
22   Bargaining Agreement as I wrote that decision.
23       Q.    And you had that conversation with her --
24   and you had that conversation with her within a

00047
1    couple of days of the close of the hearing; is that
2    right?
3        A.    Oh, probably within 24 hours.
4        Q.    Do you recall the circumstances of that
5    conversation?  In other words, was she in your
6    office?  Was it by phone?  Was it in some other
7    location?
8        A.    It would have been on campus.
9        Q.    Was it a face-to-face meeting?
10       A.    Oh, yes.  Yes.
11       Q.    Now, stepping back a step, there's been
12   testimony that -- and the bylaws speak for
13   themselves, but there's a requirement in the bylaws
14   that you notify the Personnel, Audit and Finance
15   Committee any time you are contemplating a major
16   personnel action.  Do you recall that requirement?
17       A.    Yes.
18       Q.    And you met with Laurie Taylor after
19   receiving the recommendation for termination but
20   before the administrative hearing convened and in
21   the course of that meeting issued your notice to the
22   personnel committee; is that correct?
23       A.    As I recall, I e-mailed the chairman and
24   the vice chairman alerting them that a hearing would

00048
1    be conducted and that some serious charges had been
2    raised against two professors.  And that was my
3    letting them know, that was the process I went
4    through.
5        Q.    But you did not discuss with that committee
6    on any future occasion the termination of Dr.
7    Jackson that was being contemplated, correct?
8        A.    I don't recall ever doing that.

```
 9        Q.   Now, in the past when you have notified the
10   personnel committee of contemplated major personnel
11   actions, you have in fact discussed it with the
12   committee such as reorganizations and so on; is that
13   right?
14        A.   Normally I will discuss it at the next
15   meeting of that committee, the next formal meeting,
16   if it is justified.
17        Q.   If there is not a regularly scheduled
18   meeting of the committee, you're authorized or, as a
19   practical matter, able to convene a special meeting
20   for any special purpose that may arise?
21        A.   Well, on personnel matters, I'm actually
22   authorized to proceed in the matter.
23        Q.   But you are also authorized to meet with
24   the committee if you believe that that's either
```

00049
```
 1   called for under the bylaws or would be useful to
 2   you, correct?
 3        A.   Generally that has not been my practice.
 4        Q.   I'm not asking you your practice; I'm
 5   asking you whether you could convene a meeting if
 6   one is not regularly scheduled in order to discuss a
 7   personnel action with the committee.
 8        A.   I could request one of the chair.
 9        Q.   But as far as you recall, the only
10   communication you had with the committee on this
11   action was to e-mail them the notice required under
12   the bylaws; is that correct?
13        A.   That is the only contact that I had, yes.
14        Q.   Now, the termination letter in this case is
15   dated -- strike that.
16        MS. EHRENBERG:  Let me just take a moment
17   off the record.
18        (A pause)
19   BY MS. EHRENBERG:
20        Q.   Just to refresh your recollection, I'm
21   showing you a copy of Joint Exhibit 2, and the date
22   of the termination letter is August 8, 2002.  Do you
23   see that?
24        A.   I do.
```

00050
```
 1        Q.   Now, on August 8, 2002, you in fact were
 2   involved in an automobile accident, were you not?
 3        A.   I don't know.  Was I?
 4        Q.   Were you not involved in an automobile
 5   accident on Route 27 with Donna Green on August 8,
 6   2002?
 7        A.   I cannot attest if that was the date, but
 8   there was a time when I was involved in such an
 9   accident.
10        Q.   What were the circumstances?  I mean, just
11   briefly, that was an accident that occurred around
12   eleven o'clock in the morning; is that right?
13        A.   That's incorrect.
```

```
14      Q.   What time did it occur?
15      A.   I'd say about three in the afternoon.
16      Q.   And is it fair to say -- strike that.  Were
17  you traveling -- were you done with your workday at
18  that time?
19      A.   I was traveling at that time from the
20  campus in Wellesley to the Wayland Country Club to
21  have a staff golf outing.
22      Q.   I see.  Okay.  So there was a staff golf
23  outing on that same day as well?
24      A.   On the day that I had the accident.
```

00051
```
 1      Q.   When exactly did you draft the letter
 2  that's dated August 8, 2002, concerning Dr.
 3  Jackson's termination?  Did you have it drafted
 4  before the hearing concluded?
 5      A.   I don't believe so, no.
 6      Q.   So you drafted it after the hearing
 7  concluded on August 7; is that correct?
 8      A.   That is correct.
 9      Q.   And before you left the College to go to
10  the golf tournament; is that right?
11      A.   That would have to be correct, if that's
12  the date of the accident.
13      Q.   So in fact, it's impossible for you to have
14  spent even 24 hours thinking about the body of
15  evidence that you had heard over the previous three
16  days, because before 24 hours had passed, you had
17  issued a termination letter, correct?
18      A.   I think that's incorrect.  I spent over 72
19  hours considering the testimony.
20      Q.   From the time that the hearing ended until
21  the time that the termination letter issued was a
22  period of less than 24 hours, was it not?
23      A.   That is correct.
24      Q.   In fact, the hearing on August 7th
```

00052
```
 1  concluded at 20 of six in the evening, did it not?
 2      A.   It was late in the day.
 3           MS. EHRENBERG:  Can I have a minute,
 4  please?
 5           ARBITRATOR PEACE:  Yes, you may.  Will it
 6  be five minutes?
 7           MS. EHRENBERG:  It will be five minutes.
 8           ARBITRATOR PEACE:  Then I would like to
 9  give everybody a break.
10           (Recess)
11           MS. EHRENBERG:  Nothing further.
12           ARBITRATOR PEACE:  Do you want to consult?
13           MS. MORRIS:  Do we want to take a lunch
14  break?
15           ARBITRATOR PEACE:  If you're going to have
16  cross, this might be a good time to do that.  Can we
17  do half an hour?  I don't care at this point because
18  it looks like we're doing better than we would have
```

19    anticipated timewise.  I can't figure out
20    everybody's time constraints, and if you need more
21    time to prepare, then I don't want to rush back.  On
22    the other hand, if people would like to get done
23    sooner, I'm willing to accommodate.
24              MS. EHRENBERG:  I thought we were only

00053

1    going until two, so I have something planned for
2    afterwards, which can be changed, if necessary.
3    That is my position.
4              ARBITRATOR PEACE:  Off the record.
5              (Discussion off the record)
6              ARBITRATOR PEACE:  I will see everybody at
7    12:30.
8              (Luncheon recess from 11:55 a.m.
9               to 12:40 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

00054

1                   AFTERNOON SESSION
2              ARBITRATOR PEACE:  Cross-examination?
3              MS. MORRIS:  Yes.
4              ARBITRATOR PEACE:  Thank you very much.
5                   CROSS EXAMINATION
6    BY MS. MORRIS:
7      Q.   President Norman, you testified regarding
8    your educational degrees earlier, and I wonder if
9    you could expand upon that a little.  I believe you
10   testified that you had your Ph.D. in material
11   science; is that correct?
12     A.   And physics.
13     Q.   Material science and physics.  For those of
14   us not in the sciences, could you explain what that
15   is.
16     A.   Material science is primarily the science
17   and the chemistry and the behavior of all kinds of
18   materials, the fabrication, the manufacturing of
19   those materials, the use of those materials, their
20   properties and so forth.
21     Q.   Did you get any degrees, such as a master's
22   or a bachelor's, before you got your Ph.D.?
23     A.   My master's degree was in metallurgical

24      engineering and nuclear engineering, and my

00055
1       bachelor's degrees, or degree rather, was in
2       metallurgical engineering.
3           Q.    Did you have any experience teaching and/or
4       in labs during the period of time that you were
5       receiving your educational degrees?
6           A.    Well, insofar as my undergraduate
7       education, probably more than half of the 160
8       credits required for my bachelor's degree was in
9       laboratory science courses that I had to take.  But
10      specifically as to teaching, one of the ways that I
11      helped finance my graduate education at the
12      University of Maryland was to be a graduate teaching
13      assistant in inorganic chemistry.
14          Q.    As a graduate teaching assistant in
15      inorganic chemistry, what were your
16      responsibilities?
17          A.    My primary responsibility was to supervise
18      the laboratory of entering -- of generally freshmen
19      students who were taking inorganic chemistry, and I
20      also had one lecture hour per week for those same
21      students.
22          Q.    What, if any, safety policies or protocols
23      or procedures did you follow --
24              MS. EHRENBERG:  Objection.

00056
1           Q.    -- in that role?
2               MS. EHRENBERG:  Objection.  I really think
3       that the safety policies followed by the witness
4       when he was a graduate assistant some number of
5       decades ago is quite irrelevant to the matter of
6       safety policies either in effect at MassBay
7       Community College or as followed by the grievant.
8       This is terribly remote in time and in relationship
9       to MassBay Community College.
10              MS. MORRIS:  May I respond?
11              ARBITRATOR PEACE:  Yes, you may.
12              MS. MORRIS:  I believe that the President's
13      experience as a graduate teaching assistant in what
14      safety policies are followed is extremely relevant,
15      in that he testified that he had lab experience and
16      he was supervising students.  This is not a case of
17      technological advance; this is a case regarding
18      supervision of laboratory students.
19              ARBITRATOR PEACE:  I'm going to overrule
20      the objection.  I'd like to hear the testimony and
21      I'll have to evaluate it later.
22              Go ahead, please answer the question.
23          A.    Would you repeat the question again.
24          Q.    Yes.  What, if any, safety policies or

00057
1       protocols or procedures did you follow as a graduate
2       teaching assistant in the chemistry laboratory?

```
 3        A.   The safety and supervision of the students
 4   who were my responsibility was one of the first and
 5   foremost responsibilities that was cited to me by
 6   the man who hired me, Dr. Charles White, who was
 7   head of the chemistry department at that time.  And
 8   in fact, he impressed upon me that the safety during
 9   the four hours a week they were in the laboratory
10   was my sole and total responsibility of those
11   students.
12        And he also cited that the primary reason
13   that that was of concern to the university was that
14   many of these students had had no or very limited
15   laboratory experience prior to taking that
16   particular laboratory course.  And so, therefore, it
17   was important that they be properly supervised and
18   that I was in fact -- once the class period started,
19   I was not to leave the laboratory until the end of
20   the class period.  So the laboratory was never left
21   unattended by me.
22        Q.   What if you had to get supplies?
23        A.   I would send a student with an appropriate
24   requisition to the supply room for those supplies.

00058
 1        Q.   Now, you also testified regarding your
 2   prior employment history, and that prior to being
 3   president and chancellor at Montana Tech, you worked
 4   at the Chase Manhattan Bank; is that right?
 5        A.   Yes.
 6        Q.   Prior to that, you were director of the
 7   Bureau of Mines; is that right?
 8        A.   Yes.
 9        Q.   And you also held various either positions
10   in the Bureau of Mines; is that correct?
11        A.   That is correct.
12        Q.   Could you tell me again what positions
13   those were.
14        A.   The first position I had was as a research
15   engineer where I worked in a laboratory.  I then was
16   advanced to a research supervisor where I supervised
17   a group of research technicians and engineers.  And
18   then I was promoted to an administrator in the
19   Washington, D.C., headquarters after approximately
20   ten years of research.  And I advanced in the ranks
21   until I finally became an assistant director of the
22   entire bureau.
23        Q.   What, if any, lab experience did you have
24   in those positions?

00059
 1        A.   Well, the entire almost ten years of
 2   research engineer.  Then research supervisor was in
 3   a laboratory that dealt with all kinds of different
 4   laboratory instrumentation and devices, including
 5   some fairly hazardous materials, carcinogens and
 6   radioactive materials and other things like that.
 7        MS. MORRIS:  I have no further questions.
```

```
 8              ARBITRATOR PEACE:  Does the Union have
 9    questions on redirect?
10              MS. EHRENBERG:  Yes.
11                 REDIRECT EXAMINATION
12    BY MS. EHRENBERG:
13    Q.    When were you a graduate student, what
14    years?
15    A.    Many decades ago.
16    Q.    How many?
17    A.    It would have been -- I have to do the
18    math -- I think I entered graduate school in 1960.
19    Q.    You entered in 1960?
20    A.    Yes.
21              ARBITRATOR PEACE:  Meaning at the master's
22    level?
23              THE WITNESS:  Yes.
24    Q.    So the experiences that you were
```

00060

```
 1    describing as a graduate student lab assistant
 2    occurred during the early '60s; is that a fair
 3    statement?
 4    A.    I think that is, yes.
 5    Q.    So that's 40 years ago, correct?
 6    A.    Yes.
 7    Q.    Now, is it your testimony that you based
 8    your judgments in this case on your experience 40
 9    years ago as a graduate assistant?
10    A.    I did not testify to that, no.
11    Q.    And did you?
12    A.    I based some of my decisions on my
13    perception and extensive experience on what is
14    required for laboratory safety and the well-being of
15    those people who function in that laboratory.
16    Q.    Right.  And in reaching those judgments,
17    did you base that on your experience 40 years ago as
18    a graduate assistant?
19    A.    My experience --
20    Q.    That's a yes-or-no question.
21    A.    No.
22    Q.    What's inorganic chemistry?
23    A.    It's basically a field of chemistry.  The
24    particular course that I was assisting in the
```

00061

```
 1    instruction with is often the first general college
 2    chemistry course that college students are exposed
 3    to.
 4    Q.    Does the fact that the course is entitled
 5    "Inorganic Chemistry" have significance as opposed
 6    to "Organic Chemistry"?
 7    A.    Well, the content of each is considerably
 8    does.
 9    Q.    How does inorganic chemistry differ from
10    organic chemistry?
11    A.    Organic chemistry tends to deal with -- one
12    of the definitions used -- organic materials are
```

```
13   principally composed of carbon and hydrogen.
14       Q.   Carbon based?
15       A.   Yes.
16       Q.   Carbon-based molecules; is that correct?
17       A.   Yes.
18       Q.   And inorganic chemistry is noncarbon
19   based?
20       A.   It tends to be the rest of the periodic
21   table.
22       Q.   I mean, if one considers what's living and
23   what's not, is it fair to say that organic chemistry
24   comprehends carbon-based life forms and inorganic
```

00062
```
 1   chemistry does not comprehend living forms?
 2       A.   I think that would be far too broad a
 3   generalization, because all materials, including the
 4   human body, have elements that would be considered
 5   part of inorganic chemistry.
 6       Q.   Oh, I understand that.  But the elements
 7   themselves are not living forms; they may be
 8   contained in a living form, but they do not have
 9   life themselves; is that correct?  The inorganic
10   elements; is that correct?
11       A.   I think that's too broad a generalization.
12            MS. EHRENBERG:  I have nothing further.
13            Wait a minute, I might have something
14   further.
15            (A pause)
16            MS. EHRENBERG:  I have nothing further.
17            MS. MORRIS:  One second.
18            ARBITRATOR PEACE:  That's fine.  I'm
19   waiting.
20            (A pause)
21                RECROSS EXAMINATION
22   BY MS. MORRIS:
23       Q.   President Norman, how, if at all, do you
24   believe that your knowledge of laboratory safety
```

00063
```
 1   related to your experience in inorganic chemistry
 2   and your further experience in labs and jobs that
 3   you held, how, if at all, does that relate to the
 4   biotechnology lab at MassBay?
 5       A.   Oh, I think the laboratories in general are
 6   often places that have hazardous materials,
 7   potentially dangerous equipment, if not employed
 8   correctly, if not utilized properly.  Even some of
 9   the simplest things that we often take for granted
10   in a laboratory can become dangerous and
11   occasionally lethal if not properly used.

12            My initial exposure as a graduate student
13   with very young 17-year-old high school graduates,
14   often taking chemistry for the first time, also
15   impressed upon me that sometimes these people --
16   well, 17 year olds can be 17 year olds at times.
```

```
17    And they can act up; they can take experiments or
18    risks; they're curious.  They can do things that you
19    just wouldn't want to do in the very controlled and
20    structured environment of a laboratory, where you
21    have these hazardous or potentially dangerous
22    things.
23            I even encountered that with technicians
24    that I hired when I was a professional research
```

00064
```
 1    supervisor myself, that I would personally train or
 2    have one of my research engineers personally
 3    supervise until that individual became competent in
 4    a particular technique.
 5            When I was vice president of the steel
 6    company, one of my responsibilities was research.  I
 7    had 300 people under my charge doing laboratory
 8    research, engineering research.  And these were
 9    individuals, some of which had 10, 20 and 30 years'
10    experience, who still on occasions would injure
11    themselves or burn themselves or otherwise have
12    difficulties, if they were careless, if they perhaps
13    had a bad day that morning and weren't paying
14    attention to what they were doing, or just simply
15    had not been properly supervised or trained to do a
16    particular task.
17            So over many, many years, I gained a
18    sensitivity for these things and for laboratory
19    safety.
20            MS. MORRIS:  I have no further questions.
21              REDIRECT EXAMINATION
22    BY MS. EHRENBERG:
23    Q.   Your position as a graduate student
24    assistant in the lab, in that position you drew on
```

00065
```
 1    your past experiences as a laboratory researcher,
 2    correct?
 3    A.   I drew primarily on my experiences as an
 4    undergraduate student who had taken numerous
 5    laboratory science courses and received
 6    instruction.
 7    Q.   Right.  And you received instruction from
 8    either your professor or from graduate students who
 9    were the assistants in your lab, correct?
10    A.   That is correct.
11    Q.   And the graduate students who were
12    assistants in your lab were students who had had
13    previous experience in the lab and had received
14    instruction from their instructors or their graduate
15    assistants, correct?
16    A.   I presume.
17    Q.   But there is a chain of knowledge that is
18    passed from generation to generation, if you will,
19    of instructors to student to student to student to
20    student, correct?
21    A.   From instructor to student, not student to
```

```
         22    student.
         23         Q.   Well, when you were a graduate student, you
         24    instructed undergraduate students, correct?  Is that

00066
          1    correct?
          2         A.   When I was a graduate student, I instructed
          3    undergraduate, but I did not instruct them as an
          4    undergraduate student.
          5         Q.   But when we're talking about the process of
          6    acting as a lab assistant, your job was to
          7    communicate to the people in the lab the safety
          8    policies and procedures and to see that they were
          9    adhered to, correct?
         10         A.   That is correct.
         11         Q.   And that was based on your knowledge of
         12    those safety policies and procedures, correct?
         13         A.   Correct.
         14         Q.   And you obtained that knowledge of the
         15    safety procedures and policies from the instructor,
         16    correct?
         17         A.   From the professor.
         18         Q.   The professor.  Correct?
         19         A.   Yes.
         20         Q.   And you also obtained some knowledge from
         21    your own experience as a student in the lab and
         22    seeing how the safety procedures and policies
         23    operated, correct?
         24         A.   I assume that had to be a factor, yes.

00067
          1         Q.   And when you took responsibility, for
          2    example, for the researchers that you hired, and so
          3    on, you were referring to passing on to them the
          4    benefit of your learning from your past experience
          5    in the lab, correct?
          6         A.   Passing on my expertise.
          7         Q.   Right.
          8         A.   That's correct.
          9         Q.   And when you talked about folks who injured
         10    or burned themselves in the labs that you were
         11    managing, they did so despite your best efforts to
         12    make sure that all the safety policies and
         13    procedures were adhered to, correct?
         14         A.   I assume that could be one interpretation,
         15    yes.
         16         Q.   Well, you weren't lax in your teaching of
         17    the safety policies and procedures, were you?
         18         A.   I hope not.
         19         Q.   Okay.  But despite your thorough and
         20    responsible communication of safety policies and
         21    procedures, sometimes people got hurt anyway because
         22    they lost concentration, correct?
         23         A.   That happens all the time.
         24         Q.   Okay.  And it's also true, is it not,

00068
```

1   during the years that you were president of the
2   College, on no occasion did it come to your
3   attention that any student in Dr. Jackson's class
4   had been injured during his laboratory class times,
5   correct?
6       A.   I don't believe that is correct, because I
7   remember vaguely there was -- I think a student was
8   cut.
9       Q.   Correct.
10      A.   And I remember that just from this
11  morning's testimony.
12      Q.   Now, setting aside that incident, there
13  is not a single other occasion that you can think
14  of that came to your attention of a student
15  injured during a lab overseen by Dr. Jackson,
16  correct?
17      A.   I have vague recollection of one other
18  incident, but I have no specifics.
19      Q.   So you can't tell us anything about it?
20      A.   I can't tell you anything specifically
21  about it, no.
22          MS. EHRENBERG:  I have nothing further.
23          MS. MORRIS:  I have nothing further.
24          ARBITRATOR PEACE:  Okay.  Thank you very

00069
1   much, Dr. Norman, for coming in.
2           THE WITNESS:  Thank you.
3           ARBITRATOR PEACE:  I just wonder if I could
4   talk with the two advocates for a moment off the
5   record.
6           (Hearing suspended at 12:59 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

00070
1               C E R T I F I C A T E
2           I, Anne H. Bohan, Registered Diplomate
3   Reporter, do hereby certify that the foregoing
4   transcript, Volume XVII, is a true and accurate
5   transcription of my stenographic notes taken on

6     April 21, 2004.

7

8

9     _____

10                    Anne H. Bohan
11          Registered Diplomate Reporter

12

13

14              -   -   -   -

15

16

17

18

19

20

21

22

23

24