# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |  |
|---|---|---|
| **BRUCE JACKSON** | ) | |
|      **Plaintiff,** | ) | |
|  | ) | |
| **vs.** | ) | |
|  | ) | |
| **LINDSAY NORMAN,** | ) | **C. A. NO. 05-11429-RWZ** |
| **PAULA GASTEN VELD,** | ) | |
| **GHAZI DARKAZALLI,** | ) | |
| **THOMAS SABBAGH,** | ) | |
| **LAURIE TAYLOR**, | ) | |
| **in their individual capacities** | ) | |
|  | ) | |
|      **Defendants.** | ) | |

———————————————————————

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I.  Introduction

The defendants filed a motion for summary judgment arguing that plaintiff, Bruce

Jackson ("Jackson"), who was dismissed from his employment as a tenured professor at

the Massachusetts Bay Community College ("the College"), received all the procedural

process that was due and was not subject to any violation of substantive due process. The

allegations stem from a termination process set forth in the Collective Bargaining

Agreement ("CBA") between the Union and the Board of Higher Education, which

governs the terms of Jackson's employment. Jackson has cross-moved for summary

judgment, having filed no opposition as of this date to defendants' summary judgment

motion. Jackson claims that he did not receive notice that his conduct would lead to dismissal and that his rights to procedural due process were denied. Jackson claims that the College President, Lindsay Norman ("Norman"), was not an impartial judge at the College administrative hearing and deprived him of procedural due process. Jackson argues also that the College's investigation into complaints about him and termination procedures violated his equal protection rights since the student grievance procedure was not used.

## II.  Procedural Posture

In his summary judgment memorandum, Jackson failed to set forth a statement of material undisputed facts pursuant to Local Rule 56.1.  Failure to include such a statement constitutes grounds for a denial of the motion under the Local Rule. Further, Jackson failed to oppose the statement of undisputed material facts provided by the defendants in their motion for summary judgment. Failure to do so deems that statement of facts admitted by the opposing party. For these reasons, the defendants request that this Court deny plaintiff's summary judgment motion and deem admitted the statement of facts provided by the defendants. Despite these procedural flaws, the defendants respond substantively to Jackson's summary judgment motion in this opposition memorandum.

.

## III.  Undisputed Facts

The defendants submit that the following numbered material facts are not in dispute:

1.      The College hired Jackson as a full time associate professor of microbiology in 1993 and in 2000 he was granted tenure. [1]

2.      In March 2002 the College received complaints from several students in Jackson's classes.[2] An investigation by the College's administration ensued.[3]

3.      At the conclusion of the investigation, defendant Paula Gastenveld ("Gastenveld"), the College's Vice President of Academic Affairs, recommended to Norman that Jackson be dismissed from employment.[4]

4.      Section 15.02 (2) of the CBA provides that "the President of the College shall notify the unit member that the unit member shall be recommended for dismissal…."[5]

5.      Pursuant to the CBA, Section 15.02, Norman notified Jackson of the recommendation for dismissal and provided him with a copy of the report and recommendation of Dean Darkazalli and Vice President Gastenveld.[6]

6.      On June 28, 2002, Norman provided Jackson with a formal statement of charges per the CBA Section 15.02(3): failing to teach, supervise, and be present during class time; rescheduling of class time without authorization; and teaching contrary to the course description.[7]

---

[1] September 12, 2005 Award of Arbitrator, a copy of which is annexed as Exhibit A, p.12.

[2] March 15, 2002 Memorandum from Darkazalli to Jackson, a copy of which is annexed as Exhibit B.

[3] May 16, 2002 Memorandum from Darkazalli to Jackson, a copy of which is annexed as Exhibit C.

[4] May 23, 2002 letter from Darkazalli and Gastenveld to Norman, a copy of  which is annexed as Exhibit D.

[5] June 14, 2000 Agreement between the Board of Higher Education and the Massachusetts Community Council, a copy of which is annexed as Exhibit E.

[6] May 28,2002 letter from Norman to Jackson, a copy of which is annexed as Exhibit F.

[7] June 28, 2002 letter from Norman to Jackson, a copy of which is annexed as Exhibit G.

.    7.    Jackson was afforded a formal hearing as provided by the CBA Section 15.02(4).  That section provides that the President of the College shall conduct the hearing, and that a unit member shall be represented by counsel at the hearing, be afforded an opportunity to obtain evidence, and have the right to confront and cross examine witnesses. The hearing commenced on August 5, 2002 and lasted three days.[8] Jackson was represented by counsel at the hearing.

8.    On August 8, 2002, Norman notified Jackson that he found the charges to have been substantiated and dismissed him from the College.[9]

9.    As provided by the CBA Section 15.02(8), Jackson appealed his dismissal to Judith I. Gill, the Chancellor of Higher Education. On September 16, 2002, the Chancellor's designee upheld Jackson's dismissal.[10]

10.    The Massachusetts Community College Council/ Massachusetts Teachers Association ("the Union") thereafter sought arbitration on Jackson's behalf, per the CBA.[11]

11.    Twenty-three days of arbitration hearings were held between March 12, 2003 and October 26, 2004.  The Arbitrator issued an Opinion and Award on September 12, 2005. She found that Jackson's dismissal was without just cause and was arbitrary and unreasonable, but not capricious.[12]  The Arbitrator remanded the matter for reassessment to the College.

---

[8] A copy of the transcript of the hearing of August 5, 6, 7 2002 is annexed as Exhibit H.

[9] August 8, 2002 letter from Norman to Jackson, a copy of which is annexed as Exhibit I.

[10] September 16, 2002 letter from Tsaffaras to Silverman, a copy of which is annexed as Exhibit J.

[11] September 18, 2002 Demand for Arbitration by Union, annexed as Exhibit K.

[12] Exhibit A, p.41.

12.    By this time, Norman had been succeeded by Dr. Carole Berotte Joseph, who reinstated Jackson to his position[13] and paid him back pay and benefits.[14]

### IV.  Argument

**A.    The Applicable Summary Judgment Standard.**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A "material fact" is "a contested fact [that] has the potential to change the outcome of the suit...."  McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). "Genuine" is defined as when "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party."  Id.

**B.    Jackson Was Not Deprived Of Due Process.**

**1.  An Arbitraton Award  has no precedential effect.**

Jackson claims that his dismissal and its consequences violated his right to procedural due process.  Jackson's statement of facts in his memorandum to support this argument rests on an Arbitration Award, rather than any constitutional analysis in the case law.  It is black-letter law that arbitration awards are not entitled to the precedential effect accorded to judicial decisions. El Dorado Technical Services, Inc. v. Union General De Trabajadores De Puerto Rico, 961 F.2d 317, 322 (1st Cir. l992).  An arbitration award is not considered binding or conclusive even in subsequent cases involving the same contract language but different grievances.  Courier Citizen Co. v.

---

[13] October 19, 2005 letter to Jackson from Joseph, annexed as Exhibit L.
[14] December 2005 and 2006 letters documenting back pay and reimbursed medical expenses, annexed as Exhibit M.

Boston Electrotypers Union No. 11, 702 F.2d 273, 280 (1st Cir. 1983).

The required constitutional analysis for a due process violation is set forth in defendants' Memorandum of Law in Support of its Motion for Summary Judgment, pp. 4-9, which is incorporated by reference to this Memorandum.**15**  Because Jackson does not raise substantive due process violations in his memorandum, the defendants request that the Court adopt their substantive due process arguments set forth in defendants' Memorandum of Law, pp. 9-11.

Further, the case law that the plaintiff cites in support of his assertion of procedural due process violations is inapposite and distinct. Plaintiff erroneously concludes that the case of Cotnoir v. University of Maine Systems, 35 F.3d 6 (1st Cir. l994), is "instructive."  An analysis of the Cotnoir case finds it dissimilar to the case at bar.  The other cases plaintiff cites are attorney disbarment proceedings, which are appropriately analyzed under the United States Supreme Court attorney disbarment standards rather than the Loudermill due process standards.**16**  Cleveland Board of Education v. Loudermill,  470 U.S, 532, 542 (l985); see, e.g., Dailey  v. Vought Aircraft Co., 141 F.3d 224, 231 (5th Cir. l998).

In Cotnoir, a tenured public university professor who was terminated brought a Section 1983 action against the university, alleging that his procedural due process rights were violated. Id. at 8.  After receiving a faculty complaint about the plaintiff, an investigation ensued and a report was generated containing a finding on the matter and a

---

**15** Defendants' Memorandum of Law in Support of its Motion for Summary Judgment, Jackson v. Norman, No. 05-11429-RWZ, a copy of which is annexed as Exhibit N.

**16** Disbarment or suspension proceedings are adversarial and quasi-criminal in nature. A federal court may only disbar an attorney upon clear and convincing evidence of a violation warranting this extreme sanction.  Id. at 279.

recommendation for dismissal of the plaintiff.  Id.  An administrator met with the plaintiff

but did not give him the report or tell him that there was a recommendation for dismissal.

Id.  Shortly thereafter, the plaintiff was terminated.  Id.

After the termination, the administrator met with the plaintiff and his

representative three times, but no hearing was held.  Id.  A report was then generated

asserting that there was just cause to terminate the plaintiff. The plaintiff filed another

grievance with the Chancellor, who upheld the dismissal.  Id. at 9.  Plaintiff waived his

right to appeal the decision.  In finding that the plaintiff was denied procedural due

process, the court reasoned that the university's investigation was not a hearing where

plaintiff could have an opportunity to present his side of the story.  Id. at 13.  Absent such

a hearing, a failure to apprise plaintiff of the evidence against him and the decision to

dismiss plaintiff fell short of the Loudermill standards.  See Loudermill, 470 U.S. at 542.

Cotnoir is factually distinct from the instant case, which comprised not only an

investigation, but also meetings with Jackson, a notice of the College's proposed

recommendation of dismissal, a statement of formal charges, a presentation of the

evidence and three days of hearings. Unlike Cotnoir, Jackson was provided both a pre-

termination process and a post-termination hearing.[17]

Here, the Arbitrator found that the recommendation to terminate Jackson was

made by Gastenveld and Dean Darkazalli on May 23, 2002 in a letter addressed to

President Norman for "failure to fulfill the duties of the position in which he is

---

[17] Jackson cannot allege a denial of procedural due process where this post deprivation remedy was available. Licari v. Ferruzzi, 22 F. 3d 344, 347 (1st Cir.1994) (no violation of procedural due process where adequate post deprivation remedies available).

employed."[18]  This recommendation was not made until after student complaints were made about Jackson, an investigation took place, and the administration met with Jackson several times. After receiving student complaints, the administration scheduled a meeting with Jackson on March 28, 2002, where Jackson was represented by a colleague, Professor Chandrakant Pansé.[19]  At this meeting, Jackson was informed that the administration would be talking to other students "to be fair."[20]  These students were interviewed regarding Dr. Jackson's presence in the laboratory.[21]  There was considerable testimony in the record regarding the content of these interviews.[22]  Another meeting with the administration and Jackson was held on April 26, 2002 regarding the student complaints.[23]  On May 16, 2002, Jackson was sent a packet of materials relating to the investigation of the student complaints, which included a chronology of the complaint, a summary of the student's interviews and other memoranda.[24]  Additional correspondence was sent to Jackson, including the June 28, 2002 notice of termination, pursuant to Section 15.02(3) of the CBA. It was this entire process that the Arbitrator relied on in finding that the decision to terminate Jackson was "not made on a whim" and thus not capricious.  This process was absent in Cotnoir, which distinguishes it from the instant case.

**2.Plaintiff cannot overcome the presumption that Norman was a sufficiently impartial adjudicator.**

---

[18] Exhibit D.
[19] Exhibit A, p.18.
[20] Id. at 18.
[21] Id. at 19.
[22] Id.
[23] Id. at 22.
[24] Exhibit C.

As this Court recognized in its Order of June 19, 2006, there is a legal presumption that administrators are "men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." <u>Jackson v. Norman</u> Memorandum of Decision, No. 05-11429-RWZ at 3 (D. Mass. June 19, 2006), quoting <u>Brasslett v. Cota</u>, 761 F.2d 827, 837 (1st Cir. 1985) (citations omitted). To overcome this high threshold, Jackson would have to show an actual risk of partiality. <u>Id</u>. Proving actual risk requires a "specific demonstration of partiality." <u>Id</u>. Jackson alleges, *inter alia*, that Norman refused him tenure as evidence of prior animosity.

The decision to refuse tenure to Jackson in 1999 was based on a contractual obligation imposed by the CBA.[25] According to the CBA, faculty were eligible for tenure based on length of service, required student evaluations and administrative evaluation. The record showed that in the 1998-99 academic year Jackson did not conduct student evaluations, and received an unsatisfactory review on his performance appraisal. Pursuant to the CBA, to be considered eligible for tenure, "the unit member must have received other than unsatisfactory on the unit member's most recent evaluation." CBA § 11.03, "Tenure of Full Time Unit Members."

Under Section 11.03 of the CBA, Norman had no choice but to refuse Jackson tenure in 1999 because Jackson was not in compliance with the CBA's tenure provisions.[26] Further, Norman acted on the recommendation of designated deans, supervisors and committees pursuant to that section. Even with this negative tenure

---

[25] June 4, 1999 letter from Norman to Jackson, a copy of which is annexed as Exhibit O.
[26] <u>Id.</u>

review history, and with no imperative in the CBA to do so, Norman encouraged Jackson

to address these issues in the future to remain eligible for tenure.[27]  In 2000, Norman

granted Jackson tenure.

Despite this favorable tenure decision, Jackson filed lawsuits in federal and

superior court in response to accusations by faculty or students.[28]  Jackson also accused a

faculty member of OSHA violations when he was accused of repeatedly interrupting that

colleague's class during instructional time.[29]  It is clear in the record that Jackson had

turbulent relations with several administrators, faculty and students at the College.[30]

Jackson's pattern and practice of engaging in litigation and then alleging animosity as a

result of litigation, if allowed, compromises the ability of the College to run its business

enterprise.[31]

Jackson further asserts that Norman prejudged the College hearing and was

biased.  Jackson attaches affidavits as exhibits to his memorandum to support this

purported bias.  Along with this Memorandum, the College has filed a motion to strike

these affidavits of Glenda Batzer, Donald Karp and Sarmad Saman on hearsay grounds.

That motion is incorporated by reference into this Memorandum.[32]  Notably, none of

---

[27]  April 21, 1999 letter from Norman to Jackson, a copy of which is annexed as Exhibit P.

[28] Complaints originating from his employment at the College that Jackson filed include: Jackson v. Norman, 2002 WL 31121090 (D. Mass. 2002), *dismissal with prejudice vacated by, dismissal without prejudice ordered by* Jackson v. Norman, 91 Fed. Appx. 696, 697 (1st. Cir. 2003); Jackson v. Darkazalli, No. 2002-00660 (Mass. Super. filed Apr. 22, 2002); Jackson v. Taylor, No. 1999-00547 (Mass. Super. filed Apr. 6, 1999).

[29] November 7, 2001 Memorandum from Darkazalli to Gastenveld with attachments including and e-mail of October 5, 2001 from Darkazhalli and an e-mail of September 25, 2001 from Sarmad Saman annexed as Exhibit Q.

[30] Exhibit A, p.41.

[31] On July 26, 2002 Jackson attempted to stop the College termination hearing by filing a complaint in the District Court of Massachusetts, seeking an injunction and asking the federal district court to clarify the due process rights of the parties. After a hearing, this Court dismissed the complaint.

[32] March 14, 2007 Motion to Strike Affidavits by the defendants, annexed as Exhibit R.

these affiants were called as witnesses to the College hearing where they could have

testified to the alleged bias and been cross-examined.

　In fact, Jackson chose not to call any witnesses at all in the College hearing,

which Norman did not and could not control pursuant to procedures set forth in the CBA.

While calling no witnesses, Jackson testified on his own behalf, despite the availability of

a procedure in the CBA to call other witnesses.[33]

Inexplicably, Jackson argues that the presumption of Norman's impartiality is

destroyed by the introduction any facts to the contrary.[34]　However, the First Circuit has

not adopted this interpretation. Plaintiff erroneously cites the case of United States v.

Jessup to support his assertion. See 757 F.2d 378, 382 (1st Cir. 1985). In that case, the

presumption at issue was that one charged with a serious drug offense would likely flee

before trial.　Id. at 380.　After stating the definition of a "bursting bubble" interpretation,

the First Circuit Court of Appeals plainly stated that such an approach would go against

the Congressional intent behind the presumption because surely any defendant could

present *some* evidence that he would not flee. Id. at 383.　The court then proceeded to

espouse a "middle ground" approach to rebuttable presumptions: that is, a presumption

neither shifts the burden of persuasion nor "bursts" once contrary evidence is presented.

*See* id. at 383-84.　While the court did not conclusively adopt the middle ground

approach for all presumptions, they also did not adopt the bursting bubble approach.　*See*

---

[33] The transcript of the College hearing was approximately 900 pages.  Jackson's direct examination is contained in
156 pages, pp.7-163.  He called no witnesses.  See Exhibit H.

[34] Plaintiff's Memorandum in Support of Motion for Summary Judgment, p.10.

id. Thus, the plaintiff cannot rely on the bursting bubble interpretation to reduce the burden he must overcome to prove partiality.

It is clear that Jackson has not overcome the very high threshold for impartiality. As a matter of law, he cannot prevail on this issue because he has failed to show any particular, compelling example of Norman's alleged partiality. The defendants, moreover, can point to several concrete facts to demonstrate Norman's impartiality in this case.

First of all, Norman did not initiate the investigation of Jackson. In fact, Norman was not involved in the investigation until he received a letter dated May 23, 2002, signed by Dean Ghazi Darkazalli and Vice President Gastenveld, recommending Plaintiff's dismissal.[35] Moreover, even if he had initiated the investigation, that would not disqualify him as an impartial decisionmaker. O'Brien v. DiGrazia, 544 F.2d 543, 547 (1st Cir. 1976); see also Jackson v. Norman, Memorandum of Decision, No. 05-11429-RWZ at 3 (D. Mass. June 19, 2006). Second, in 2000 Norman recommended Jackson for tenure, despite a negative tenure history. Third, as evidenced by the May 23, 2002 letter from Darkazalli and Gastenveld, Norman did not recommend dismissal; Darlazalli and Gastenveld did. Finally, Jackson failed to show the basis of his allegations that Norman was a partial adjudicator when he was specifically asked to do so during discovery.[36] In conclusion, the available facts not only fail to overcome plaintiff's

---

[35] Exhibit D.

[36] Plaintiff's Response to Interrogatories of Defendant, November 20, 2006 (which are not executed by the plaintiff, but by his lawyer) Interrogatories 5, 6, 7, 9, annexed as Exhibit S.

significant burden of proving partiality, they provide ample support for the contention

that Norman was a fair and impartial adjudicator.

### C. As A Matter Of Law, Plaintiff Was Not Constitutionally Entitled To A Wholly Impartial Decision Maker.

Even if Jackson could prove that Norman was not an impartial decision maker, an

employee facing discharge is not entitled to a wholly impartial decision maker.  This

Court has acknowledged that "it is not required that a hearing be conducted before an

'impartial decisionmaker.'…In fact the hearing may be presided over by the employer

himself."  Jackson v. Norman, Memorandum of Decision, No. 05-11429-RWZ at 3 (D.

Mass. June 19, 2006), quoting Acosta-Sepulveda v. Hernandez-Purcell, 889 F.2d 9, 12

(1st Cir. 1989), citing Feliciano-Angulo v. Rivera-Cruz, 858 F.2d 40, 44 (1st Cir. 1988).

A hearing before an employer ensures that "at least the [employer] will be alerted to the

existence of disputes about facts and arguments about cause and effect." Feliciano-

Angulo at 44.  The terms of Jackson's employment were governed by the CBA, which

expressly requires that "[t]he president of the College shall conduct the hearing…"

Section 15.02(5).  Further, the Rule of Necessity provides that judges may hear a case in

which they have an interest, where there is no provision for appointment of another

judge.  Thus, there was no alternative for anyone other than President Norman to conduct

the hearing.

### D. Defendants did not deny Jackson of equal protection under the law by not using the student grievance process to investigate complaints of faculty.

13

**1. The Applicable Equal Protection Standard.**

Jackson has set forth a "class of one" equal protection claim. To prevail on this claim, plaintiff must meet three requirements: he must show that he was intentionally treated differently from others similarly situated, that no rational basis existed for that difference in treatment, and that the different treatment was based on a malicious or bad faith intent to injure. Buchanan v. State of Maine, 469 F. 3d 158, 177-78 (1st Cir. 2006). Further, plaintiff must "identify and relate specific instances…that have the capacity to demonstrate that [plaintiffs] were singled…out for unlawful oppression." Buchanan, supra, at 178 (citing *Rubinovitz v. Rogato*, 60 F.3d 906 (1st Cir. 1995)). As is shown below, plaintiff has not satisfied any of these requirements.

**2. Plaintiff cannot meet the three-prong equal protection standard.**

To satisfy the first requirement, plaintiff must show that he was intentionally treated differently from others similarly situated. As the United States Supreme Court has stated, "the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same."[37] Tigner v. Texas, 310 U.S. 141, 147 (1940). Although the plaintiff contends that he was treated differently from other faculty members who were the subject of complaints, it would be difficult if not impossible to say that all such faculty were "in all relevant respects alike," as the United States

---

[37] In fact, several cases cited by plaintiff declined to recognize equal protection violations on this basis. In Toledo v. Sanchez, for example, a disabled student at the University of Puerto Rico claimed that he was given a failing grade because of the University's "discriminatory animus." 454 F.3d 24, 33-34 (1st Cir. 2006). The Court of Appeals for the First Circuit, however, found that the plaintiff was not similarly situated to other students because he was repeatedly 45 minutes late to class, was absent for several weeks due to a hospital stay, and that many of his assignments were late or incomplete. Id.

Supreme Court requires.  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992); Pagan v. Calderon, 448 F.3d 16, 35 (1st Cir. 2006).

Plaintiff fails to prove that any other alleged instances of complaints against faculty were similarly situated to his case but treated differently, [38] despite his conclusory statement that he was "uniformly treated differently from other faculty against whom complaints had been made."[39]  Furthermore, Jackson's claim that "several equally important, or even almost identical complaints, were not investigated at all," is without merit.  He alleges that the defendants did not investigate safety complaints against fellow faculty member Dr. Sarmad Saman.[40] However, a letter from Darkazalli to Gastenvald[41] specifically states that "[Jackson's] allegations related to lab safety are being reviewed…"[42]

Even if plaintiff could meet the first requirement for his equal protection claim, he must go on to prove the second: that the defendants' choice not to use the student grievance procedure was irrational or arbitrary.  As the Court of Appeals for the First Circuit noted in Wojcik v. Massachusetts State Lottery Commission, "The legal test we apply to appellee's conduct is an exceptionally deferential one. An equal protection claim will only succeed if the decision to treat an individual differently than those similarly situated is *wholly* 'arbitrary or irrational.'"  300 F.3d 92, 104-05 (1st Cir. 2002)

---

[38] Plaintiff had the opportunity to set out such examples during discovery but failed to do so. For example, when asked for a description of the basis of his equal protection claim, plaintiff's answer was unresponsive. See Plaintiff's Response to Interrogatories of Defendants, Interrogatory No. 7, annexed as Exhibit S.

[39] Plaintiff's Memorandum in Support of Motion for Summary Judgment at 21.

[40] Id.

[41] Exhibit P.

[42] Moreover, that same letter points out that plaintiff's allegations of unsafe lab practices against. Saman were raised only after Saman filed a complaint regarding Jackon's disruptive behavior during one of Saman's classes.

(emphasis added).  Plaintiff has a heavy burden to meet, since there is a strong presumption in favor of the defendants.**43**   *See* <u>Heller v. Doe</u>, 509 U.S. 312, 320 (1993). To overcome that presumption, plaintiff would have to show that there was no reasonably conceivable set of facts that would provide a rational basis for the defendants' conduct. *See* <u>id.</u>

Plaintiff has not overcome that presumption. He provides no support for his contention that the defendants had no rational basis for their decision not to utilize the student grievance procedures in his case. Moreover, the defendants can demonstrate that they did have a rational basis for that decision.

First, the section of the College's Student Handbook entitled "Utilizing the Student Grievance Procedure" states that the procedures are permissive, not mandatory.**44** That section begins by stating: "The Student Grievance Procedure *may* be used by a student to address complaints…"  This can be contrasted with the language of the third paragraph of that section, which states: "If a complaint involves a grade dispute, a student *shall* process the complaint in accordance with the Student Grievance Procedure…" Thus, the defendants' decision not to utilize the student grievance procedure was completely within their discretion.

Second, the student grievance procedure was not the appropriate procedure to use in plaintiff's case. As its title suggests, the procedure is in place for *students*; it is not a mechanism to be initiated by the school's administration. The procedure's explicit goal is

---

**43** This proposition stems from <u>Heller v. Doe</u>, where the use of different standards for the  commitment of mentally ill and mentally retarded persons did not violate the equal protection clause. Although the factual setting in that case is different from the case at bar, the rational basis analysis remains the same.

**44** For references to the Student Grievance Procedure throughout this section, see MBCC 2001-2002 Student Handbook at 111-112, annexed as Exhibit T.

to help students resolve conflicts when they feel their rights have been abridged. It is not an appropriate avenue for the investigation of whether a faculty member was in violation of the CBA. Thus, the fact that the defendants did not use the student grievance procedure is not evidence that their conduct had no rational basis. In fact, the only evidence plaintiff offers to support that contention is a statement from the Arbitrator's Award, which, as discussed above at page 5 has no precedential value in this Court.[45] Thus, plaintiff has failed to overcome the presumption that defendants' conduct was constitutional.

Finally, even if Jackson managed to satisfy the first two requirements for his equal protection claim, he must show that defendants' allegedly differential treatment was based on malicious or bad faith intent to injure. Buchanan, supra, at 178. Plaintiff has not demonstrated any such intent. Rather, he makes only "vague allusions…while failing to back them up with sufficient argument and record citation." See Wojcik, supra, at 105. For example, he makes the conclusory statement that the defendants' conduct during his investigation "demonstrates quite clearly that there was an intention to dismiss Jackson."[46] His only support for this allegation, however, comes from sources that, as discussed above, have no evidentiary value in this court.[47]

In conclusion, for the reasons stated above, Plaintiff has failed to meet the three requirements of a "class of one" equal protection claim.

**E. Defendants are entitled to qualified immunity**.

---

[45] Plaintiff's Memorandum in Support of Motion for Summary Judgment at 23.

[46] Id. at 22.

[47] Id.

17

Even if the defendants were determined to have violated Jackson's rights to due process and equal protection, they are not financially liable on the grounds of qualified immunity. As Jackson has not challenged defendants' qualified immunity arguments set forth in defendants' Memorandum in Support of Summary Judgment , the defendants request that the Court adopt those arguments and the arguments that appear below.

The law is clear that qualified immunity shields government actors from damages conduct "unless a reasonable official would have known, in light of clearly established law, that he was acting unconstitutionally." Jordan v. Carter, 428 F.3d 67, 71 (1st Cir. 2005) (citations omitted).

A three-part inquiry determines whether qualified immunity applies. Mihos v. Swift, 358 F.3d 91,102 (1st Cir. 2004). A court must first consider whether the plaintiff's allegations, if true, establish a constitutional violation. Id. Second, the court must determine whether the right allegedly violated was "clearly established" at the time of the challenged conduct. Id. Third and finally, if the first two questions are answered in the affirmative, the court must determine "whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." Id. If the final answer is "no," the defendant or defendants are entitled to qualified immunity notwithstanding any constitutional injury to the plaintiff. Jordan, 428 F.3d at 72.

Jackson fails to meet the first part of this test because he has not established a constitutional violation for the reasons set forth in this memorandum of law at pp. 5-17. However, even if Jackson's rights to due process and equal protection had been violated,

as required by part one, the relevant law in has not been "clearly established," as required

by part two.

The question of whether a right has been "clearly established" must be undertaken

"'in light of the specific context of the case, not as a broad general proposition.'" <u>Suboh</u>

<u>v. District Attorney's Office of Suffolk District</u>, 298 F.3d 81, 93 (lst Cir.2002) quoting

<u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  It has not been clearly established that

dismissal of a tenured public professor pursuant to CBA procedure, or the use of protocol

other than student grievance procedures to investigate complaints of faculty, would

violate due process or equal protection guarantees. In the absence of existing case law,

defendants had no fair warning that their conduct was in violation of plaintiff's

constitutional rights. <u>Suboh</u>, 298 F.3d at 93.

Finally, even if Jackson were able to meet the first two parts of the test for

qualified immunity, the defendants would still be entitled to qualified immunity because

part three requires that a "similarly situated reasonable official" would have understood

that the challenged action violated the constitutional rights at issue.  The defendants acted

in what they believed were the best interest of their students.  They followed the CBA in

moving to dismiss Jackson and conducted an investigation on complaints of Jackson.

Even if these actions were less than ideal, the defendants would still be entitled to

qualified immunity, which has been applied broadly that  "'all but the plainly incompetent

or those who knowingly violate the law' are protected from civil rights suits for money

damages."  <u>Hegarty v. Somerset County</u>, 53 F.3d 1367, 1373 (1st Cir. 1995) quoting

<u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991).  There is no evidence of plain incompetence

on the part of the defendants, nor that they knowingly violated the law, hence the defendants are entitled to qualified immunity.

**IV.    Conclusion**

In addition to the procedural reasons set forth in p.2 of this memorandum, summary judgment should be granted in the defendants' favor because Jackson received all procedural process that was due and he was not subjected to any violation of substantive due process or equal protection guarantees.  Moreover, even if Jackson had suffered constitutional error, the defendants would be protected by qualified immunity because such error was neither clearly established nor would it have been apparent to reasonable officials in the specific circumstances of this case.

LINDSAY NORMAN, PAULA GASTENVELD, LAURIE TAYLOR, GHAZI DARKAZALLI, THOMAS SABBAGH, in their individual capacities,

By their Attorney,

MARTHA COAKLEY

ATTORNEY GENERAL

/s/Teresa Walsh _____
Teresa Walsh
BBO # 550047
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02l08
6l7-727-2200 ext.2578

20

## <u>CERTIFICATE OF SERVICE</u>

I, Teresa Walsh, Assistant Attorney General, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the notice of electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants by first class mail, postage prepaid.


/s/ Teresa Walsh
Teresa Walsh
Assistant Attorney General
Trial Division

Dated:  March 14, 2007

21